# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                            No. CR 12-0128 JB

RAMON GONZALEZ, SR.,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Suppress, filed August 7, 2014 (Doc. 675)("Motion"). The Court held evidentiary hearings on the Motion on January 22, 2015, January 28, 2015, and January 30, 2015. The primary issues are: (i) whether the United States Drug Enforcement Agency's investigation of the Homero Varela Drug-Trafficking Organization ("Varela DTO") gave Luis Almonte and Manny Marquez -- sheriff's deputies with the El Paso County Sheriff's Office -- probable cause to stop Defendant Ramon Gonzalez, Sr.'s truck and to search his trailer on November 10, 2011; (ii) whether the Court will suppress the cocaine and marijuana that Almonte and Marquez discovered in Gonzalez, Sr.'s trailer, and Gonzalez, Sr.'s post-arrest statements as fruit of an unlawful search and seizure under the Fourth Amendment to the United States Constitution; and (iii) whether, if the Court cannot impute probable cause from the DEA's investigation of the Varela DTO to Almonte and Marquez, their stop of Gonzalez, Sr.'s truck and search of Gonzalez, Sr.'s trailer violated the Fourth Amendment. Under the collective knowledge doctrine, the DEA's investigation of the Varela DTO gave Almonte and Marquez probable cause to stop Gonzalez, Sr.'s truck and to search his trailer. Accordingly, the Court will not suppress the cocaine and marijuana that the deputies

discovered in Gonzalez, Sr.'s trailer, and will not suppress Gonzalez, Sr.'s post-arrest statements as the fruit of an unconstitutional search or seizure.[1]  If the Court could not impute probable cause from the DEA's investigation to the deputies, however, their search of Gonzalez, Sr.'s trailer was unlawful, and the Court would suppress the drugs that they discovered during their search and Gonzalez, Sr.'s post-arrest statements as the fruit of an unlawful search and seizure. Consequently, the Court will deny the Motion.

## FACTUAL BACKGROUND

When ruling on a motion to suppress, the Court must state its essential findings on the record.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d)'s purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.   See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982)("[U]nder Rule[] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'"  (quoting United States v. Matlock, 415 U.S. 164, 174 (1974))).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege.").

---

[1]The Motion does not raise any Fifth Amendment challenges to Gonzalez, Sr.'s statements, but argues only that they are "fruit of the poisonous tree[,] because the arrest and comments made were a direct result of the drugs found during the illegal search."  Motion at 8.

Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments.  In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)[2]("We need not resolve whether Crawford [v. Washington, 541 U.S. 36 (2004)]'s[3] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"); United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is beyond reasonable debate that

---

[2]United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266 (10th Cir. 2005).  The Court finds that United States v. Sauzamedz-Mendoza, 595 F. App'x 769 (10th Cir. 2014)(unpublished), United States v. Garcia, United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010)(unpublished), United States v. Montes-Ramos, 347 F. App'x 383 (10th Cir. 2009)(unpublished), United States v. Olivares-Campos, 276 F. App'x 816 (10th Cir. 2008)(unpublished), United States v. Romero, 247 F. App'x 955 (10th Cir. 2007)(unpublished), United States v. Reed, 195 F. App'x 815 (10th Cir. 2006)(unpublished), United States v. Wilson, 96 F. App'x 640 (10th Cir. 2004)(unpublished), United States v. Herrell, 41 F. App'x 224 (10th Cir. 2002)(unpublished), all have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[3]Crawford v. Washington stands for the proposition that testimonial out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross examine the witness.  See 541 U.S. at 53-54.

Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."). Cf. United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").[4]

**1.      The DEA's Investigation of the Varela DTO.**

1.      Special Agent Gerald Maestas has worked for the DEA for approximately fifteen years, and has been involved in at least ten wiretap investigations. See Transcript of Hearing at 19:17-23 (taken January 22, 2015)(Maestas), filed March 30, 2015 (Doc. 753)("Jan. 22, 2015, Tr."); id. at 27:7-9 (Maestas).

2.      By the time Maestas reviewed the intercepted telephone calls related to what would later become known as the El Paso Drug Seizure -- i.e., the seizure of the cocaine and marijuana that the deputies discovered in Gonzalez, Sr.'s trailer -- he had spent approximately

---

[4]Gonzalez, Sr. does not object under Crawford v. Washington to any evidence in this case; the Court, therefore, need not decide whether Crawford v. Washington applies to suppression hearings.  The Court notes, however, that the courts that have decided whether the Confrontation Clause applies to suppression hearings have found that Crawford v. Washington does not apply to suppression hearings.  See Ebert v. Gaetz, 610 F.3d 404, 414 (7th Cir. 2010)(Tinder, J., joined by Posner & Rovner, JJ.)(holding the right of confrontation does not apply at a suppression hearing); United States v. Garcia, 324 F. App'x at 708 ("There is no binding precedent from the Supreme Court or this court concerning whether Crawford applies to pretrial suppression hearings.  To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia."). Cf. United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007)("[W]e hold that Crawford v. Washington does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence."); United States v. Saneaux, 365 F. Supp. 2d 493, 498 n.5 (S.D.N.Y. 2005)(concluding that Crawford v. Washington does not apply to determining whether a statement is admissible under the co-conspirators hearsay exception: "[B]ecause the Court is not bound by the Rules of Evidence in the disposition of preliminary matters such as this one, I may properly consider such evidence even if it cannot be introduced at trial.").

eight months as the case agent in charge of the DEA's investigation of the Varela DTO.  See Jan. 22, 2015, Tr. at 27:14-18 (Swainston).

3.       The DEA's investigation of the Varela DTO involved, among other things:  (i) the development and use of at least eight confidential sources, who collectively provided reliable, active, and historical information about the organization, Varela, Gonzalez, Sr., and numerous other associates of the organization dating back to at least 2009; (ii) the use of undercover agents; (iii) the review and analysis of electronic data, which included an analysis of the use of cellular telephones by members and associates of the Varela DTO; (iv) physical surveillance, including the use of a pole camera; and (v) the examination of discarded trash.  See Jan. 22, 2015, Tr. at 27:19-29:16 (Swainston).

4.       Beginning in July, 2011, the United States District Court for the District of New Mexico authorized four wiretaps for the DEA's investigation.  See Jan. 22, 2015, Tr. at 29:16-21 (Swainston).

5.       In July, 2011, Maestas identified Gonzalez, Sr. as a drug smuggler, a Sinaloa Cartel associate, and a Varela associate.  See Jan. 22, 2015, Tr. at 29:24-30:6 (Swainston).

6.       The DEA began intercepting telephone calls between Varela and Jaime Ibarra-Solis, whom Maestas had identified as Varela's primary source of supply of illegal drugs.  See Jan. 22, 2015, Tr. at 30:14-18 (Swainston).

7.       Maestas determined, through reviewing telephone toll records[5] and intercepted communications from Varela and others, that Gonzalez, Sr. was communicating with J. Ibarra-Solis.  See Jan. 22, 2015, Tr. at 30:19-21 (Swainston).

---

[5]The Honorable D. Brook Bartlett, then-Chief Judge of the United States District Court for the Western District of Missouri, provides the best explanation of telephone toll records that the Court has found.  According to Judge Bartlett, telephone toll records

8.     From November 3, 2011, through November 11, 2011, the DEA intercepted approximately twenty pertinent telephone calls between: (i) Varela and J. Ibarra-Solis; (ii) Varela and Gonzalez, Sr.'s nephew, Andres Gonzalez; (iii) Varela and Gonzalez, Sr.'s son, Ramon Gonzalez, Jr.; (iv) Varela and Steve Chavez; and (v) Varela and Gonzalez, Sr.  See Jan. 22, 2015, Tr. at 31:2-7 (Swainston).

9.     Based on his assessment of the intercepted communications, Maestas believed that a shipment was about to occur, in which Gonzalez, Sr. and A. Gonzalez would transport cocaine from J. Ibarra-Solis to Varela.  See Jan. 22, 2015, Tr. at 31:12-18 (Swainston).

10.    On or about November 9, 2011, Maestas directed other agents and officers to use a "walled-off stop"[6] to intercept the shipment in El Paso, Texas.  Jan. 22, 2015, Tr. at 32:19-24 (Swainston).

**2.     Wiretap Evidence Showing a Drug Shipment Was Likely Imminent.**

11.    What follows in the findings of fact is primarily Maestas' interpretation of the intercepted communications, with which the Court agrees; following each finding of fact, there is a citation sentence that provides a direct quotation or synopsis of the telephone conversation --

---

cover[] all records maintained of individual calls made from a particular telephone number or attributed to it that are or could be the subject of a particularized charge depending on the billing plan offered by the provider and accepted by the customer.  In other words, a telephone toll billing record is broad enough to cover all records of calls from or attributed to a particular number, regardless of whether, in fact, a separate charge is assessed for each call.

In re Matter of Grand Jury Subpoenas to Sw. Bell Mobile Sys., Inc., 894 F. Supp. 355, 359 (W.D. Mo. 1995).

[6]A walled-off stop is when officers who are not involved in the wiretap investigation obtain their own probable cause -- typically based on a motor vehicle code violation -- independent of the wiretap investigation to do a traffic stop of the target vehicle.  See Jan. 28, 2015, Tr. at 185:14-24 (Swainston, Lopez).

translated from Spanish into English -- that Maestas is interpreting.  It appears that, where the direct quotation or synopsis includes pronouns, the Spanish translator attempted to identify each pronoun's antecedent in parentheses.  In other words, the content in the parentheses was not explicitly stated during the telephone conversations, but added by whomever interpreted the calls.  This information is the rawest data that the Court has for these telephone conversations. Gonzalez, Sr. has not argued that any of the synopses or direct quotations inaccurately translated Spanish into English.[7]

### a.   Telephone Conversations Between Varela and J. Ibarra-Solis.

12.   In a November 2, 2011, telephone call, Varela told J. Ibarra-Solis that he was preparing a horse trailer that would be ready in January, 2012, in which he could transport larger shipments of cocaine.  See Jan. 22, 2015, Tr. at 94:15-21 (Swainston, Maestas); Session Number: 11 (Nov. 3, 2011) at 3,[8] admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 11").[9]

---

[7]The linesheets also occasionally include the letters "NFI" or "UNK" in brackets or parentheses.  The United States has not explained what those letters mean, but it appears that the translators used those letters when they could not determine the antecedent of a pronoun used in the same sentence; in other words, it was a shorthand for "No Further Information" or "Unknown."  The linesheets also include ellipses.  To avoid any confusion, where the Court has altered a synopsis -- a word, added or removed a punctuation mark -- it will place those alterations in bolded brackets or bolded ellipses.  Any ellipses or brackets -- and those brackets' content -- that are not bolded are in the original linesheet.

[8]The Court will use the linesheets' internal pagination -- i.e., the numbers in the center of the bottom of each page -- to cite the linesheets.

[9]The content of the conversation, translated from Spanish into English, is as follows:

> UM471 asked if Varela almost finished his ride.  Varela replied that he was not doing that (ride) until January of next year, and added that he had a bad ass trailer for six horses like the aluminum one that he (Varela) had sold to UM471's nephew.  UM471 concurred and said that it (trailer) was bad ass. Varela said that it (ride) won't be ready until January.  UM471 told Varela to get ready and that UM471 would help him (Varela) to accommodate it (ride) big

13.     Varela told J. Ibarra-Solis that, sometimes, he would ask his source of supply for thirty to forty kilograms of cocaine, receive the cocaine on consignment, and then pay the source of supply when he sold the drugs.  See Jan. 22, 2015, Tr. at 96:15-97:3 (Swainston, Maestas); Call 11 at 4.[10]

14.     In a November 4, 2011, telephone call, Varela asked J. Ibarra-Solis if he expected a cocaine shipment soon.  See Jan. 22, 2015, Tr. at 97:24-98:4 (Swainston, Maestas); Session Number: 22 (Nov. 4, 2011) at 3, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 22")("Varela told UM471 that he was checking to find out what time they [UNK] are coming, and have they [UNK] told UM471 what time they would be coming.  UM471 told Varela that he would call and find out, but he first needs to go to the doctor to have his stitches removed.").

15.     In a subsequent call on November 4, 2011, Varela learned that J. Ibarra-Solis' driver backed out of his agreement to transport the cocaine.  See Jan 22, 2015, Tr. at 98:5-11 (Swainston, Maestas); Session Number: 79 (Nov. 4, 2011) at 7, admitted at the January 22, 2015,

_____

time.  Varela agreed and said that he's not worried about getting work, because with this (ride) is how one gets ahead, and the way that they (Varela et al) are handling it right now, is not working out and added that it was too much work for so little money.  UM471 agreed.

Call 11 at 3.

As Maestas explained, "UM471" is "the call number where that person was first identified, was the monitor's assignment, of that number to that unidentified person.  So the first time Jamie Ibarra-Solis was intercepted prior to being identified fully as Jaime Ibarra-Solis, it was called 471."  Jan. 22, 2015, Tr. at 105:23-106:4 (Maestas).

[10]The content of the conversation, translated from Spanish into English, is as follows:

Varela said that sometimes he would have a pile, and he would ask them for 30 or 40, and they would tell him not to worry because there was more coming, and for Varela to receive it, then send whatever (money).  Varela added that this way, you can get ahead, because you're constantly moving.

Call 11 at 4.

evidentiary hearing as Government Exhibit 2 ("Call 79")("UM471 informed that the guy [UNK] who was going to give them (UM471 et al) a ride had backed out and didn't want to go anymore. UM471 commented that since yesterday the guy [UNK] was giving excuses and added that his buddy [UNK] was angry about it.").

16.     Varela agreed to help find a new driver, but said that he did not have any trips scheduled at that time.  See Jan. 22, 2015, Tr. at 98:12-13 (Swainston, Maestas); Call 79 at 7 ("Varela commented that he didn't have any trips right now.  UM471 asked if Varela knew of somebody who would help them out.  Varela responded that he would try to find out **. . . .**").

17.     J. Ibarra-Solis stated that he had a vehicle available and that it was similar to the vehicle that Gonzalez, Jr. had previously used to transport drugs.  See Jan. 22, 2015, Tr. at 98:13-21 (Swainston, Maestas); Call 79 at 7.[11]

18.     Varela explained that his clients were calling him insistently for cocaine and asked J. Ibarra-Solis to check on the cocaine shipment.  See Jan. 22, 2015, Tr. at 98:22-99:3 (Swainston, Maestas); Call 79 at 7.[12]

---

[11]The content of the call, translated from Spanish into English, is as follows:

     UM471 replied that there is a vehicle available and has everything [NFI] ready.  UM471 added that it (vehicle) is just like the one Varela used to have. UM471 informed Varela that it (vehicle) is the same one that junior used to take. UM471 said that this vehicle is ready and that he (junior) had taken several trips in it.  UM471 added that he (junior) had taken some horses to Kansas in that vehicle, and had gone twice.

Call 79 at 7.

[12]The content of the call, translated from Spanish into English, is as follows:

     Varela informed that they (Varela et al) were in real need and noted that they [UNK] were calling him (Varela) insistently.  UM471 agreed and added that his buddy had told him to hustle, and to see who might be able to help them

19.     In a telephone call on November 5, 2011, Varela told J. Ibarra-Solis that J. Ibarra-Solis' brother-in-law was working on a trailer with hidden compartments that could hold money or drugs.  See Jan. 22, 2015, Tr. at 99:5-13 (Swainston, Maestas); Session Number: 117 (Nov. 5, 2011) at 4, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 117").[13]

20.     In another call that same day, Varela asked J. Ibarra-Solis if his brother, Alonso Ibarra-Solis, had at least two kilograms of cocaine in Albuquerque; J. Ibarra-Solis replied that his brother did not have any cocaine at that time.  See Jan. 22, 2015, Tr. at 99:21-25 (Swainston, Maestas); Session Number: 119 (Nov. 5, 2011) at 5, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 119").[14]

-----

(Buddy et al).  UM471 said that he was hoping someone would lend them a hand, and said that he would wait for Varela's call.

Call 79 at 7.

[13]The content of the call, translated from Spanish into English, is as follows:

UM471 asked Varela if he was going to get the apparatus to work.  Varela said that they [UNK] are making it [NFI] for him.  UM471 asked Varela if it takes this long.  Varela said that they have to make the molds and everything, and the aluminum and all that stuff.  Varela added that this guy (UM471's brother-in-law) is pretty sharp.  UM471 said that he know who Varela is talking about.  UM471 said that he (Varela) needs to push him to finish, because it is going to be needed.  UM471 told Varela that Varela needs to take advantage of where (Varela) is right now.  Varela told UM471 that he is doing it right, so that he won't have to struggle later on.  That it will be for however many.  Varela added that he thinks it can be a 6-0 for sure.  UM471 affirmed and said that he is sure it will happen.  UM471 told Varela that he hoped that it [NFI] will be finished real soon.
        Varela told UM471 that he has the truck and everything, and just needs the other [NFI].

Call 117 at 4.

[14]The content of the telephone conversation, translated from Spanish into English, is as follows:

21.     In a telephone call later that day, J. Ibarra-Solis asked Varela for his telephone number, so that someone could call Varela to pick up money from him.  See Jan. 22, 2015, Tr. at 101:2-6 (Swainston, Maestas); Session Number: 194 (Nov. 5, 2011) at 16, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 194")("UM471 asked Varela for a phone number, so that they [NFI] call call **[sic]** him, in order for them [UNK] to go ahead and pick that [NFI] up from him (Varela).").

22.     Later that day, Varela told J. Ibarra-Solis that he would send him $198,000.00. See Jan. 22, 2015, Tr. at 101:7-9 (Swainston, Maestas); Session Number: 195 (Nov. 5, 2011) at 17, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 195").[15]

23.     In the final telephone call on November 5, 2011, Varela told J. Ibarra-Solis that Varela had given the money to Ramiro and that Ramiro would give the money to J. Ibarra-Solis. See Jan. 22, 2015, Tr. at 101:10-15 (Swainston, Maestas); Session Number: 218 (Nov. 5, 2011)

─────────────────────

          Varela asked UM471 if his (UM471's) brother was ready right now. UM471 asked if Varela was talking about Varela's location.  Varela affirmed. UM471 negated and added that he (brother) didn't have anything right now. Varela said that he was hoping for at least 2.  UM471 told Varela that he (brother) is at 0.

Call 119 at 5.

[15]The content of the telephone conversation, translated from Spanish into English, is as follows:

          Varela asked UM471 if he was ready for the number.  Varela proceeded to give UM471 991-9665 (TT4/Varela's number).  UM471 told Varela that he was going to give them [UNK] a call, so that Varela can give them [UNK] that [NFI] now.  UM471 proceeded to ask what he was at, and was it 198.  Varela affirmed and added that he has all the paper there.

Call 195 at 17.

at 21, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 218").[16]

24.     On November 6, 2011, J. Ibarra-Solis explained in a telephone call with Varela that, altogether, including A. Ibarra-Solis' cocaine, he had between thirty-five and forty kilograms of cocaine to send to Varela, but they still could not find a driver to transport it.  See Jan. 22, 2015, Tr. at 101:17-21 (Swainston, Maestas); Session Number: 293 (Nov. 6, 2011) at 3, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 293").[17]

_____

[16]The content of the telephone conversation, translated from Spanish into English, is as follows:

> Varela told UM471 that it was done.  UM471 asked who had gone for it [NFI].  Varela replied it was the same man Ramiro.  UM471 asked what Ramiro had said.  Varela answered that Ramiro was buying food for the horses and wanted Varela to sell medicine for his (Ramiro's) horses.  Varela asked if Ramiro was close by, and was that the reason why he had responded so quickly.  UM471 responded that he didn't know and Ramiro had only asked him (UM471) if someone could go there [NFI] and pick that [NFI] up, and UM471 had agreed and said that they (UM471 et al) were ready.  UM471 added that the dude (Ramiro) must have been nearby.  Varela told UM471 that as soon as he hung up with UM471, Ramiro called him (Varela) and told Varela to go and take it [NFI] right away.  Varela added that he went right away, and is just now heading out.  UM471 said that it was good, and that they finally got rid of that issue, because it's too risky to have that there.  Varela concurred and said that it turned out good.  Varela told UM471 that he had it [NFI] in a beautiful spot and noted that the guy [NFI] who came was old and knew Varela's father.

Call 218 at 21.

[17]The content of the telephone conversation, translated from Spanish into English, is as follows:

> Varela proceeded to tell UM471 that things are dry right now.  UM471 told Varela that his (UM471) brother is the same way, and is even in a bad mood because he (brother) can't find anybody to give him a ride [NFI].  UM471 told Varela that he (UM471) is thinking that the others [NFI] are going to beat him (brother) to the punch.  Varela asked UM471 if his (UM471's) brother has everything ready there [NFI].  UM471 said that he (brother) is ready there [NFI].  Varela asked UM471 how many total there are.  UM471 said that all together

25.     Varela said that he was tempted to ask A. Gonzalez to transport the cocaine.  <u>See</u> Jan. 22, 2015, Tr. at 101:21-23 (Swainston, Maestas); Call 293 at 3 ("Varela told UM471 that he is feeling like asking this man's nephew [UNK] to go for them.").

26.     J. Ibarra-Solis told Varela to ask A. Gonzalez to drive the load, and advised J. Ibarra-Solis to not tell A. Gonzalez that the cocaine belongs to A. Ibarra-Solis.  <u>See</u> Jan. 22, 2015, Tr. at 101:24-102:1 (Swainston, Maestas); Call 293 at 3 ("UM471 told Varela to go ahead and ask him (man's nephew), and not to say that they [NFI] don't belong to that other dude [UNK], that they [UNK] belong to UM471.  . . .  UM471 told Varela to tell him (man's nephew) that they [NFI] belong to him (Varela).").

27.     In a telephone conversation later that day, Varela told J. Ibarra-Solis that he had asked Gonzalez, Sr. about transporting the drugs and that Gonzalez, Sr. had asked for J. Ibarra-Solis' telephone number.  <u>See</u> Jan. 22, 2015, Tr. at 102:7-11 (Swainston, Maestas); Session Number: 444 (Nov. 6, 2011) at 14, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 444").[18]

---

there are about 35 or 40.  . . .   Varela asked UM471 if there are at least 30. UM471 said that like 35 or 40 for sure.

Call 293 at 3.

[18]The content of the telephone conversation, translated from Spanish into English, is as follows:

Varela told UM471 that he had told the man [UNK], and he (man) had asked for his (UM471's) number, and asked UM471 if he (UM471) wanted for Varela to give it (number) to him (man).  UM471 affirmed.  Varela told UM471 to go ahead and get him (man), that although he (man) is tight with his money, maybe UM471 can get something out of him (man).

Call 444 at 14.

28.     Varela told J. Ibarra-Solis that Gonzalez, Sr.'s "eyes popped out" when Varela told him that there was a large shipment of cocaine to transport.  Jan. 22, 2015, Tr. at 102:12-14 (Swainston, Maestas); Call 444 at 14.[19]

29.     Varela said that Gonzalez, Sr. was still upset about a prior dispute with A. Ibarra-Solis, but that Gonzalez, Sr. was the only one who could help them with the shipment in light of their time constraints.  See Jan. 22, 2015, Tr. at 102:15-19 (Swainston, Maestas); Call 444 at 14 ("Varela told UM471 that he (Varela) is still upset about the problem, but well he has no other recourse but to continue working.  Varela proceeded to tell UM471 that the man is the only one who can help them (Varela et al) out right now.").

30.     In a telephone conversation later that day, J. Ibarra-Solis told Varela that Gonzalez, Sr. had agreed to transport the cocaine.  See Jan. 22, 2015, Tr. at 104:6-8 (Swainston, Maestas); Session Number: 489 (Nov. 6, 2011) at 21, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 489").[20]

_____

[19]The content of the telephone conversation, translated from Spanish into English, is as follows:

Varela added that just as soon as he told him (man) that there were a lot of them, his eyes popped out.  Varela told UM471 that he (man) is going to call him (UM471), and for UM471 to ask him (man) if he can do it right now, as soon as the races are over.  Varela told UM471 to put pressure on the man.

Call 444 at 14.

[20]The content of the telephone conversation, translated from Spanish into English, is as follows:

Varela asked UM471 what he [UNK] had said.  UM471 said that he [UNK] had said that he could wait.  UM471 told Varela that he asked [UNK] if he could do it tomorrow and [UNK] had agreed to do it, since UM471 is in a rush.  UM471 said he had told him [UNK] to help him (UM471) out.  UM471 added that he [UNK] had agreed, and had said that he could do it tomorrow, and for

- 14 -

31.     In a later telephone call on November 6, 2011, J. Ibarra-Solis indicated to Varela that, because they had failed to find a driver in time, the source of supply sent the cocaine to someone else.  See Jan. 22, 2015, Tr. at 104:9-12 (Swainston, Maestas); Session Number: 491 (Nov. 6, 2011) at 22, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 491")("UM471 told Varela that the man had sent them yesterday afternoon. Varela asked UM471 if he (man) was already headed this way (Varela's) location.  UM471 said that since he (man) hadn't found anyone, he had to throw them [NFI] in there [NFI].").

32.     J. Ibarra-Solis told Varela that the only cocaine left to send is A. Ibarra-Solis'. See Jan. 22, 2015, Tr. at 104:12-15 (Swainston, Maestas); Call 491 at 22 ("Varela asked UM471 if the only ones left are his (UM471's) brother.  UM471 affirmed **. . . .**").

33.     J. Ibarra-Solis told Varela that his source of supply promised to have another twenty kilograms of cocaine to transport on Tuesday, November 8, 2011.  See Jan. 22, 2015, Tr. at 104:15-19 (Swainston, Maestas); Call 491 at 22 ("UM471 told Varela that he (man) had promised him that he would have a 2,0[**21**] [NFI] there [NFI] on Tuesday.  Varela said that was good, and then all of his (UM471's) brother.  UM471 affirmed and added that including the other 2,0 that his (UM471'**[s]** brother) has.").

34.     The next day, November 7, 2011, J. Ibarra-Solis confirmed to Varela that the source of supply was going to send twenty kilograms of cocaine to J. Ibarra-Solis.  See Jan. 22,

---

UM471 to get ready, and he [UNK] would be there [NFI] tomorrow.  Varela said it was awesome.

Call 489 at 21.

[21]Maestas testified that he interpreted "2,0" as twenty kilograms, because he "had listened to numerous conversations . . . prior to this particular call.  And . . . this particular group, it was common for them to use -- to break the number down as in 3, 0, 0 for 300; 2, 0 for 20."  Jan. 22, 2015, Tr. at 165:15-20 (Maestas).

2015, Tr. at 106:17-20 (Swainston, Maestas); Session Number: 590 (Nov. 7, 2011) at 10, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 590").[22]

35.    On November 8, 2011, J. Ibarra-Solis told Varela that he was able to secure only four kilograms of cocaine at that time.  See Jan. 22, 2015, Tr. at 106:21-23 (Swainston, Maestas); Session Number: 795 (Nov. 8, 2011) at 30, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 795").[23]

36.    J. Ibarra-Solis said that, in addition to his four kilograms of cocaine, another twenty-three kilograms of cocaine was available from A. Ibarra-Solis.  See Jan. 22, 2015, Tr. at 106:23-107:2 (Swainston, Maestas); Call 795.[24]

---

[22]The content of the telephone conversation, translated from Spanish into English, is as follows:

> Varela asked how many were going to go and asked if his buddy had informed him (Jaime).  Jaime replied he had said he would see if he would send him (Jaime) a veinton/twenty 20 [NFI].  Varela cussed and said hopefully that way this man would come/leave right away.  Varela added so this man could leave right away and bring them [NFI] to Varela right away over here.  Jaime affirmed and added he (Jaime) would let Varela know early tomorrow what was up.

Call 590 at 10.

[23]The content of the telephone conversation, translated from Spanish into English, is as follows:

> Jaime added that he [NFI] guaranteed Jaime something there and that he (Jaime) had called this senor/man [NFI] and that he's [NFI] going to come for . . . one of those [NFI] that Varela knew who and a 4 [NFI] that Jaime had obtained there [NFI].  Jaime advised he (Jaime) would only take a 4 [NFI] there.

Call 795 at 30.

[24]The content of the telephone conversation, translated from Spanish into English, is as follows:

> Varela asked if the senor/man had said he (senor) would go.  Jaime affirmed and advised for 2, 3 [NFI] but that the rest was that one's [NFI].

37.     J. Ibarra-Solis said that Gonzalez, Sr. agreed to do the shipment and would be in El Paso at 4:00 p.m. the following day, November 9, 2011.  See Jan. 22, 2015, Tr. at 107:3-6 (Swainston, Maestas); Call 795.[25]

38.     Varela had previously planned a trip to Mexico during the week that the cocaine shipment was supposed to arrive.  See Jan. 22, 2015, Tr. at 107:7-16 (Swainston, Maestas).

39.     Varela asked J. Ibarra-Solis to leave four kilograms of cocaine for him with one of J. Ibarra-Solis' contacts in Albuquerque and hold them until Varela returned.  See Jan. 22, 2015, Tr. at 107:12-16 (Swainston, Maestas); Call 795 at 30 ("Varela then added so that they could come to an agreement and then so that Jaime could give him (Varela) those 4 [NFI].").

40.     J. Ibarra-Solis and Varela then discussed cutting Gonzalez, Sr. out of the next shipment of cocaine and not telling him about it.  See Jan. 22, 2015, Tr. at 110:18-24 (Swainston, Maestas); Call 795 at 31.[26]

---

Varela said 2, 3 [NFI] and asked if they [NFI] were his (Jaime) brother's or what.  Jaime affirmed and then said only 4 of his (Jaime) were there/in there [NFI].

Call 795 at 30.

[25]The content of the telephone conversation, translated from Spanish into English, is as follows:

Varela acknowledged and advised that was good and again asked if this man had said he would go.  Jaime affirmed and advised he [NFI] would be at Jaime's tomorrow at 4:00.  Varela acknowledged and advised he [NFI] had called and said that he (Jaime) hadn't called him [NFI] and that he [NFI] was going to Califas/California and had advised him (Varela) that if he (Jaime) called then he [NFI] would not be able to go and Varela said he didn't know why he [NFI] would have told Varela that.

Call 795 at 30.

41.     Varela told J. Ibarra-Solis to ask A. Ibarra-Solis to give Varela fifteen kilograms of cocaine from his shipment.  See Jan. 22, 2015, Tr. at 111:1-3 (Swainston, Maestas); Call 795 at 31 ("Varela advised that at least those 4 [NFI] are there and that he (Jaime) should tell his brother [NFI] to give Varela some 15 [NFI] at least to do something . . . .").

42.     Varela then changed his mind and asked J. Ibarra-Solis for only two additional kilograms of cocaine, so that he could have a total of six kilograms.  See Jan. 22, 2015, Tr. at 111:3-5 (Swainston, Maestas); Call 795 at 31 ("Varela then said at least another 2 [NFI] so it could be 6 [NFI].").

43.     In a telephone call on November 9, 2011, J. Ibarra-Solis and Varela discussed that Varela's brother-in-law would receive the cocaine shipment from J. Ibarra-Solis' contact in Albuquerque.  See Jan. 22, 2015, Tr. at 111:9-15 (Swainston, Maestas); Session Number: 912

---

[26]The content of the telephone conversation, translated from Spanish into English, is as follows:

> Jaime then advised that for the next time that Jaime would tell this guy [NFI] and come to an agreement with him [NFI] and then asked if they (Jaime/Varela) were going to tell this same man [NFI].  Varela said negative and said the guy [NFI] didn't want anything to do with this man [NFI].  Jaime acknowledged and asked if he [NFI] had aparato/device and everything.  Varela affirmed and advised that as a matter of fact the aparato/device is his [NFI] and that the guy [NFI] was well off/well connected.  Jaime acknowledged and agreed right there [NFI] would be perfect then.  Jaime reiterated for Varela to tell this guy [NFI] that they were on for next time and that that would just be between Jaime, Varela and him [NFI].  Jaime advised for Varela to one day give him (Jaime) the guy's radio so that Jaime could talk to him [NFI] so that Jaime could explain to him that it would just be between Jaime, Varela and the buddy.

Call 795 at 31.

(Nov. 9, 2011) at 6, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 912").[27]

44.     Later that day, Varela asked J. Ibarra-Solis for the telephone number of his contact who would hold Varela's cocaine in Albuquerque.  See Jan. 22, 2015, Tr. at 111:20-24 (Swainston, Maestas); Session Number: 917 (Nov. 9, 2011) at 7, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 917")("**[Varela]** asked if Jaime wanted to give him (Varela) the number of that guy [UNK].").

45.     Again, later that day, J. Ibarra-Solis told Varela that he was calling Gonzalez, Sr., but Gonzalez, Sr. was not answering his telephone.  See Jan. 22, 2015, Tr. at 112:1-4 (Swainston, Maestas); Session Number: 959 (Nov. 9, 2011) at 13, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 959")("Jaime informed that he was calling this man [NFI] and he didn't answer.").

46.     Varela told J. Ibarra-Solis that A. Gonzalez said that he and Gonzalez, Sr. were already in El Paso to pick up the cocaine shipment; Varela agreed to call A. Gonzalez.  See Jan. 22, 2015, Tr. at 112:5-7 (Maestas); Call 959 at 13 ("Varela said that he had to be there [NFI] and

---

[27]The content of the telephone conversation, translated from Spanish into English, is as follows:

> Jaime thought it was better if Varela would tell this guy [UNK] to go to Varela's brother-in-law.  Varela asked if this guy [UNK] and said he could do it like that.  Varela commented that Jaime could give Varela the number of the guy of Jaime's brother and Varela would talk to him [NFI] right.  Varela would talk to him [UNK] there in his (Varela's) house, and his brother-in-law would go there (Varela's house) and everything would be done there.  Jaime agreed but said that he was referring to the guy [UNK] that would go, that he would take them [NFI] to his brother-in-law.  Varela said that he would talk to his brother-in-law to do all that right now.

Call 912 at 6.

Varela noted that he (Varela) had talked to the nephew [NFI] and he (the nephew) had said that they were there already**. . . .** Varela said that he would call the nephew.").

47.     In a subsequent call, J. Ibarra-Solis told Varela that Gonzalez, Sr. had finally answered his telephone.  <u>See</u> Jan. 22, 2015, Tr. at 112:12-16 (Maestas); Session Number: 965 (Nov. 9, 2011) at 15, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 965")("Varela asked if he (Ramon) had already answered.  Jaime affirmed and added Jaime was calling Varela to let him know.").

48.     Maestas' toll analysis of telephone calls during this period showed communications between Gonzalez, Sr.'s telephone and J. Ibarra-Solis' telephone.  <u>See</u> Jan. 22, 2015, Tr. at 112:17-21 (Maestas, Swainston).

49.     In anticipation of the drug transport, Varela told J. Ibarra-Solis that the United States Border Patrol checkpoint between El Paso and Albuquerque was active.  <u>See</u> Jan. 22, 2015, Tr. at 112:23-25 (Maestas); Session Number: 1000 (Nov. 9, 2011) at 23, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 1000")("Varela told Jaime the machines [NFI] were placed there [NFI]**. . .** Varela reiterated he (Varela) had just passed there [NFI] and the machines were in place [NFI].").

50.     J. Ibarra-Solis asked if Varela had told Gonzalez, Sr. that the checkpoint was active.  <u>See</u> Jan. 22, 2015, Tr. at 112:25-113:2 (Maestas); Call 1000 at 23 ("Jaime acknowledged and asked if Varela had told them (Ramon et al).").

51.     Varela "affirmed and added that they (Ramon et al) were going to wait a little longer."  Call 1000 at 23.

**b.      Telephone Conversations Between Varela and Gonzalez, Jr.**

52.      On November 6, 2011, in a call between Varela and Gonzalez, Jr., Varela asked Gonzalez, Jr. if he had received any cocaine, and Gonzalez, Jr. said that he had not; Varela confirmed that he expected his source of supply to send him cocaine that week.  See Jan. 22, 2015, Tr. at 115:19-24 (Maestas); Session Number: 418 (Nov. 6, 2011) at 12, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 418")("Varela asked UM4[**28**] if he had received anything yet.  UM4 negated and added that they [UNK] were sending [NFI] this week.  Varela affirmed.").

53.      Varela explained that he had forty-five kilograms of cocaine available to him and confirmed to Gonzalez, Jr. that his source of supply is J. Ibarra-Solis.  See Jan. 22, 2015, Tr. at 115:23-116:5 (Maestas); Call 418 at 12 ("UM4 asked Varela if Alonso or Jaime had called.  Varela said Jaime.  Varela said that they (Jaime/Alonso) have 45 right now, and they want for Varela to bring them [NFI].").

54.      In another call later that day, Varela asked Gonzalez, Jr. if he was willing to transport the drugs.  See Jan. 22, 2015, Tr. at 116:7-9 (Maestas); Session Number: 457 (Nov. 6, 2011) at 17, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 457")("Varela told UM418 that's why he (Varela) was calling him, to see if he (UM418) could go and get at least that [NFI].").

55.      Varela then joked about transporting the cocaine himself, and told Gonzalez, Jr. to wait for his call in case Varela called him from jail.  See Jan. 22, 2015, Tr. at 116:11-14 (Maestas); Call 457 at 17 ("Varela agreed and added those 45 [NFI] were there [NFI] and added he didn't know what he was going to do.  Varela added he might have to go alone.  UM418

---

[28]In the initial calls between Varela and Gonzalez, Jr., Gonzalez, Jr. is identified as "UM4" or "UM418."

laughed.  Varela told UM418 to wait for the call in case he (Varela) called him (UM418) from jail.").

56.     In a November 9, 2011, call, Varela asked Gonzalez, Jr. if his source of supply for marijuana had arrived, because Varela had some buyers who were looking for 300 pounds of marijuana.  See Jan. 22, 2015, Tr. at 119:3-8 (Maestas); Session Number: 895 (Nov. 9, 2011) at 5, admitted at the January 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 895")("Varela asked if Gonzalez Jr.'s friends had arrived yet and informed that he (Varela) was being asked for 300 [NFI].").

57.     Gonzalez, Jr. indicated that the marijuana would arrive on Monday.  See Jan. 22, 2015, Tr. at 119:3-8 (Maestas); Call 895 at 5 ("Gonzalez Jr. replied that for Monday.").

58.     Gonzalez, Jr. asked about the cocaine, and Varela said that his suppliers had sent twenty kilograms of cocaine.  See Jan. 22, 2015, Tr. at 119:10-12 (Maestas); Call 895 at 5 ("Gonzalez Jr. asked about this dude [UNK] and asked if they [UNK] had arrived late.  Varela negated and said that at the end they [UNK] did send some and 20 [NFI] would arrive.").

59.     Varela then indicated to Gonzalez, Jr. that his supplier would ship twenty-three kilograms of cocaine, but that J. Ibarra-Solis wanted a week for distribution and payment in case Gonzalez, Jr. was interested in receiving some of the shipment.  See Jan. 22, 2015, Tr. at 119:12-19 (Maestas); Call 895 at 5 ("Gonzalez Jr. asked if they [NFI] were going to be Jaime's.  Varela said that he thought those [NFI] would be Jaime's but he wanted a week and noted that they [NFI] were going to be 23 [NFI] in case Gonzalez Jr. would want them.").

60.     Gonzalez, Jr. asked for J. Ibarra-Solis' telephone number, so that he could speak to J. Ibarra-Solis himself.  See Jan. 22, 2015, Tr. at 119:19-21 (Maestas); Call 895 ("Gonzalez Jr. asked for Jaime's number so he could talk to Jaime.").

c.      **Telephone Conversations Between Varela and A. Gonzalez.**

61.     On November 5, 2011, in a telephone conversation between Varela and A. Gonzalez, Varela told A. Gonzalez that J. Ibarra-Solis was calling him insistently.  See Jan. 22, 2015, Tr. at 120:1-4 (Maestas); Session Number: 122 (Nov. 5, 2011) at 6, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 122")("Varela told UM580[**29**] that these dudes [UNK] are calling him insistently.").

62.     A. Gonzalez thought that Gonzalez, Sr. did not want to work with the Ibarra-Solises because of a previous transaction in which Freddie Ibarra-Solis, another one of J. Ibarra-Solis' brothers, took a long time to pay Gonzalez, Sr. for a drug shipment.  See Jan. 22, 2015, Tr. at 120:5-10 (Maestas); Call 122 at 6.[30]

63.     A. Gonzalez indicated that he was ready to do the drug shipment.  See Jan. 22, 2015, Tr. at 120:10-13 (Maestas); Call 122 at 6 ("UM580 added that he already put a hitch ball on the truck, and he is good to go.  Varela told UM580 that this way, his (UM580's) uncle won't be disappointed when he sees that the trailer is missing.").

_____

[29]In the initial calls between A. Gonzalez and Varela, A. Gonzalez is identified as "UM580."

[30]The content of the telephone conversation, translated from Spanish into English, is as follows:

> UM580 told Varela that the boss doesn't want these dudes [UNK], because since the last time when they let him (boss) down.  Varela asked UM580 how they (dudes) had let him (boss) down.  UM580 said that they had agreed to pay him (boss) a certain amount of money, and they ended up shorting him 2 bucks, and said that it was because Freddy had hustled them [NFI].  UM580 added that later on, they also ended up owing him (boss) another 2 bucks, and it took them about 2 and a half months, and he (boss) got pretty mad.

Call 122 at 6.

64.     A. Gonzalez said that he had horses that he could use as a cover load; in other words, A. Gonzalez said that he could transport the horses in the trailer along with the drugs, in the hopes that law enforcement searching the trailer would not search any further upon seeing the horses.  See Jan. 22, 2015, Tr. at 120:18-121:1 (Maestas); Call 122 at 6 ("Varela said that he (UM580) is going to need some horse.  UM580 said that it is not a problem, and he can get some horses out there somewhere.").

65.     A. Gonzalez said that he would need to wait until Wednesday, November 9, 2011, to do the shipment, because of his horse-training responsibilities.  See Jan. 22, 2015, Tr. at 121:3-7 (Maestas); Call 122 at 7 ("UM580 said for Varela to tell him [UNK], and if they [UNK] are willing to wait, he can do it Wednesday, and UM580 and Varela can get a share.").

66.     On November 9, 2011, A. Gonzalez told Varela he could not transport the cocaine himself, or by himself, and that it would be better to let Gonzalez, Sr. do the shipment.  See Jan. 22, 2015, Tr. at 121:14-20 (Maestas); Session Number: 950 (Nov. 9, 2011) at 11, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 950")("Andres . . . said that regarding what they (Andres & Varela) had talked the other day, Andres wasn't going to be able to go by himself so it would be better to give all to his uncle [UNK] . . . .").

67.     Varela told A. Gonzalez that it was only going to be two or three kilograms of cocaine this time.  See Jan. 22, 2015, Tr. at 121:20-22 (Maestas); Call 950 at 11 ("Varela commented that they were going to be only 2 or 3 anyway.").

68.     Varela said that the next shipment, which would take place presumably the following week, would not involve Gonzalez, Sr., and that the fees associated with that shipment would go to Varela and A. Gonzalez only.  See Jan. 22, 2015, Tr. at 122:25-123:5 (Maestas); Call 950 at 11 ("Varela expressed that for the next time they (Varela et al) would take them all,

and told Andres not to say anything. . . .  Varela reiterated that it would be all just for him

(Andres) and Varela.  Andres acknowledged.").

                **d.**      **Telephone Conversations Between Varela and Chavez.**

69.     On November 5, 2011, Chavez asked Varela if he had any cocaine.  See Jan. 22,

2015, Tr. at 123:16-17 (Maestas); Session Number: 139 (Nov. 5, 2011) at 10, admitted at the Jan.

22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 139")("Chavez . . . asked Varela if

they [UNK] brought a bunch.").

70.     Varela said he had just received a call from a source of supply in Mexico, and

they were asking for help transporting cocaine.  See Jan. 22, 2015, Tr. at 123:16-20 (Maestas);

Call 139 at 10 ("Varela told Chavez that they [UNK] had just called him (Varela) and had asked

him (Varela) to help them out to bring them [NFI] from over there.").

71.     Varela said that he was sending someone over to do the shipment that night.  See

Jan. 22, 2015, Tr. at 123:20-22 (Maestas); Call 139 at 10 ("Varela is going to send his (Varela's)

guy over there [NFI] tonight.").

72.     Chavez asked how many kilograms of cocaine, and Varela indicated that he was

unsure, but that it was a lot.  See Jan. 22, 2015, Tr. at 123:22-24 (Maestas); Call 139 at 10

("Chavez asked Varela how many he (Varela) was going to have.  Varela said he didn't know,

but was told that it's quite a bit.").

73.     Chavez said he would help Varela with distributing or selling that cocaine.  See

Jan. 22, 2015, Tr. at 123:24-124:1 (Maestas); Call 139 at 10 ("Chavez told Varela that if Varela

would help him, he (Chavez) will help Varela move them [NFI].").

74.     Varela indicated that the cocaine was coming from A. Ibarra-Solis, but he also

thought J. Ibarra-Solis and A. Ibarra-Solis were putting their cocaine together for one shipment.

See Jan. 22, 2015, Tr. at 125:11-17 (Maestas); Call 139 at 10 ("Chavez asked Varela if he was going to get them [NFI] from the other brother and not f[r]om the other one.  Varela affirmed and said that from the other brother, but that he (Varela) thought that they are both going to put theirs together.").

75.     Chavez said that he would rather take cocaine from Varela than an unknown source, suggesting that Chavez had more trust in the quality of Varela's cocaine.  See Jan. 22, 2015, Tr. at 125:18-21 (Maestas); Call 139 at 10 ("Chavez told Varela that he would rather get them [NFI] from Varela, because they are way better than the other ones.").

76.     In a later call on November 5, 2011, Varela told Chavez that Varela needed to sell some drugs and make money.  See Jan. 22, 2015, Tr. at 125:24-25 (Maestas); Session Number: 145 (Nov. 5, 2011) at 11, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 145")("Varela . . . told Chavez that they (Varela et al) have to do something, because Varela has been trying to look for some, and had called the guy, and he (guy) had said that he didn't have anything either.").

77.     Varela said A. Ibarra-Solis will probably give them eighteen kilograms of cocaine for $17,000.00 per kilogram if they paid for it up front rather than on consignment.  See Jan. 22, 2014, Tr. at 125:24-126:4 (Maestas); Call 145 at 12 ("Varela told Chavez that he thinks they [UNK] will hook them up over there [NFI] for like 18.  Varela said that they're 17 if they [UNK] pay them right away, b[u]t Varela told Chavez that his (Chavez's) friends will hook them (Varela et al) up at 18.").

78.     During this period, Varela was purchasing the cocaine for $23,000.00 per kilogram on consignment, so the conversation between Varela and Chavez indicated that Varela

could purchase the cocaine at a lower price if he paid for it up front.  See Jan. 22, 2015, Tr. at 126:12-14 (Maestas).

79.     On November 8, 2011, Varela asked if he should delete Chavez' old number, and Chavez said yes.  See Jan. 22, 2015, Tr. at 127:3-6 (Maestas); Session Number: 666 (Nov. 8, 2011) at 11, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 666")("Varela asked Steve if he (Steve) wanted Varela to delete the other one (phone number). Steve affirmed . . . .").

80.     Chavez added that no one had his new telephone number but the driver and his buyer in Florida.  See Jan. 22, 2015, Tr. at 127:6-8 (Maestas); Call 666 at 11 ("Steve added no one had this one (phone number) but the guy there (possibly Miami), the driver and now Varela.").

81.     Chavez said his buyer has cash and never asks Chavez to give him drugs on consignment.  See Jan. 22, 2015, Tr. at 127:9-10 (Maestas); Call 666 at 11 ("Steve added those fuckers had cash and didn't ask for anything to be fronted.").

82.     Chavez said that the price of a kilogram of cocaine in Florida is $32,000.00 to $35,000.00 per kilogram, and that his buyer was willing to pay $35,000.00 per kilogram.  See Jan. 22, 2015, Tr. at 127:10-14 (Maestas); Call 666 at 11 ("Steve asked Varela if he knew how much they got for those fuckers there.  Varela replied about 34 [NFI].  Steve informed Varela they got between 32 and 35 [NFI], Steve added he could get 35 for them today.").

83.     Chavez said that his buyer could sell all of the twenty kilograms of cocaine.  See Jan. 22, 2015, Tr. at 128:2-5 (Maestas); Call 666 at 11 ("Steve told Varela he could sell, move them.").

84.     In a later call on November 8, 2011, Chavez asked Varela if he would be able to provide at least twenty kilograms of cocaine; Varela affirmed.  See Jan. 22, 2015, Tr. at 128:7-129:10 (Maestas); Session Number: 688 (Nov. 8, 2011) at 13, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 688")("Steve asked if it would be no less than 20 [NFI].  Varela affirmed.").

85.     Chavez' buyer in Florida got on the telephone and told Varela that he could move fifteen to twenty kilograms per week.  See Jan. 22, 2015, Tr. at 129:24-25 (Maestas); Call 688 ("UM proceeded to tell Steve they (UM et al) moved a total of 20 [NFI]**. . . .** UM told Varela that he (Steve) could tell Varela he (UM) was moving between 15 to 20 [NFI] weekly.").

86.     The buyer said that he could pay for six or seven kilograms right now, and then asked to wait six or seven days -- or seven to eight days, to be safe -- to sell the remainder of the cocaine and to collect the proceeds.   See Jan. 22, 2015, Tr. at 129:24-130:6 (Maestas, Swainston); Call 688 at 13.[31]

87.     In a later call on November 8, 2011, Chavez told Varela that the deal is done in Florida and that there was no turning back; in other words, Chavez said that he was ready to conduct the transaction for the twenty kilograms of cocaine.  See Jan. 22, 2015, Tr. at 130:18-20 (Maestas); Session Number: 723 (Nov. 8, 2011) at 19, admitted at the Jan. 22, 2015, evidentiary

---

[31]The content of the telephone conversation, translated from Spanish into English, is as follows:

UM acknowledged and added as soon as Steve arrived with the 20 [NFI], UM added what he would do is pay him (possibly Steve or driver) for seven or six [NFI].  UM told Varela the other ones would be sold with his **. . . .** UM told Varela the most he took was six days, UM added to be on the safe side it would be 7 or 8 days.  UM reiterated he moved them (the 20) [NFI] fast.

Call 688 at 13.

hearing as Government Exhibit 2 ("Call 723")("Steve told Varela that it was all lined up for sure. Steve asked Varela if it was for sure, Steve added there was no turning back for him (Steve).").

88.     Varela said that he would be leaving town and indicated that he did not want to leave the cocaine at his house while he was on vacation.  See Jan. 22, 2015, Tr. at 131:3-5 (Maestas); Call 723 at 19 ("Varela added he (Varela) couldn't have all that (the 20) standing there (possibly his location) till he came back.").

89.     The next day, November 9, 2011, Varela told Chavez that a person nicknamed "Cheekies" -- who Maestas later identified as Rigoberto Eduardo Serano -- would give him Varela's cocaine.  Jan. 22, 2015, Tr. at 131:12-17 (Maestas); id. at 143:10-12 (Maestas).  See Session Number: 971 (Nov. 9, 2011) at 17, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 971")("Varela told Steve Chiquis would hook Varela up.").

90.     Chavez asked if it was the same quality of cocaine that Varela always gets, and Varela said yes.  See Jan. 22, 2015, Tr. at 131:18-132:14 (Maestas); Call 971 ("Steve . . . asked if they were the same ones or the PVC fuckers.  Varela replied they were the same ones.  Steve asked if the ones Varela always got.  Varela affirmed.").

91.     Chavez is a firefighter for the Albuquerque Fire Department and a construction worker; he is not involved with horse racing or horse training.  See Jan. 22, 2015, Tr. at 124:18-125:6 (Maestas, Swainston).

92.     Varela was not a construction worker or a firefighter.  See Jan. 22, 2015, Tr. at 125:7-9 (Maestas, Swainston).

          e.     **Telephone Conversations Between Varela and Gonzalez, Sr.**

93.     On November 6, 2011, Gonzalez, Sr. called Varela, and Varela said that J. Ibarra-Solis had forty-five kilograms of cocaine ready to be transported.  See Jan. 22, 2015, Tr. at

133:20-22 (Maestas); Session Number: 329 (Nov. 6, 2011) at 11, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 329")("Varela informed Ramon that they (Jaime et al) had 45 there [NFI].").

94.     Gonzalez, Sr. said that J. Ibarra-Solis had no one to transport the cocaine at that time.  See Jan. 22, 2015, Tr. at 133:24-25 (Maestas); Call 329 at 11 ("Ramon advised they (Jaime et al) didn't have anyone to train their horses [NFI] right now.").

95.     Varela replied that the vehicle that was being used for cocaine shipments could only hold sixteen kilograms of cocaine and that they wanted to transport all forty-five kilograms of cocaine at once.  See Tr. at 133:24-134:6 (Maestas); Call 329 at 11 ("Varela replied they do have, but only 16 [NFI] fit and they (Jaime et al) wanted it all at once.").

96.     Varela said that law enforcement would catch them if they had to cross the Border Patrol checkpoint back and forth multiple times.  See Jan. 22, 2015, Tr. at 134:18-21 (Maestas).[32]

97.     In a subsequent telephone conversation on November 6, 2011, Varela asked if Gonzalez, Sr. was ready to transport the cocaine, and Gonzalez, Sr. said that he was.  See Jan. 22, 2015, Tr. at 135:16-18 (Maestas); Session Number: 452 (Nov. 6, 2011) at 15, admitted at the

---

[32]The content of the telephone conversation, translated from Spanish into English, is as follows:

> Varela added that the dude was going to take off right now after all, but with 16 [NFI] and added the dude was going to have to do two trips.  Varela asked what 16 and 16 were.  Varela replied to himself that it was 32 and told Ramon the dude would have to make three trips.  Ramon agreed.  Varela said that was what they didn't want to have to do and added they wanted it all at once.  Ramon replied they would burn themselves crossing and crossing and added the maestros/teachers [NFI] were not stupid.  Ramon chucked and asked if Varela understood.  Varela affirmed.  Ramon told Varela that one of those falls [NFI] for those guys would be fucked up and added they would lose a shit load of money.

Call 329 at 11.

Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 452")("Varela asked if Ramon was ready.  Ramon acknowledged **. . . .**").

98.     Both discussed generally the need to transport the forty-five kilograms of cocaine, and Gonzalez, Sr. said that he would bring all of the cocaine at once.  <u>See</u> Jan. 22, 2015, Tr. at 135:15-22 (Maestas); Call 452 at 15 ("Varela told Ramon to call since he (Varela) had asked him [UNK] to help him (Varela) out with at least half [NFI]**. . . .**  Ramon said that he (Ramon) would bring all of them [NFI] at once.").

99.     In a later call on November 6, 2011, Gonzalez, Sr. told Varela that J. Ibarra-Solis would call right now and that J. Ibarra-Solis would probably want to arrange the shipment of cocaine the following day.  <u>See</u> Jan. 22, 2015, Tr. at 136:1-4 (Maestas); Session Number: 484 (Nov. 6, 2011) at 20, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 484")("Ramon told Varela he [UNK] would call right now, but that Ramon that that he [UNK] would probably want to do it tomorrow [NFI].").

100.    In a November 7, 2011, telephone call, Varela asked Gonzalez, Sr. if he had talked to J. Ibarra-Solis, and then asked if Gonzalez, Sr. had left for El Paso yet.  <u>See</u> Jan. 22, 2015, Tr. at 136:6-9 (Maestas); Session Number: 544 (Nov. 7, 2011) at 12, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 544")("Varela asked Ramon if he had talked to . . .  and then asked if he [UNK] had left over there [NFI] after all.").

101.    Gonzalez, Sr. told Varela that J. Ibarra-Solis had said that all the cocaine was ready at the stash location and that it was for Varela; Varela affirmed.  <u>See</u> Jan. 22, 2015, Tr. at 136:16-21 (Maestas); Call 544 at 12 ("Ramon informed Varela he [NFI] had said that all the muebles/furniture [NFI] of those apartments [NFI] were for Varela.  Varela affirmed **. . . .**").

102.    The next day, November 8, 2011, Gonzalez, Sr. told Varela that J. Ibarra-Solis said that the cocaine shipment would not be ready until the following day.  See Tr. at 137:19-22 (Maestas); Session Number: 595 (Nov. 8, 2011) at 1, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 595")("Ramon said that he (Jaime) had called and said that they (Jaime et al) were not ready until Wednesday.").

103.    Gonzalez, Sr. said that he thought that J. Ibarra-Solis might be using another guy to do the cocaine shipment.  See Tr. at 137:12-24 (Maestas); Call 595 at 1 ("Ramon said that he thought that he (Jaime) might be using another guy.").

104.    Varela said no and added that he was still waiting.  See Jan. 22, 2015, Tr. at 137:24-138:2 (Maestas); Call 595 at 1 ("Varela negated and added that he (Varela) is waiting.").

105.    Varela told Gonzalez, Sr. that other drug smugglers all charge the same fee to transport drugs.  See Jan. 22, 2015, Tr. at 138:2-9 (Maestas); Call 595 at 1 ("Varela told Ramon that they (guys) all charge the same thing.").

106.    Gonzalez, Sr. told Varela that, on Sunday, J. Ibarra-Solis had told him that J. Ibarra-Solis wanted Gonzalez, Sr. to come Monday and that he thought it was going to be thirty-six kilograms of cocaine, but that J. Ibarra-Solis just told him that there would only be twenty kilograms.  See Jan. 22, 2015, Tr. at 138:2-9 (Maestas); Call 595 at 1 ("Ramon proceeded to tell Varela that on Sunday, he (Jaime) had told him that he (Jaime) wanted for Ramon to come Monday.  That Ramon thought it was 36, but that he (Jaime) just told them that there are only 20.").

107.    Varela said that it would be good to transport only twenty kilograms of cocaine. See Jan. 22, 2015, Tr. at 139:16-20 (Maestas); Call 595 at 1 ("Varela told Ramon that he's going

to call the dude (Jaime), and if he (Jaime) has that, well it would be good to just bring that (20). Varela proceeded to say that twenty (20) is good.").

108.    Gonzalez, Sr. said that he would not be able to do it on Thursday night, because he wanted to leave El Paso early in the morning on Friday.  See Jan. 22, 2015, Tr. at 139:21-23 (Maestas); Call 595 at 2 ("Ramon said that he won't be able to do it on Thursday night, because he (Ramon) wants to leave early morning Friday.").

109.    Varela said he could also not do the shipment, because he was supposed to leave for his vacation in Mexico on Wednesday; Varela added that, if the shipment does not arrive in Albuquerque by Wednesday, he would not be able to receive it.  See Jan. 22, 2015, Tr. at 139:23-140:5 (Maestas); Call 595 at 2 ("Varela said that he can't do it either, because as Ramon should recall, Varela was supposed to go to Cancun and it was cancelled because of the hurricane.  So now, Varela is going to leave on Wednesday, and if it doesn't arrive by Wednesday, Varela won't be able to receive it.").

110.    Varela said that he would call J. Ibarra-Solis to ensure that the shipment made it to Albuquerque in time.  See Jan. 22, 2015, Tr. at 140:5-7 (Maestas); Call 595 at 2 ("Varela told Ramon that he was going to call him (Jaime), because it's a must that it gets here to him (Varela).").

111.    Later on November 8, 2011, Varela and Gonzalez, Sr. discussed their frustration that they did not know when the cocaine shipment would be ready.  See Jan. 22, 2015, Tr. at 141:6-9 (Maestas); Session Number: 760 (Nov. 8 2011) at 27, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 760")("Varela asked if that dude (Jaime) had called him.  Ramon negated and told Varela it was just bullshit.  Varela agreed and added he was calling him and he (Jaime) didn't answer.  Ramon added it was all a lie.").

112.    Varela and Gonzalez, Sr. expressed concern that J. Ibarra-Solis or A. Ibarra-Solis had arranged for someone else to do the cocaine transport.  See Jan. 22, 2015, Tr. at 141:9-11 (Maestas); Call 760 ("Ramon told Varela they probably found someone else.").

113.    Both discussed further how they looked forward to a good relationship with the Ibarra-Solises, and Gonzalez, Sr. informed Varela that he expected an $8,000.00 transportation fee; Varela agreed.  See Jan. 22, 2015, Tr. at 141:11-15 (Maestas); Call 760 at 27 ("Varela told Ramon once they started they would get with it.  Ramon affirmed and informed Varela it was going to happen with this fucking man [UNK].  Ramon added he was going to give him about 8 [NFI].  Varela affirmed.").

114.    Both Varela and Gonzalez, Sr. were so frustrated that they had not yet solidified the upcoming cocaine transport that they said they should agree to do future cocaine transports for the Ibarra-Solises, and then not show up or answer their calls.  See Jan. 22, 2015, Tr. at 141:17-22 (Maestas); Call 760 at 27 ("Ramon added that next time they needed someone they were fucked.  Varela affirmed.  Ramon told Varela they would pay them back.  Varela told Ramon they would say yes and not answer their calls.").

115.    In a later call on November 8, 2011, it became clear that the cocaine shipment was back on track and that it would be ready for pick up in El Paso the following day.  See Jan. 22, 2015, Tr. at 142:12-19 (Maestas); Session Number: 797 (Nov. 8, 2011) at 33, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 797")("Varela asked if the dude (Jaime) had called him.  Ramon affirmed and advised had just called him 5 minutes ago.  Varela told Ramon he had called and told him (Varela) this man was on his way over tomorrow.").

- 34 -

116.   Gonzalez, Sr. stated that J. Ibarra-Solis had told him the drugs would be ready by 3:00 or 4:00 p.m.   See Jan. 22, 2015, Tr. at 142:20-22 (Maestas); Call 797 at 33 ("Ramon acknowledged and added Jaime had told him it would be ready by three or four.").

117.   Gonzalez, Sr. explained how he had told J. Ibarra-Solis that he would pick up the cocaine at about 4:30 p.m. or 5:00 p.m.   See Jan. 22, 2015, Tr. at 142:23-25 (Maestas); Call 797 at 33 ("Ramon told Jaime he would pick it up about 4:30 or 5:00.").

118.   Varela asked Gonzalez, Sr. if it would be twenty-three kilograms of cocaine; Gonzalez, Sr. affirmed.   See Jan. 22, 2015, Tr. at 142:23-143:21 (Maestas); Call 797 at 33 ("Varela acknowledged and told Ramon if he (Jaime) had told him (Ramon) it was 2,3.  Ramon affirmed.").

119.   Varela said "that was something" and "told Ramon he (Ramon) could go to Califas/California very comfortably and laughed."  Call 797 at 33.

120.   On the next day, November 9, 2011, Varela and Gonzalez, Sr. discussed the final arrangements for the cocaine shipment, including where Varela wanted the cocaine to be delivered; Varela said he wanted it taken to Serano, who would then give the cocaine to Chavez.  See Jan. 22, 2015, Tr. at 143:3-12 (Maestas); Session Number: 966 (Nov. 9, 2011) at 16, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 966").[33]

---

[33]The content of the telephone conversation, translated from Spanish into English, is as follows:

> Varela had told Jaime Ramon was probably already there (El Paso).  Ramon affirmed and asked Varela when he was going back.  Varela replied he was leaving on Monday.  Ramon asked Varela where that (possibly the 23) was going to be delivered, Ramon asked it if was going to Varela's.  Varela negated and told Ramon it was going to be delivered to the same dude they (the 23) always were.  Varela added with the tall dumb guy.

Call 966 at 16.

121.    In a later call on November 9, 2011, Varela asked Gonzalez, Sr. if he was on his way to Albuquerque with the cocaine shipment; Gonzalez, Sr. said that he was not on his way yet.  See Jan. 22, 2015, Tr. at 143:21-25 (Maestas); Session Number: 994 (Nov. 9, 2011) at 22, admitted at the Jan. 22, 2015, evidentiary hearing as Government Exhibit 2 ("Call 994")("Varela asked Ramon if he was on his way.  Ramon negated and added he was just going to see this dudes offices of the apartments.").

122.    Varela then informed Gonzalez, Sr. that the Border Patrol checkpoint was operational.  See Jan. 22, 2015, Tr. at 144:1-3 (Maestas); Call 994 at 22 ("Varela informed Ramon the machine [NFI] was in place.").

123.    Gonzalez, Sr. agreed and added that it was "red alert" there.  Jan. 25, 2015, Tr. at 144:3-4 (Maestas); Call 994 at 22 ("Ramon affirmed and added it was red alert there [NFI].").

124.    Gonzalez, Sr. told Varela that he was aware of the checkpoint and would leave from El Paso with the cocaine at 4:00 a.m. the next morning, when the checkpoint would likely not be operational.  See Jan. 22, 2015, Tr. at 145:12-17 (Maestas); Call 994 at 22 ("Ramon told Varela he saw it since he got there [NFI].  Ramon added he would take off at four in the morning.  Varela replied that was better.  Ramon added why take a risk.").

125.    Gonzalez, Sr. is a horse trainer of fairly national recognition.  See Jan. 22, 2015, Tr. at 42:10-19 (Maestas, Walz).

126.    Varela and Gonzalez, Sr. were part owners of at least one horse.  See Jan. 22, 2015, Tr. at 43:6-17 (Maestas, Walz).

127.    Video surveillance of Gonzalez, Sr.'s multiple homes did not reveal any criminal activity, and that physical surveillance of Gonzalez, Sr. and A. Gonzalez at a racetrack in

Sunland, New Mexico, also did not reveal any criminal activity.  See Jan. 22, 2015, Tr. at 42:10-51:16 (Maestas, Walz).

     **3.**      **The DEA's Surveillance Operation.**

     128.   In addition to the telephone conversations referenced above, Maestas arranged for DEA agents to assist with the investigation by conducting surveillance of Gonzalez, Sr., A. Gonzalez, and others in the El Paso area on November 9, 2011, and November 10, 2011.  See Transcript of Hearing (taken January 28, 2015) at 155:8-15 (Gooch), filed March 30, 2015 (Doc. 754)("Jan. 28, 2015, Tr."); id. at 156:13-18 (Gooch); id. at 158:16-25 (Gooch).

     129.   Douglas Gooch, a DEA Special Agent from the Albuquerque DEA office, was in charge of the surveillance operation in El Paso and supervised five DEA agents from the Albuquerque office and six to eight agents from the El Paso office.  See Jan. 28, 2015, Tr. at 156:19-157:18 (Swainston, Gooch).

     130.   The purpose of the surveillance operation was to seize the cocaine shipment that Gonzalez, Sr. planned to transport from El Paso to Albuquerque.  See Jan. 28, 2015, Tr. at 157:19-158:6 (Swainston, Gooch).

     131.   The surveillance operation began on November 9, 2011 when Maestas called Gooch and told him that, based on intercepted telephone communications, Maestas believed that Gonzalez, Sr. was going to pick up a drug load in El Paso.  See Jan. 28, 2015, Tr. at 158:16-20 (Swainston, Gooch).

     132.   Gooch and the surveillance team first encountered Gonzalez, Sr. and A. Gonzalez on November 9, 2011, heading south on Interstate 25 towards El Paso at a truck stop just over the border into Texas; Gonzalez, Sr. was driving a white Dodge pickup truck with an attached

horse trailer and A. Gonzalez was driving a maroon Dodge pickup without a trailer attached to it. See Jan. 28, 2015, Tr. at 158:16-159:8 (Gooch).

133.    Agents continued to maintain surveillance of Gonzalez, Sr. and A. Gonzalez in the El Paso area.  See Jan. 28, 2015, Tr. at 158:16-167:5 (Swainston, Gooch).

134.    At approximately 8:30 p.m., the agents observed a meeting between Gonzalez, Sr., A. Gonzalez, and two female subjects in a mall parking lot.  See Jan. 28, 2015, Tr. at 159:1-160:4 (Swainston, Gooch).

135.    After the meeting at the parking lot, Gonzalez, Sr. and A. Gonzalez returned to their hotel.  See Jan. 28, 2015, Tr. at 160:5-10 (Gooch).

136.    At approximately 9:00 p.m., agents observed A. Gonzalez leave the hotel in the maroon pickup, but the agents were unable to maintain surveillance of it.  See Jan. 28, 2015, Tr. at 161:15-20 (Gooch).

137.    A few minutes later, agents observed Gonzalez, Sr. drive his truck and trailer from the hotel to a storage facility and drive into the storage facility.  See Jan. 28, 2015, Tr. at 161:21-162:12 (Gooch).

138.    A. Gonzalez' and Gonzalez, Sr.'s hotel was located about a half mile from the storage facility.  See Jan. 28, 2015, Tr. at 166:10-14 (Swainston, Gooch).

139.    At approximately 9:15 p.m., a blue minivan arrived at the storage facility, pulled up to the front gate and stopped; A. Gonzalez' truck then drove to the front gate to activate the gate, so that the blue minivan could enter the facility.  See Jan. 28, 2015, Tr. at 162:13-21 (Gooch).

140.    The blue minivan and A. Gonzalez' truck drove back to a storage unit together. See Jan. 28, 2015, Tr. at 162:18-21 (Gooch).

141.     At approximately 10:00 p.m., Gonzalez, Sr.'s truck, A. Gonzalez' truck, and the minivan left the storage facility "in tandem."  Jan. 28, 2015, Tr. at 162:22-25 (Gooch).

142.     The surveillance team never observed A. Gonzalez or Gonzalez, Sr. take any boxes from the storage unit and put them in the trailer.  See Jan. 28, 2015, Tr. at 171:18-20 (Walz, Gooch).

143.     The surveillance team did not see any action by either Gonzalez, Sr. or A. Gonzalez at the storage site indicating that they were transferring any items from the storage facility to the trailer attached to Gonzalez, Sr.'s pickup.  See Jan. 28, 2015, Tr. at 171:20-25 (Walz, Gooch).

144.     Throughout the surveillance operation, Gooch and Maestas were in constant communication, and Maestas was giving Gooch instructions based on the telephone conversations that he was intercepting.  See Jan. 28, 2015, Tr. at 167:8-16 (Swainston, Gooch).

145.     Maestas told Gooch that, based on intercepted telephone conversations, he expected Gonzalez, Sr. and A. Gonzalez to leave El Paso at approximately 4:00 a.m. on November 10, 2011, so Gooch and the surveillance team maintained constant surveillance on Gonzalez, Sr. and A. Gonzalez at the hotel after they went to sleep.  See Jan. 28, 2015, Tr. at 167:1-7 (Swainston, Gooch).

146.     At almost 4:00 a.m., Gonzalez, Sr. got into the white Dodge pickup with the trailer, A. Gonzalez got into the maroon Dodge pickup, and both began driving towards Albuquerque.  See Jan. 28, 2015, Tr. at 169:9-14 (Gooch).

147.     A. Gonzalez' and Gonzalez, Sr.'s trucks eventually separated, and the surveillance team split up, so that they could follow both vehicles.  See Jan. 28, 2015, Tr. at 169:18-23 (Gooch).

148.    Although Gooch and other agents followed A. Gonzalez, they eventually let him go without stopping his vehicle.  See Jan. 28, 2015, Tr. at 169:24-170:12 (Swainston, Gooch).

149.    At the surveillance team's direction, Border Patrol officers later stopped the two female subjects, conducted a search of their vehicle, but did not find any contraband; the officers found hidden compartments in the vehicle, however.  See Jan. 28, 2015, Tr. at 175:17-23 (Walz, Gooch).

150.    The DEA surveillance team did not participate in the stop or search of Gonzalez, Sr.'s vehicle, because they wanted to protect the DEA's wiretap investigation.  See Jan. 28, 2015, Tr. at 170:13-23 (Swainston, Gooch); id.. at 196:23-197:4 (Swainston, Lopez).

**4.      The Stop of Gonzalez, Sr.'s Truck and the Search of His Trailer.**

151.    DEA Special Agent Emrich, who worked in the Albuquerque, New Mexico DEA office, asked Angel Lopez, who is a detective with the El Paso Sheriff's Office assigned to the DEA as a Task Force Officer, to obtain the assistance of deputies with the El Paso Sheriff's Office in conducting a "walled-off" traffic stop of Gonzalez, Sr.'s vehicle.  Jan. 28, 2015, Tr. at 185:1-9 (Swainston, Lopez).  See id. at 206:22-207:14 (Walz, Lopez).

152.    A walled-off stop is when officers who are not involved in the wiretap investigation obtain their own probable cause -- typically based on a motor vehicle code violation -- to conduct a traffic stop on the target vehicle.  See Jan. 28, 2015, Tr. at 185:14-24 (Swainston, Lopez).

153.    The El Paso Sheriff's Office assigned Almonte and Marquez to conduct the walled-off stop of Gonzalez, Sr.'s vehicle.  See Jan. 28, 2015, Tr. at 187:15-24 (Swainston, Lopez).

154.    Lopez explained to Marquez that he and Almonte were assisting the Albuquerque DEA office in a wiretap investigation and that the DEA needed the deputies to conduct a traffic stop on a vehicle that was possibly loaded with an unknown amount of cocaine.  See Jan. 28, 2015, Tr. at 189:5-15 (Swainston, Lopez).

155.    Lopez told Marquez that he and Almonte should find their own probable cause to stop Gonzalez, Sr.'s truck, but did not tell them for what violations to look.  See Jan. 28, 2015, Tr. at 200:8-13 (Walz, Lopez).

156.    Lopez also informed Marquez that the truck would likely be loaded with drugs, but he did not say anything about obtaining Gonzalez, Sr.'s consent to search the truck.  See Jan. 28, 2015, Tr. at 200:14-23 (Walz, Lopez).

157.    Lopez also gave Marquez a DEA radio, so he could be in contact with the DEA surveillance team.  See Jan. 28, 2015, Tr. at 188:19-189:4 (Swainston, Lopez).

158.    At approximately 3:30 a.m., on November 10, 2011, Lopez met Marquez at Gonzalez, Sr.'s and A. Gonzalez' hotel, so that Lopez could point out Gonzalez, Sr.'s vehicle to Marquez.  See Jan. 28, 2015, Tr. at 192:14-193:4 (Swainston, Lopez).

159.    Marquez and Almonte agreed to park in different locations, so that one of them could intercept Gonzalez, Sr., regardless which direction he traveled from the hotel.  See Jan. 28, 2015, Tr. at 193:7-20 (Swainston, Lopez).

160.    Lopez stayed at A. Gonzalez' and Gonzalez, Sr.'s hotel, so that he could communicate Gonzalez, Sr.'s location to Marquez and Almonte.  See Jan. 28, 2015, Tr. at 193:22-194:6 (Swainston, Lopez).

161.    From that point forward, Lopez used the DEA radio to communicate with Marquez, and Marquez communicated with Almonte through the Sheriff's Office radio.  See Jan. 28, 2015, Tr. at 194:11-14 (Swainston, Lopez).

162.    Marquez gave Almonte a description of Gonzalez, Sr.'s truck and trailer, and told him that a DEA investigation indicated that Gonzalez, Sr.'s truck likely contained illegal drugs. See Jan. 28, 2015, Tr. at 250:16-20 (Swainston, Almonte); id. at 251:22-252:6 (Swainston, Almonte); id. at 253:7-10 (Walz, Almonte); id. at 265:1-10 (Walz, Almonte).

163.    When Gonzalez, Sr.'s truck left the hotel, Lopez followed it and relayed its location to Marquez, who then relayed its location to Almonte, who conducted the stop.  See Jan. 28, 2015, Tr. at 194:7-196:22 (Swainston, Lopez); id. at 202:18-22 (Walz, Lopez); id. at 226:1-16 (Swainston, Almonte).

164.    While he was driving down the road, Almonte was on the left side of Gonzalez, Sr.'s truck, where he observed that there was a paper tag on the truck's left rear window, and he could not make out the paper tag; it also appeared to Almonte that the paper was lifted, obscuring the tag.  See Jan. 28, 2015, Tr. at 226:22-227:2 (Swainston, Almonte).

165.    Almonte also noticed, while he was driving down the road, that there was no license plate on the truck's rear bumper.  See Jan. 28, 2015, Tr. at 227:2-3 (Swainston, Almonte).

166.    Almonte thus decided to stop Gonzalez, Sr.'s truck for improperly displaying a temporary, paper registration that was in the left rear window but was rolled and unreadable, thus obscuring any applicable expiration date.  See Jan. 28, 2015, Tr. at 226:17-227:19 (Swainston, Almonte).

167.    At approximately 4:08 a.m., Almonte turned on his emergency lights on, and Gonzalez, Sr. pulled the truck to the side of the road; then, Almonte exited his vehicle and

approached the driver's side of the truck.  See Jan. 28, 2015, Tr. at 228:12-22 (Swainston, Almonte).

168.     Gonzalez, Sr. was alone in the truck.  See Jan. 28, 2015, Tr. at 228:12-22 (Swainston, Almonte).

169.     The interior of Gonzalez, Sr.'s truck was very dirty, with clothing and luggage on the rear bench seat, several empty water bottles, uneaten food on the floor boards, and several empty food wrappers and containers.  See Jan. 28, 2015, Tr. at 235:19-236:5 (Swainston, Almonte); id. at 298:1-25 (Swainston, Marquez).

170.     In Spanish, Almonte asked for Gonzalez, Sr.'s driver's license and insurance card, and advised him that he was stopped for his paper tag not being clearly visible and for having no license plate on the truck's rear bumper.  See Jan. 28, 2015, Tr. at 230:4-11 (Swainston, Almonte).

171.     Almonte is proficient in Spanish.  See Jan. 28, 2015, Tr. at 226:23-24 (Swainston, Almonte).

172.     Gonzalez, Sr. "did not say a word," but lifted a New Mexico license plate off the right front seat of the vehicle and showed it to Almonte.  Jan. 28, 2015, Tr. at 230:12-14 (Almonte).

173.     Almonte advised Gonzalez, Sr. that the license plate belongs on the truck's rear bumper, and asked a second time for Gonzalez, Sr.'s driver's license and insurance card.  See Jan. 28, 2015, Tr. at 230:14-17 (Almonte).

174.     Gonzalez, Sr. again did not respond to Almonte and showed Almonte the license plate a second time.  See Jan. 28, 2015, Tr. at 230:17-20 (Almonte).

175.    After Almonte asked Gonzalez, Sr. for his driver's license and insurance card a third time, Gonzalez, Sr. finally gave them to Almonte.  See Jan. 28, 2015, Tr. at 230:21-24 (Almonte).

176.    Almonte asked Gonzalez, Sr. to whom the truck belonged, and Gonzalez, Sr. responded that it was his.  See Jan. 28, 2015, Tr. at 232:12-14 (Almonte).

177.    Almonte asked Gonzalez, Sr. how long he had owned the truck, and Gonzalez, Sr. replied that he had owned it for approximately one month.  See Jan. 28, 2015, Tr. at 232:12-15 (Almonte).

178.    Almonte then asked Gonzalez, Sr. how long he had owned the horse trailer, and Gonzalez, Sr. responded that he had owned it for two years.  See Jan. 28, 2015, Tr. at 232:15-17 (Almonte).

179.    Almonte then asked Gonzalez, Sr. to exit the vehicle, because Gonzalez, Sr. was speaking very softly and Almonte could not hear him well.  See Jan. 28, 2015, Tr. at 231:17-21 (Almonte).

180.    Almonte had difficulty hearing at the January 28, 2015, evidentiary hearing, and had hearing problems at the time that he conducted the stop of Gonzalez, Sr.'s truck.  See Jan. 28, 2015, Tr. at 231:22-24 (Swainston, Almonte).

181.    Gonzalez, Sr. exited his truck, and walked to the shoulder of the highway on the right back corner of his truck.  See Jan. 28, 2015, Tr. at 232:1-3 (Almonte); id. at 233:4-14 (Swainston, Almonte).

182.    Almonte asked Gonzalez, Sr. where he was going, and Gonzalez, Sr. replied that he was on his way to pick up a horse at Chamberino Market de Mendon Ranch.  See Jan. 28, 2015, Tr. at 233:23-234:14 (Swainston, Almonte).

183.     At that time, which was approximately 4:12 a.m., Marquez pulled up to the location at which Almonte had stopped Gonzalez, Sr.'s truck.  <u>See</u> Jan. 28, 2015, Tr. at 209:20-21 (Walz, Lopez); <u>id.</u> at 232:4-5 (Swainston, Almonte).

184.     Marquez was in a marked patrol car, and he was wearing his full police uniform. <u>See</u> Jan. 28, 2015, Tr. at 234:22-25 (Swainston, Almonte).

185.     Almonte advised Marquez why he had stopped Gonzalez, Sr., that he was going to conduct a record check on Gonzalez, Sr. and the truck, and that Gonzalez, Sr. had told him that he was on his way to Chamberino, New Mexico to pick up a horse.  <u>See</u> Jan. 28, 2015, Tr. at 232:4-8 (Swainston, Almonte).

186.     A record check involves the deputy contacting the Sheriff's Office dispatcher and giving her the license plate number and the individual's driver's license number; if the check comes back negative for outstanding arrest warrants, the deputy proceeds with his or her interview of the driver.  <u>See</u> Jan. 28, 2015, Tr. at 237:20-238:3 (Swainston, Almonte).

187.     While Almonte was conducting the records check, Marquez had a conversation with Gonzalez, Sr.  <u>See</u> Jan. 28, 2015, Tr. at 284:7-10 (Swainston, Marquez).

188.     Initially, Gonzalez, Sr. told Marquez that he was going to Chamberino to pick up two mares and a colt that belonged to him.  <u>See</u> Jan. 28, 2015, Tr. at 284:15-23 (Swainston, Marquez); Incident/Investigation Report at 9,[34] filed August 7, 2014 (Doc. 675-1)("Incident Report")("Gonzales stated that he had just left a hotel and was on the way to Chamberino, NM to pick up two mares and a colt.  Gonzales stated that the horses were his . . . .").

189.     When Marquez asked where Gonzalez, Sr. was going a second time, however, Gonzalez, Sr. said that he was going to pick up some horses that belonged to the owner of the

_____

[34]The Court will use CM/ECF's pagination -- <u>i.e.</u>, in the numbers in the furthest upper-right-hand corner of each page -- rather than document's.

farm.  See Jan. 28, 2015, Tr. at 285:5-13 (Swainston, Marquez); Incident Report at 9 ("Gonzales was asked where he was going and to what farm in Chamberino, NM.  Gonzales stated he was going to pick up some horses that belonged to the owner of the farm.").

190.    When Marquez spoke to Gonzalez, Sr., Gonzalez, Sr. appeared "a little more nervous than somebody who has just committed a traffic violation."   Jan. 28, 2015, Tr. at 285:16-18 (Marquez).

191.    Marquez said that Gonzalez, Sr. appeared nervous because "[h]e would point at the truck," "turn and look at it," "rub his face," "really couldn't stand still," and was "shuffling his feet around."  Jan. 28, 2015, Tr. at 209:15-18 (Marquez).

192.    The records check on Gonzalez, Sr. and his truck ultimately came back negative, indicating that there were no outstanding warrants associated with Gonzalez, Sr. or the truck. See Jan. 28, 2015, Tr. at 238:8-10 (Swainston, Almonte).

193.    Although the record check came back negative, Almonte did not give Gonzalez, Sr. back his driver's license or insurance card, but instead placed them in a metal folder in his patrol car.  See Jan. 28, 2015, Tr. at 248:11-24 (Swainston, Almonte); id. at 260:10-20 (Walz, Almonte).

194.    Gonzalez, Sr. was not free to leave at that point.  See Jan. 28, 2015, Tr. at 260:10-20 (Almonte).

195.    Based on the information that Almonte had received about the DEA wiretap investigation, what he had observed regarding the truck's lack of license plate, the paper tags, and the condition of the truck's interior, he asked Gonzalez, Sr. if he had anything illegal in the truck; Gonzalez, Sr. said no.  See Jan. 28, 2015, Tr. at 239:7-12 (Almonte).

196.    Almonte then asked Gonzalez, Sr. if he had any cocaine in the truck, to which Gonzalez, Sr. said no.  See Jan. 28, 2015, Tr. at 239:12-14 (Almonte).

197.    Almonte asked Gonzalez, Sr. if he any methamphetamine in the truck, and Gonzalez, Sr. said no.  See Jan. 28, 2015, Tr. at 239:14-15 (Almonte).

198.    Almonte asked Gonzalez, Sr. if he had any heroin in the truck, and Gonzalez, Sr. said no.  See Jan. 28, 2015, Tr. at 239:15-16 (Almonte).

199.    Almonte asked Gonzalez, Sr. if he had any marijuana in the truck, and Gonzalez, Sr. said no.  See Jan. 28, 2015, Tr. at 239:16-17 (Almonte).

200.    Almonte then asked Gonzalez, Sr. if he would consent to a search of his truck; Gonzalez, Sr. said yes.  See Jan. 28, 2015, Tr. at 239:18-20 (Almonte).

201.    Almonte gave Gonzalez, Sr. a consent-to-search form that Gonzalez, Sr. reviewed and signed.  See Jan. 28, 2015, Tr. at 241:1-244:10 (Almonte); Consent to Search (dated Nov. 10, 2011), admitted at the January 28, 2015, evidentiary hearing as Government Exhibit 1 ("Consent Form").

202.    When Almonte gave the Consent Form to Gonzalez, Sr., Marquez took a couple steps away from Gonzalez, Sr. so that he did not feel intimidated by two officers being right next to him.  See Jan. 28, 2015, Tr. at 288:3-18 (Swainston, Marquez).

203.    The Consent Form has identical statements in English and Spanish; Gonzalez, Sr. filled out only the Spanish portion.  See Jan. 28, 2015, Tr. at 240:16-18 (Swainston, Almonte); Consent Form at 1.

204.    Superimposing Gonzalez, Sr.'s statements on the English portion, the Consent Form reads as follows:

    I, Ramon D. Gonzalez Dob 7-15-66, have been informed of my
    constitutional right guaranteed under the Fourth Amendment of the U.S.

- 47 -

Constitution, not to have a search made hereinafter mentioned without a search warrant, and of my right to refuse consent to a search.  I hereby authorize Luis Almonte M. Marquez, K9 Remo and K9 Remo (Police Dog), Deputy Sheriff(s) of the El Paso County Sheriff's Department, to conduct a complete search of my 2012 Dodge Truck NM72640 Sundowner Horse Trailer (premises, vehicles), located at Interstate 10 West Redd Rd., El Paso County, Texas.  These officers are authorized by me to take any letter, papers, materials, or other property, which they may deem necessary.  This written permission is given by me to the above named officers voluntarily and without threats, promises, or coercion of any kind.

Consent Form at 1.  <u>See</u> Jan. 28, 2015, Tr. at 241:17-243:22 (Swainston, Almonte).

205.    Gonzalez, Sr. took approximately two minutes to read and fill out the Consent Form.  <u>See</u> Jan. 28, 2015, Tr. at 244:11-13 (Swainston, Almonte).

206.    Gonzalez, Sr. did not have any questions or concerns about the Consent Form before he signed it.  <u>See</u> Jan. 28, 2015, Tr. at 244:14-16 (Swainston, Almonte); <u>id.</u> at 288:19-25 (Swainston, Marquez).

207.    Gonzalez, Sr. also noted the time that he signed the Consent Form -- 4:24 a.m. -- in the Consent Form's bottom-right corner.  <u>See</u> Jan. 28, 2015, Tr. at 244:4-10 (Swainston, Almonte).

208.    Almonte and Marquez also signed the Consent Form.  <u>See</u> Jan. 28, 2015, Tr. at 244:1-3 (Swainston, Almonte).

209.    When Gonzalez, Sr. read and signed the Consent Form, Almonte's drug-detection dog, Remo, was in Almonte's patrol car.  <u>See</u> Jan. 28, 2015, Tr. at 245:12-19 (Swainston, Almonte).

210.    Before Gonzalez, Sr. signed the Consent Form, his discussion with Almonte was "conversational, . . . low voice tone, and cooperative."  Jan. 28, 2015, Tr. at 245:7-11 (Swasinton, Almonte).

211.    Almonte did not tell Gonzalez, Sr. that he had to sign the consent or "force him to sign the consent in any way." Jan. 28, 2015, Tr. at 245:12-15 (Swainston, Almonte).

212.    When Gonzalez, Sr. reviewed and signed the Consent Form, he appeared calm and was mainly silent, except when Almonte asked if he would consent to the search, and Gonzalez, Sr. said "yes." Jan. 28, 2015, Tr. at 245:20-246:2 (Swainston, Almonte).

213.    Almonte then retrieved Remo from his patrol unit to conduct the search. See Jan. 28, 2015, Tr. at 246:6-7 (Swainston, Marquez).

214.    Because Gonzalez, Sr.'s driver's license and insurance card were still in Almonte's patrol car, Gonzalez, Sr. was not free to leave when he signed the Consent Form or when the search was conducted. See Jan. 28, 2015, Tr. at 262:22-263:1 (Walz, Almonte).

215.    While Almonte and Remo were searching Gonzalez, Sr.'s truck and trailer, Marquez asked Gonzalez, Sr. a number of questions -- for example, if he had anything illegal, any weapons, or any drugs in the truck; Gonzalez, Sr. responded no to all of these questions. See Jan. 28, 2015, Tr. at 293:20-294:5 (Swainston, Marquez).

216.    When Marquez asked Gonzalez, Sr. if he had any marijuana, Gonzalez, Sr. looked towards his truck and said "no," while laughing nervously. Jan. 28, 2015, Tr. at 234:5-7 (Swainston, Marquez).

217.    When Marquez asked Gonzalez, Sr. if he had any large amounts of currency, Gonzalez, Sr. reached into his pocket and pulled out a handful of change. See Jan. 28, 2015, Tr. at 294:12-16 (Swainston, Marquez).

218.    After the search began, Gonzalez, Sr. never said: "Stop doing the search, I revoke my consent." Jan. 28, 2015, Tr. at 244:21-24 (Swainston, Almonte).

219.     When Almonte approached Gonzalez, Sr.'s horse trailer with Remo, the dog immediately alerted to the presence of drugs at the rear of the trailer.  See Jan. 28, 2015, Tr. at 246:12-15 (Almonte).

220.     Remo then alerted several times along the side of the trailer and once at the trailer's nose.  See Jan. 28, 2015, Tr. at 246:16-21 (Almonte).

221.     Almonte then opened the trailer, but did not see any animals inside; Remo went inside of the trailer's nose and alerted at a compartment that was approximately four feet off of the floor of the trailer.  See Jan. 28, 2015, Tr. at 246:22-247:4 (Almonte).

222.     At that point, which was approximately 4:26 a.m., Almonte returned Remo to his patrol car and asked Marquez to search the trailer's nose.  See Jan. 28, 2015, Tr. at 247:5-248:10 (Swainston, Almonte); id. at 293:16-20 (Swainston, Marquez).

223.     Almonte did not tell Gonzalez, Sr. that he could not leave at any time during the search; he also did not put handcuffs on Gonzalez, Sr. at any time during the search.  See Jan. 28, 2015, Tr. at 249:25-250:10 (Swainston, Almonte).

224.     Marquez ultimately discovered marijuana in the compartment in the trailer's nose, he then handcuffed Gonzalez, Sr., placed him in his patrol car, and read Gonzalez, Sr. his rights under Miranda v. Arizona, 384 U.S. 436 (1966)("Miranda").[35]   See Jan. 28, 2015, Tr. at 296:6-297:2 (Swainston, Marquez).

---

[35]Miranda "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"   United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda, 384 U.S. at 444).  The Supreme Court provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made

225.    After Marquez placed Gonzalez, Sr. in his patrol car, he called Lopez and told

him that he had discovered marijuana in the trailer attached to Gonzalez, Sr.'s truck.  See Jan. 28,

2105, Tr. at 211:1-5 (Walz, Lopez); id. at 297:16-19 (Swainston, Marquez).

226.    Lopez then told Marquez to "go back in, because there should be cocaine in the

vehicle."  Jan. 28, 2015, Tr. at 211:4-5 (Walz, Lopez).  See Jan. 28, 2015, Tr. at 297:19-20

(Swainston, Marquez).

227.    Marquez then searched the compartment in the trailer's nose a second time and

found a black bag with cocaine inside.  See Jan. 28, 2015, Tr. at 297:7-22 (Swainston, Marquez).

228.    Marquez transported Gonzalez, Sr. to the detention facility for processing and to

do the arrest paperwork.  See Jan. 28, 2015, Tr. at 304:18-21 (Swainston, Marquez).

229.    While Gonzalez, Sr. and Marquez "were having conversations," and while

Marquez was asking Gonzalez, Sr. about some horse trainers, Gonzalez, Sr. told Marquez that

"we had stopped him too soon.  If we would have waited, we would have gotten the owner at the

Pilot in Acton."[36]  Jan. 28, 2015, Tr. at 304:22-305:25 (Marquez)(internal quotation marks

omitted).

230.    Gonzalez, Sr. said that "he was a small fish and the other ones would have been a

bigger catch."  Jan. 28, 2015, Tr. at 305:2-4 (Marquez)(internal quotation marks omitted).

---

voluntarily, knowingly and intelligently.  If, however, he indicates in any manner
and at any stage of the process that he wishes to consult with an attorney before
speaking there can be no questioning.  Likewise, if the individual is alone and
indicates in any manner that he does not wish to be interrogated, the police may
not question him.

Miranda, 384 U.S. at 444-45.

[36]Neither party has provided additional information explaining what "the Pilot in Acton"
means.  Jan. 28, 2015, Tr. at 304:22-305:25 (Marquez).

231.    Marquez asked Gonzalez, Sr. if he was being followed or being checked on, and Gonzalez, Sr. told Marquez that "he was in communication with somebody else on a push-to-talk phone that was in the truck."  Jan. 28, 2015, Tr. at 306:4-8 (Marquez).

232.    Marquez asked Gonzalez, Sr. why he had not told Marquez during the traffic stop that he was possibly being followed; Gonzalez, Sr. said that "it was because he was in the unit and there was nobody there."  Jan. 28, 2015, Tr. at 306:11-20 (Marquez).

233.    Marquez did not take Gonzalez, Sr.'s statements, and he did not have Gonzalez, Sr. sign them.  See Jan. 28, 2015, Tr. at 307:4-9 (Walz, Marquez).

234.    Marquez also did not record Gonzalez, Sr.'s statements.  See Jan. 28, 2015, Tr. at 309:2-5 (Walz, Marquez).

235.    After Gonzalez, Sr. was processed at the El Paso County Detention Facility, Alberty Montoya, an El Paso County Sheriff's Office detective, read Gonzalez, Sr. his Miranda rights in Spanish.  See Jan. 28, 2015, Tr. at 338:20-22 (Swainston, Montoya).

236.    Gonzalez, Sr. signed the Miranda rights form, indicating that he had read his rights and acknowledged them.  See Jan. 28, 2015, Tr. at 339:2-11 (Swainston, Montoya); Miranda Warning Form (dated Nov. 20, 2011), admitted at the January 28, 2105, evidentiary hearing as Government Exhibit 3 ("Miranda Form").

237.    After signing the Miranda Form, Gonzalez, Sr. said he wanted to speak to an attorney, and Montoya ended the interview.  See Jan. 28, 2015, Tr. at 339:19-23 (Montoya).

238.    As Gonzalez, Sr. and Montoya were waiting for the judge to arraign Gonzalez, Sr., Gonzalez, Sr. blurted out in Spanish: "Once you're in this business, if you don't do what they tell you to do, even your family is in danger."  Jan. 28, 2015, Tr. at 346:3-5 (Montoya).

239.    Gonzalez, Sr.'s statement was not in response any questioning.  See Jan. 28, 2015, Tr. at 340:15-19 (Swainston, Montoya).

240.    Montoya is proficient in Spanish.  See Jan. 28, 2015, Tr. at 340:13-14 (Swainston, Montoya).

241.    Montoya then asked Gonzalez, Sr. if he or his family was in any danger, to which Gonzalez, Sr. responded: "No.  I'm just saying."  Jan. 28, 2015, Tr. at 340:7-10 (Swainston, Montoya).

## PROCEDURAL BACKGROUND

Gonzalez, Sr. is one of fifteen co-Defendants whom the United States indicted on January 24, 2012, in an indictment which charged the Defendants with: (i) conspiring to distribute controlled substances, in violation of 21 U.S.C. § 846; (ii) distributing fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A); (iii) conspiring to launder money, in violation of 18 U.S.C. § 1957; (iv) structuring transactions to evade reporting requirements, in violation of 31 U.S.C. §§ 5323(a)(1), (d)(1), (d)(2); and (v) using a telephone to facilitate drug trafficking, in violation of 21 U.S.C. § 843(b).  See Indictment *passim*, filed January 24, 2012 (Doc. 2).

### 1.    The Motion.

Gonzalez, Sr. filed the Motion on August 7, 2014.  See Motion at 1.  In the Motion, Gonzalez, Sr. asks the Court to suppress any statements made or evidence seized as the fruit of an unconstitutional stop of Gonzalez, Sr.'s truck and an unconstitutional search of his trailer on November 11, 2011.  See Motion at 1.  Gonzalez, Sr. explains that, to satisfy the Fourth Amendment's requirements, an officer's traffic stop of a vehicle must satisfy two steps: (i) the stop must be justified at its inception; and (ii) it must be reasonably related in scope to the

circumstances which justified the stop in the first place.  See Motion at 3 (quoting Terry v. Ohio, 391 U.S. 1, 20 (1968)("Terry")).  Gonzalez, Sr. asserts that an investigative stop usually must last "no longer than necessary to effectuate the purpose of the stop."  Motion at 3 (citing United States v. Lee, 73 F.3d 1034 (10th Cir. 1996)).  Gonzalez, Sr. says that, once a driver has provided proof that he is entitled to operate the vehicle, "he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning."  Motion at 3 (quoting United States v. Morse, 15 F. App'x 590, 594 (10th Cir. 2001)(unpublished))(internal quotation marks omitted).

Gonzalez, Sr. points out that there are two exceptions to the general rule that a driver must be allowed to proceed once he or she has provided evidence that he or she is allowed to drive, and an officer has issued any warnings or traffic citations: (i) the officer has reasonable suspicion that the driver is involved in illegal activity; or (ii) the driver consents to further questioning.  See Motion at 4 (citing United States v. Patten, 183 F.3d 1190, 1193 (10th Cir. 1999); United States v. W., 219 F.3d 1171, 1176 (10th Cir. 2000)(holding that a driver must be permitted to leave after a routine traffic stop if a license and registration check reveal no reason to detain the driver further, the officer has no reasonable suspicion, and the driver has not consented to further questioning)).  Gonzalez, Sr. asserts that there is a two-step process to determine if consent is freely and voluntarily given.  See Motion at 4.  First, the United States "must proffer clear and positive testimony that the consent was equivocal and specific, and freely and intelligently given."  Motion at 5.  Second, the United States must show that coercion or duress did not give rise to the consent.  See Motion at 5 (citing United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996)).

Gonzalez, Sr. contends that the Court should consider several factors to determine if he gave consent voluntarily: (i) the presence of multiple officers; (ii) an officer's use of a threatening tone; (iii) an officer's prolonged retention of personal documents; (iv) the "absence of the public"; and (v) the officer not informing the individual that he or she is free to leave. Motion at 5 (citing United States v. Ledesma, 447 F.3d 1307 (10th Cir. 2006); United States v. Harmon, 785 F. Supp. 2d 1146, 1150 (D.N.M. 2011)(Browning, J.), aff'd 742 F.3d 451 (10th Cir. 2014)). Gonzalez, Sr. maintains that, in the United States Court of Appeals for the Tenth Circuit, there is a bright-line rule that an encounter which an officer initiates through a traffic stop "cannot be consensual if the driver's license and registration have not been returned to him." Motion at 5 (citing United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994)).

Gonzalez, Sr. argues that there is insufficient information for the Court to conclude that Almonte's initial stop of Gonzalez, Sr.'s vehicle was justified, "as it was 4:00 am and it seems unusual that a stop at this hour would be made for failing to display a proper license tag." Motion at 5. Gonzalez, Sr. asserts that, after Almonte obtained Gonzalez, Sr.'s current registration and permanent license plate, and verified that Gonzalez, Sr. did not have any outstanding warrants, the initial reason for Almonte's stop ended. See Motion at 6. Gonzalez, Sr. contends that, at that point, Almonte should have issued him a citation, given him a warning, or allowed him to leave. See Motion at 6.

Gonzalez, Sr. states that, to continue his detention after the traffic stop's purpose was accomplished, Almonte and Marquez needed to obtain Gonzalez, Sr.'s consent or to have reasonable suspicion of illegal activity. See Motion at 6. Gonzalez, Sr. asserts:

> There were no actions taken by Defendant that would lead to a reasonable suspicion that the Defendant was involved in any illegal activity. The deputy did not indicate that Defendant showed any signs of excessive nervousness or had any inconsistencies in his responses to the general questioning by the Deputy. The

Defendant owned the vehicle and it was not rented.  He had proper proof of insurance and was properly licensed to drive.  He did not try to hide his identity and has no prior criminal history.  Further, there were no other factors which the deputy could have known of which would lead to a reasonable suspicion that illegal activity was afoot.

Motion at 6.  Gonzalez, Sr. argues that, although Almonte was permitted to take Gonzalez, Sr.'s driver's license and proof of insurance to determine if there were any warrants against him, and, if his license was legitimate, the stop become an impermissible seizure once those searches came back clean and Almonte continued to hold onto those documents.  See Motion at 6-7.

Gonzalez, Sr. argues that he did not freely and voluntarily consent to be detained for further questioning or to have his trailer searched.  See Motion at 7.  Gonzalez, Sr. says that there were "at least" two deputies present, the deputies questioned Gonzalez, Sr. and obtained his consent "at an early hour of the morning and on the side of Interstate 10," there was "a general absence of the public" on the side of the highway at 4:00 a.m., and Almonte did not return any of Gonzalez, Sr.'s documents before obtaining his consent.  Motion at 7.  Gonzalez, Sr. argues that, because the deputies did not have reasonable suspicion that he was involved in criminal activity, and because they did not obtain his free and voluntary consent to search the trailer, the deputies violated his Fourth Amendment rights to be free from unreasonable search and seizure.  See Motion at 7.

Gonzalez, Sr. asserts that the Court must suppress any evidence obtained as a direct result of the unlawful search as "fruit of the poisonous tree."  Motion at 7 (quoting United States v. Harmon, 785 F. Supp. 2d at 1159)(internal quotation marks omitted).  Gonzalez, Sr. argues that "[a]s a result of the Constitutional violations all of the drugs seized during the illegal search of Defendant's truck and trailer should be suppressed because they were obtained during an unlawful search in violation of Defendant Gonzalez' Fourth Amendment rights."  Motion at 7.

- 56 -

Gonzalez, Sr. urges that the Court should suppress any subsequent statements that he made "after his arrest and prior to Defendant asking for an attorney during questioning by detectives," because those statements were a direct result of the drugs found during the illegal search. Motion at 7-8.

> **2.     The Response.**

The United States responded to the Motion on December 4, 2014.  <u>See</u> United States' Response to Defendant's Motion to Suppress, filed December 4, 2014 (Doc. 720)("Response"). The United States asks the Court to deny the Motion for five reasons.  First, the United States argues that, based on his wiretap analysis, surveillance activities, and experience, Maestas had probable cause to believe that Gonzalez, Sr. was engaged in illegal drug trafficking.  Response at 21.  The United States argues that the automobile exception to the Fourth Amendment's warrant requirement permits law enforcement officers who have probable cause to believe a car contains contraband to search the car without obtaining a search warrant.  <u>See</u> Response at 22 (citing <u>United States v. Beckstead</u>, 500 F.3d 1154, 1165 (10th Cir. 2007)).  The United States contends that, when Almonte stopped Gonzalez, Sr., the DEA had in its possession "all of the intercepted calls and surveillances," and, in particular, "the final calls between Varela and Gonzalez, Sr., that SA Maestas[] reasonably believed would result in the drug transaction that eventually transpired."  Response at 22-23.

Second, the United States argues that Almonte had a lawful basis to stop Gonzalez, Sr.'s vehicle and to search his trailer, because of Almonte's reasonable reliance on the DEA's investigation of the Varela DTO.  <u>See</u> Response at 21.  The United States points out that Lopez instructed Almonte and Marquez that the DEA had an ongoing investigation into the Varela DTO.  <u>See</u> Response at 21.  The United States maintains that, even if the Court decides that

Almonte's stop of Gonzalez, Sr. "was not based on a sufficient motor vehicle code violation," the DEA investigation provided sufficient probable cause for Almonte to conduct the stop. Response at 21 (citing United States v. Whitley, 680 F.3d 1227, 1234 (10th Cir. 2012)("[T]he officer who makes the stop need not have reasonable suspicion that criminal activity is afoot. Instead, the knowledge and reasonable suspicions of one officer can be imputed to another."); United States v. Chavez, 534 F.3d 1338, 1345-49 (10th Cir. 2008)(holding that police officers may rely on the instructions of another law enforcement officer to initiate an automobile stop and conduct a search under the automobile exception, even if the information forming the basis of probable cause is not communicated)).  The United States contends that the DEA's investigation also gave Almonte and Marquez probable cause to search Gonzalez, Sr.'s trailer.  See Response at 24.

Third, the United States argues that Gonzalez, Sr. gave valid consent for the deputies to search his trailer.  See Response at 24.  The United States points out that Gonzalez, Sr. "not only consented but did so in writing."  Response at 24.  According to the United States, there was no undue duress or coercion of any kind, and Gonzalez, Sr. "did not know he was the subject of a DEA wiretap investigation so he did not know the search of his . . . trailer would likely take place even if he did not consent."  Response at 24.  The United States contends that Gonzalez, Sr. consented to the search "in the hopes that the Deputies would not locate[] the hidden stash of drugs, so that he could be on his way."  Response at 24.

Fourth, the United States urges that the DEA had probable cause to arrest Gonzalez, Sr. See Response at 25.  The United States asserts that, based on his training, experience, and the evidence collected on the wiretap, Maestas had probable cause to believe that Gonzalez, Sr. was engaged in "an active, fast moving conspiracy to transport drugs from Mexico to New Mexico

for distribution, and that Gonzalez, Sr. would be the transporter of the drugs on or about November 10, 2011." Response at 25. The United States contends that, even without the seizure of the drugs, Gonzalez, Sr. "could have been arrested for violation of using a telephone to advance a drug trafficking crime, in violation of 21 U.S.C. § 843(b)." Response at 25.

Fifth, the United States maintains that Gonzalez, Sr.'s post-arrest statements are admissible. See Response at 25. The United States points out that, although Gonzalez, Sr. was in custody when he "blurted out" the statements that he now seeks to suppress, he was not under any express questioning or functional equivalent by any law enforcement officers at the time. Response at 25. The United States argues that, as a result, his statements are admissible. See Response at 25 (citing Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)).

### 3.     The Reply.

Gonzalez, Sr. replied to the Response on January 2, 2015. See Reply Supporting Defendant's Motion to Suppress, filed January 2, 2015 (Doc. 724)("Reply"). Gonzalez, Sr. begins the Reply by attacking the United States' reliance on Maestas' interpretations of the intercepted communications between the Varela DTO's members. Reply at 1-2. Gonzalez, Sr. says that the United States does not provide a description of the parties' coded language and "fails to acknowledge that Defendant never once mentioned drugs in any of the recorded conversations." Reply at 2. Gonzalez, Sr. then reiterates his primary argument from the Motion -- i.e., that the deputies ran afoul of the Fourth Amendment when they detained Gonzalez, Sr. longer than was necessary to effectuate the purpose of the traffic stop -- and addresses each of the United States' five arguments from its Response. See Reply at 4-8.

First, in response to the United States' argument that Maestas had probable cause to believe Gonzalez, Sr. possessed illegal drugs, Gonzalez, Sr. contends that Maestas "was not

involved in the initial traffic stop or the subsequent questioning, search, and arrest" of Gonzalez, Sr.  Response at 6.  Gonzalez, Sr. urges that, accordingly, whether Maestas had information on which to base probable cause "is immaterial to the inquiry at hand."  Reply at 6.  Second, in response to the United States' contention that the deputies had a lawful basis to stop and question Gonzalez, Sr. based on the DEA investigation, Gonzalez, Sr. asserts that the United States has provided no evidence that the deputies "had any knowledge of the DEA investigation or of Defendant's alleged complicity in a drug trafficking operation."  Reply at 7.  Gonzalez, Sr. maintains that, to the contrary, the incident reports from the traffic stop are devoid of such information.  See Reply at 7 (citing Incident/Investigation Report (dated Nov. 10, 2011), filed August 7, 2014 (Doc. 675-1)("Incident Report")).  Gonzalez, Sr. adds that the traffic stop alone did not provide the deputies a basis for questioning about drugs or for a vehicle search "regardless of whether consent was obtained."  Reply at 7.

Third, addressing the United States' assertion that "there was probable cause to believe the vehicle contained drugs," Gonzalez, Sr. says that the United States has not presented any evidence that either Almonte or Marquez had any knowledge of the DEA's investigation of the Varela DTO or Maestas' belief that Gonzalez, Sr. was transporting drugs.  Reply at 7.  Fourth, in response to the United States' contention that Gonzalez, Sr. voluntarily consented to the search of his trailer, Gonzalez, Sr. says that the United States fails to address the cases that Gonzalez, Sr. cited in the Motion which held that an individual cannot give voluntary consent when officers retain his or her license and registration.  See Reply at 7.

Fifth, and finally, Gonzalez, Sr. challenges the United States' assertion that his post-arrest statement was voluntary.  See Reply at 7.  Gonzalez, Sr. contends that, although the United States relies on Miranda's progeny to support this argument, those cases are all inapposite.  See

- 60 -

Reply at 7.  Gonzalez, Sr. asserts that, because his Fourth Amendment rights were violated, "any evidence obtained as a result of that violation cannot be used by the government, including post-arrest statements, whether made during a custodial interrogation or not."  Reply at 7-8 (citing United States v. Baity, No. CR 05-186 JB, 2006 WL 1305035 (D.N.M. Jan. 25, 2006)(Browning, J.)(suppressing evidence and the defendant's statements that resulted from an officer's unconstitutional frisk of the defendant)).

> ### 4.      The Suppression Hearings.

The Court held hearings on the Motion on January 22, 2015, January 28, 2015, and January 30, 2015.  Before the United States began its opening statement, the parties discussed whether the Court may use the collective knowledge doctrine to justify the stop of Gonzalez, Sr.'s truck and the search of his trailer.  See Jan. 22, 2015, Tr. at 9:9-17:8 (Court, Swainston, Walz).  The parties agreed that, generally, courts may use the collective knowledge doctrine to impute reasonable suspicion and probable cause from one officer to another.  See Jan. 22, 2015, Tr. at 11:5-14:3 (Swainston, Walz); id. at 15:17-24 (Walz).  Gonzalez, Sr. argued, however, that: (i) the DEA's investigation into the Varela DTO did not cultivate sufficient probable cause to justify the stop of Gonzalez, Sr.'s vehicle or the search of his trailer; and (ii) even if the DEA's investigation established probable cause to stop Gonzalez, Sr.'s vehicle and to search his trailer, the United States has not shown a sufficient connection between Maestas and the deputies for the Court to impute the DEA's probable cause to Almonte and Marquez.  See Jan. 22, 2015, Tr. at 15:1-16:4 (Walz).

The United States called Maestas to testify at the evidentiary hearing.  Maestas testified that, beginning on November 3, 2011, the DEA began to intercept calls between: (i) Varela and J. Ibarra-Solis; (ii) Varela and A. Gonzalez; (iii) Varela and Gonzalez, Jr.; (iv) Varela and

Chavez; and (v) Varela and Gonzalez, Sr.  See Jan. 22, 2015, Tr. at 30:15-30:7 (Maestas).

Maestas said that, based on his investigation, he believed that Gonzalez, Sr. and A. Gonzalez

planned to transport cocaine from J. Ibarra-Solis to Varela.  See Jan. 22, 2015, Tr. at 31:12-18

(Swainston, Maestas).  On or about November 9, 2011, Maestas determined that this pending

drug shipment was going to occur in the next few days, and he directed other agents and officers

to intercept the shipment in El Paso through a walled-off stop.  See Jan. 22, 2015, Tr. at 32:19-24

(Swainston).  At different points in Maestas' testimony on direct- and cross-examination, he

explained how he interpreted the coded language in the intercepted telephone calls to conclude

that the co-Defendants were planning a shipment of illegal drugs.  See Jan. 22, 2015, Tr. at 54:4-

63:23 (Maestas, Walz); id. at 76:1-80:9 (Maestas, Walz); id. at 91:9-146:8 (Maestas, Swainston).

Maestas also testified that there were no irregularities in Gonzalez, Sr.'s bank accounts or

financial records.  See Jan. 22, 2015, Tr. at 83:6-9 (Maestas, Walz).  Maestas said that the DEA's

search of Gonzalez, Sr.'s property did not uncover any money.  See Jan. 22, 2015, Tr. at 83:10-

21 (Maestas, Walz).  Maestas testified that Gonzalez, Sr. is a horse trainer "of fairly national

recognition," that video surveillance of Gonzalez, Sr.'s multiple homes did not reveal any

criminal activity, and that physical surveillance of Gonzalez, Sr. and A. Gonzalez at a racetrack

in Sunland, New Mexico, also did not reveal any criminal activity.  See Jan. 22, 2015, Tr. at

42:10-51:16 (Maestas, Walz).

The United States also called Gooch to the stand.  Gooch testified that he was in charge

of the DEA's surveillance operation in El Paso.  See Jan. 28, 2015, Tr. at 156:19-23 (Swainston,

Gooch).  Gooch explained that he initiated the operation when Maestas called and told him that,

based on intercepted telephone communications, he believed that Gonzalez, Sr. was going to

pick up a drug load in El Paso on or about November 10, 2011.  See Jan. 28, 20115, Tr. at

158:16-20 (Swainston, Gooch).  Gooch detailed the DEA's surveillance of Gonzalez, Sr. and A. Gonzalez in and around El Paso, and explained how the surveillance team did not participate in the stop of Gonzalez, Sr.'s truck or the search of his trailer, because they wanted to protect the wiretap investigation.  See Jan. 28, 2015, Tr. at 170:13-23 (Swainston, Gooch).

Lopez testified that he worked as a DEA Task Force Officer during the lead-up to the El Paso Drug Seizure.  See Jan. 28, 2015, Tr. at 185:1-9 (Swainston, Lopez); id. at 206:22-207:14 (Walz, Lopez).  Lopez explained how he enlisted Almonte and Marquez to conduct a walled-off stop of Gonzalez, Sr.'s vehicle, so that the DEA could prevent the cocaine shipment from reaching Albuquerque while protecting the ongoing wiretap investigation.  See Jan. 28, 2015, Tr. at 187:15-24 (Swainston, Lopez).  Lopez said that he told Marquez that he and Almonte were assisting the Albuquerque DEA office in a wiretap investigation and that the DEA needed them to conduct a traffic stop of a vehicle that would likely be loaded with an unknown amount of cocaine.  See Jan. 28, 2015, Tr. at 189:5-15 (Swainston, Lopez); id. at 200:8-23 (Walz, Lopez).  Lopez explained how he pointed out Gonzalez, Sr.'s truck to Marquez on the morning of November 10, 2011, and that he gave Marquez a DEA radio to communicate with Marquez throughout the operation.  See Jan. 28, 2015, Tr. at 193:7-194:14 (Swainston, Lopez).  Lopez also said that Marquez relayed his instructions to Almonte over the Sheriff's Office radio.  See Jan. 28, 2015, Tr. at 194:11-14 (Swainston, Lopez).

Marquez said that he relayed a description of Gonzalez, Sr.'s truck to Almonte and told Almonte that the truck likely contained illegal drugs.  See Jan. 28, 2015, Tr. at 250:16-20 (Swainston, Almonte); id. at 251:22-252:6 (Swainston, Almonte); id. at 253:7-10 (Walz, Almonte); id. at 265:1-10 (Walz, Almonte).  Marquez testified that, when Gonzalez, Sr. left his hotel on the morning of November 10, 2011, he relayed Gonzalez, Sr.'s location to Almonte.

See Jan. 28, 2015, Tr. at 194:7-196:22 (Swainston, Lopez).  Almonte and Marquez explained the circumstances of the stop of Gonzalez, Sr.'s truck and the search of his trailer, their discovery of marijuana and cocaine in Gonzalez, Sr.'s trailer, and their subsequent arrest of Gonzalez, Sr.  See Jan. 28, 2015, Tr. at 226:22-263:1 (Swainston, Walz, Almonte); id. at 294:12-304:18 (Swainston, Marquez).  Marquez also testified that, while he was processing Gonzalez, Sr. at the detention facility, Gonzalez, Sr. told Marquez that "we had stopped him too soon.  If we would have waited, we would have gotten the owner at the Pilot in Acton."  Jan. 28, 2015, Tr. at 304:22-305:25 (Marquez).  Marquez testified that Gonzalez, Sr. said that "he was a small fish and the other ones would have been a bigger catch."  Jan. 28, 2015, Tr. at 305:2-4 (Marquez).

The parties largely stuck to the briefing in their closings.  See Transcript of Hearing (taken Jan. 30, 2015) at 345:1-425:18 (Court, Swainston, Walz), filed March 30, 2015 (Doc. 755)("Jan. 30, 2015, Tr.").  Gonzalez, Sr. advanced three arguments.  First, he argued that the United States did not develop sufficient probable cause through the DEA's investigation of the Varela DTO to stop Gonzalez, Sr.'s vehicle or to search his trailer.  See Jan. 30, 2015, Tr. at 348:17-351:2 (Walz).  He contended that it does not appear, listening to the intercepted telephone calls, reading the transcripts, and listening to the testimony of the DEA agents involved in the surveillance operation in El Paso on November 9, 2011, and November 10, 2011, that he was involved in any criminal activity.  See Jan. 30, 2015, Tr. at 349:23-351:2 (Walz). Second, Gonzalez, Sr. argued that, assuming that the deputies did not obtain probable cause to conduct the stop and search from the DEA's investigation, his consent to search the trailer was invalid, because the deputies exceeded the traffic stop's permissible scope when they did not return Gonzalez, Sr.'s license and registration after his records check came back clean, and they did not issue him a citation.  See Jan. 30, 2015, Tr. at 352:11-353:13 (Walz).  Third, Gonzalez,

Sr. said that his allegedly nervous behavior and the presence of clothes and food wrappers in his truck did not give the deputies reasonable suspicion to extend the traffic stop.  See Jan. 30, 2015, Tr. at 353:13-355:13 (Walz).

When pressed, Gonzalez, Sr. said that the Court can deny the Motion if it finds that the DEA's investigation into the Varela DTO provided Almonte and Marquez probable cause to stop Gonzalez, Sr.'s vehicle and to search his trailer.  See Jan. 30, 2015, Tr. at 362:1-12 (Court, Walz).  Gonzalez, Sr. also conceded that the traffic stop was lawful, because his registration tag was expired and he was not showing his license plate.  See Jan. 30, 2015, Tr. at 369:5-23 (Court, Walz).  Gonzalez, Sr. asserted, however, that the deputies exceeded the traffic stop's permissible scope when they continued to hold onto his license and registration after resolving the reasons for the traffic stop -- i.e., his expired registration tag and lack of a visible license plate.  See Jan. 30, 2015, Tr. at 371:16-20 (Walz).  Gonzalez, Sr. said that, from that point forward, the deputies' actions were unlawful.  See Jan. 30, 2015, Tr. at 371:21-25 (Walz).  The Court asked Gonzalez, Sr. whether it would have made a difference for the deputies to ask for his consent while they were writing out the ticket; Gonzalez, Sr. replied that asking for consent in that scenario would have been permissible.  See Jan. 30, 2015, Tr. at 372:1-21 (Court, Walz).

When the United States took the lectern, it stuck to its arguments from the briefing: (i) the deputies obtained probable cause to stop Gonzalez, Sr.'s vehicle and to search his trailer from the DEA's investigation into the Varela DTO; (ii) even if the deputies did not obtain probable cause to stop Gonzalez, Sr.'s vehicle from the DEA investigation, Almonte obtained probable cause to stop him after he observed Gonzalez, Sr. commit two traffic violations; (iii) even if Almonte had to rely on Gonzalez, Sr.'s traffic violations to stop his vehicle, he and Marquez had reasonable suspicion to extend the traffic stop based on Gonzalez, Sr.'s behavior,

and on the clothes and trash in his vehicle; and (iv) even if the deputies did not have probable cause from the DEA investigation to search Gonzalez, Sr.'s trailer, Gonzalez, Sr. knowingly and voluntarily consented to their search.  See Jan. 30, 2015, Tr. at 379:13-415:25 (Swainston).

At the end of the hearing, the Court said that it was inclined to deny the Motion.  See Jan. 30, 2015, at 421:6-424:23 (Court).  The Court said that it was inclined to think that the DEA's investigation of the Varela DTO cultivated sufficient probable cause to stop Gonzalez, Sr.'s vehicle and to search his trailer, and that Maestas adequately conveyed that information to Almonte and Marquez.  See Jan. 30, 2015, Tr. at 421:15-422:10 (Court).  The Court explained that, even if the deputies did not have probable cause from the DEA investigation to stop Gonzalez, Sr.'s vehicle, Almonte obtained probable cause to stop Gonzalez, Sr. after witnessing him commit the traffic violations.  See Jan. 30, 2015, Tr. at 422:8-12 (Court).  The Court said that, either way, the stop was likely lawful.  See Jan. 30, 2015, Tr. at 422:11-12 (Court).  The Court asserted that the search of Gonzalez, Sr.'s trailer was likely lawful for two reasons: (i) the deputies obtained probable cause for the search from the DEA investigation; and (ii) the deputies obtained Gonzalez, Sr.'s knowing and voluntary consent to search his trailer.  See Jan. 30, 2015, Tr. at 422:13-23 (Court).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. Fourth Amendment rights are enforceable against state actors through the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961); United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against state law enforcement officials as incorporated

through the Due Process Clause of the Fourteenth Amendment.").   "Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness."  United States v. Harmon, 785 F. Supp. 2d at 1157.  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  (quoting Brigham City v. Stuart, 547 U.S. 398 (1978))).  The Supreme Court of the United States has stated that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

1.    **The Fourth Amendment "Standing" Analysis.**

"The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of 'standing.'"  Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *8 (D.N.M. Feb. 28, 2014)(Browning, J.)(citing United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.")).  Accordingly, the Court, following the Tenth Circuit's lead, has also referred to this test as one of standing.  See, e.g., United States v. Harmon, 785 F.

Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting <u>United States v. Poe</u>, 556 F.3d at 1121).  The Supreme Court's decisions suggest, however, that the "standing" test has now expressly been incorporated into the substantive Fourth Amendment search analysis.  <u>United States v. Sweeney</u>, No. CR 14-0020, 2014 WL 2514926, at *2 (E.D. Wisc. June 4, 2014)(Adelman, J.)("Once referred to as 'standing,' this requirement is actually part of substantive Fourth Amendment law.").

In <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."  439 U.S. at 133.  Dispensing with this label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain <u>Jones</u>'[37] use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant.  However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," <u>Simmons v. United States</u>, 390 U.S. [377, 389 (1968)] . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in <u>Jones</u>, and reaffirmed

---

[37]<u>Jones v. United States</u>, 362 U.S. 257 (1960), <u>overruled by</u> <u>United States v. Salvucci</u>, 448 U.S. 83 (1980).

today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  The inquiry under either approach is the same.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.  The Court in <u>Jones</u>, also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks.

439 U.S. at 138-39 (citations omitted).  The Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . .  But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40.  In <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998), the Supreme Court recognized

that <u>Rakas v. Illinois</u> put an end to the Fourth Amendment standing analysis as separate from the

substantive Fourth Amendment search analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in <u>Rakas</u> . . . .  Central to our analysis [in <u>Rakas v. Illinois</u>] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."

525 U.S. at 87-88 (citations omitted).  The Supreme Court has, thus, noted that the analysis

under either approach -- the substantive Fourth Amendment doctrine that the rights that the

Amendment secures are personal versus the separate notion of "standing" -- is the same.  <u>Rakas</u>

<u>v. Illinois</u>, 439 U.S. at 139.

## 2.   Whether a Fourth Amendment Search Occurred.

A court cannot suppress evidence unless the search was a Fourth Amendment search.  A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information.  See United States v. Jones, 132 S. Ct. at 947.  "[T]he Katz reasonable-expectation-of-privacy test has been *added to,* not *substituted for,* the common-law trespassory test."  United States v. Jones, 132 S. Ct. at 947 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).

### a.  Katz v. United States' Reasonable-Expectations-of-Privacy Analysis.

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"  Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. at 174).  "A district court cannot suppress evidence unless the movant proves that a search implicates *personal* Fourth Amendment interests."  United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).  "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'"  United States v. Miller, 425 U.S. 435, 440 (1976)(quoting Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).  The Tenth Circuit has, thus, noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched."  United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)).  Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends,

after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.) abrogated on other grounds as recognized in Ysasi v. Brown, 2014 WL 936835, at *9 n.24.

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court has, thus, recognized that, rather than determining whether law enforcement conduct was a search, it sometimes proves easier to "assess[] when a search is not a search." Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States. Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth. As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33. The Supreme Court, thus, articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed., 2004) -- which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"  United States v. Jones, 132 S. Ct. at 951.  See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").  In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control."  Rakas v. Illinois, 439 U.S. at 143 & n.12.  Although ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession."  United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

i.      **Subjective Expectation of Privacy.**

A defendant maintains a subjective expectation of privacy when he or she "has shown that 'he sought to preserve something as private.'"  Ysasi v. Brown, 2014 WL 936835, at *8 (quoting Bond v. United States, 529 U.S. at 338).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  "[T]he Fourth Amendment protects people, not places.  What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  Katz v. United States, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to

> Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.  In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well.  In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.   In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

Smith v. Maryland, 442 U.S. at 740 n.5.  Most recently, in United States v. Jones, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.  People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.  Perhaps, as Justice

- 73 -

Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(citations omitted). The Court notes, however, that, regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think that what they post on the internet is or remains private. See United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(holding that a person posting to his Facebook profile had "no justifiable expectation that his 'friends' would keep his profile private").

## ii. Privacy Expectation That Society Is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." United States v. Ruiz, 664 F.3d 833, 838 (10th Cir. 2012)(United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000)). The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." United States v. Jacobsen, 466 U.S. 109, 122 (1984). "Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values that the Fourth Amendment protects." United States v. Alabi, 943

F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.)(citing California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")), aff'd, 597 F. App'x 991 (10th Cir. 2015)(unpublished).   This second factor of Katz v. United States' reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'" LaFave, § 2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353).   Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather on whether the expectation of privacy is justified or legitimate.   The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.   In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."   Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).   In United States

v. Place, 462 U.S. 696 (1983), the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  462 U.S. at 707.  The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699. The drug-sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could identify only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage.  It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage.  Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search.  Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item.  Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.
>
> In these respects, the canine sniff is *sui generis*.  We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.  Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

United States v. Place, 462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122-24. A Federal Express employee and supervisor opened a damaged package, and exposed four zip-lock plastic bags containing 6 ½ ounces of white powder. See 466 U.S. at 111. They then called the DEA and repacked the contents in the original packaging before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

> The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted). The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment." United States v. Jacobsen, 466 U.S. at 122. The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?

. . . .

A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest. Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

. . . .

Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place, and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[38]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the series of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at], governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interests.'"  543 U.S. at 408

---

[38]The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

(quoting <u>United States v. Jacobsen</u>, 466 U.S. at 123)(emphasis in original).  The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'" 543 U.S. at 408-09 (quoting <u>United States v. Jacobsen</u>, 466 U.S. at 122).  The Supreme Court in <u>Illinois v. Caballes</u> noted that its decision was consistent with <u>Kyllo v. United States</u>, as the thermal imaging device in <u>Kyllo v. United States</u> could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search.  <u>Kyllo v. United States</u>, 533 U.S. 27 . . . (2001) . . . .  Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath."  <u>Id.</u>, at 38 . . . .  The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car.  A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

<u>Illinois v. Caballes</u>, 543 U.S. at 409-10.

In <u>United States v. Alabi</u>, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants."  943 F. Supp. 2d at 1275.  The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- <u>i.e.</u>, intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp. 2d at 1280.  The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search

when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ."  943 F. Supp. 2d at 1281. Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals."  943 F. Supp. 2d at 1287.

### b.  Trespass-Based Analysis.

In Florida v. Jardines, the Supreme Court explained that the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation."  United States v. Jones, 132 S. Ct. at 951 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).  In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information."  United States v. Jones, 132 S. Ct. at 951 n.5.  The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection."  Bond v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court, in Florida v. Jardines, suggested that the trespass-based

analysis applies only when the trespass occurs in one of the four places or things listed in the

Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text . . . .  But when it comes to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414.

In United States v. Alabi, the Court analyzed whether the Secret Service's digital scan of

electronic information contained in the defendants' credit and debit cards' magnetic strips was a

Fourth Amendment search under a trespass-based analysis, concluding that it was not, because

the Secret Service properly possessed the credit and debit cards, and the additional act of

scanning the cards to read the virtual data contained on the strips did not involve a physical

intrusion or physical penetration of space.  See 943 F. Supp. 2d at 1264-65.  The Court noted

that, "[e]ven if the Supreme Court were to extend the trespass-based analysis for Fourth

Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one

credit and debit cards still would not amount to a Fourth Amendment search," because the

magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally

protected area.  943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip.

> Protecting this area from law enforcement search and seizure would thus not
> further the Fourth Amendment's express purpose of protecting "[t]he right of the
> people to be secure in *their* persons, houses, papers, and effects . . . ."  U.S. Const.
> amend IV.

943 F. Supp. 2d at 1273 (omission in case but not in quoted source)(emphasis in case but not in

quoted source).

### c.   <u>Katz v. United States'</u> Reasonable-Expectation-of-Privacy Test <u>Remains Good Law.</u>

The Court has noted that, in light of the Supreme Court's recent decisions in <u>Florida v.

Jardines</u> and <u>United States v. Jones</u>, both of which Justice Scalia wrote for the majority, and both

of which analyze whether government conduct constituted a Fourth Amendment search using the

trespass-based approach, "the question arises whether the <u>Katz v. United States</u> reasonable-

expectation-of-privacy test is still good law."  <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1242

(citing <u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)).   Justice Scalia has

consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the <u>Katz</u>
> test (which has come to mean the test enunciated by Justice Harlan's separate
> concurrence in <u>Katz</u> . . .) is that, unsurprisingly, those "actual (subjective)
> expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'"
> bear an uncanny resemblance to those expectations of privacy that this Court
> considers reasonable.  When that self-indulgent test is employed (as the dissent
> would employ it here) to determine whether a "search or seizure" within the
> meaning of the Constitution has *occurred* (as opposed to whether that "search or
> seizure" is an "unreasonable" one), it has no plausible foundation in the text of the
> Fourth Amendment.  That provision did not guarantee some generalized "right of
> privacy" and leave it to this Court to determine which particular manifestations of
> the value of privacy "society is prepared to recognize as 'reasonable.'"  Rather, it
> enumerated ("persons, houses, papers, and effects") the objects of privacy
> protection to which the *Constitution* would extend, leaving further expansion to
> the good judgment, not of this Court, but of the people through their
> representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(citations

omitted).  In both <u>United States v. Jones</u> and <u>Florida v. Jardines</u>, however, Justice Scalia, writing

- 82 -

for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis.  Rather, his majority opinions asserted that <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis added to the trespass-based analysis.  See <u>Florida v. Jardines</u>, 133 S. Ct. at 1417 ("The <u>Katz</u> reasonable-expectations test 'has been *added to,* not *substituted for,*' the traditional property-based understanding of the Fourth Amendment."  (emphasis in original)(quoting <u>United States v. Jones</u>, 132 S. Ct. at 952)).  The Court concluded in <u>United States v. Alabi</u> that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the <u>Katz v. United States</u> reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach." 943 F. Supp. 2d at 1243.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in <u>Maryland v. King</u>, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure." 133 S. Ct. at 1980.  Justice Scalia criticized the majority opinion for analogizing DNA testing to taking an arrestee's photograph by citing to <u>Katz v. United States</u> and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" <u>Maryland v. King</u>, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in his or her body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee."  But why are the "privacy-related concerns" not also "weighty" when an intrusion into the *body* is at stake? (The Fourth Amendment lists "persons" *first* among the entities protected against unreasonable searches and seizures.).

<u>Maryland v. King</u>, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphases in original)(citations

omitted).   Justice Scalia also suggested that the Founders would have shared these privacy-

related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school.  Perhaps the construction of such a genetic panopticon is wise.  But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

<u>Maryland v. King</u>, 133 S. Ct. at 1989 (Scalia J., dissenting).  The Court, therefore, concludes that

Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when

determining whether a search is reasonable for Fourth Amendment purposes, although Justice

Scalia may not turn to the expectations prong until after he runs the facts through the trespass

prong.

**3.      <u>Search Warrants Require Probable Cause.</u>**

"The Supreme Court requires that a magistrate judge be provided information sufficient

to determine the existence of probable cause before he or she issues a warrant."  <u>United States v.

Romero</u>, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing <u>Illinois v. Gates</u>, 462

U.S. 213, 239 (1983)), <u>aff'd</u>, 749 F.3d 900 (10th Cir. 2014).  Probable cause requires "more than

mere suspicion but less evidence than is necessary to convict."  <u>United States v. Burns</u>, 624 F.2d

95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in

support of a search warrant "must contain facts sufficient to lead a prudent person to believe that

a search would uncover contraband or evidence of criminal activity."  <u>United States v. Danhauer</u>,

229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between

suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899

F.2d 927, 937 (10th Cir. 1990).  The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v.

Gates, 462 U.S. at 238).   See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir.

1997)(finding that, in determining whether an affidavit supports a finding of probable cause, the

court must review the affidavit as a whole and look to the totality of the information contained

therein).   In making his or her determination, the Magistrate Judge "may draw reasonable

inferences from the material provided in the warrant application."  United States v. Rowland,

145 F.3d 1194, 1205 (10th Cir. 1998).

    "A reviewing court should accord great deference to a magistrate's determination of

probable cause."  United States v. Reed, 195 F. App'x at 822.  The court's duty is "simply to

ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause

existed."  Illinois v. Gates, 462 U.S. at 236, 238-39.  This deference is appropriate to further the

Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727,

733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the

constitutionality of a search warrant should begin with the rule that the informed and deliberate

determinations of magistrates empowered to issue warrants . . . are to be preferred over the

hurried action of office[r]s.").  Because of the strong preference for warrants, "in a doubtful or

marginal case a search under a warrant may be sustainable where without one it would fall."

United States v. Ventresca, 380 U.S. at 106.

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless."  United States v. Alabi, 943 F. Supp. 2d at 1253 (citing United States v. Leon, 468 U.S. 897, 914 (1984)).  The court should not defer to a Magistrate Judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause.  See United States v. Danhauer, 229 F.3d at 1006.  Specifically, the court should not defer to a Magistrate Judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. at 734; Illinois v. Gates, 462 U.S. at 239).

### 4.    Search Warrants Require Particularity.

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Supreme Court has explained that the "manifest purpose" of the particularity requirement is "to prevent general searches." Maryland v. Garrison, 480 U.S. 79, 84 (1987).  "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  Maryland v. Garrison, 480 U.S. at 84.  Moreover, a particular warrant "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search."  United States v. Chadwick, 433 U.S. 1, 9 (1977)(citations omitted).  See

Illinois v. Gates, 462 U.S. at 236 ("[P]ossession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct.").

     **5.**       **The Automobile Exception to the Warrant Requirement.**

"Under the automobile exception to the Fourth Amendment's warrant requirement, 'police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'" United States v. Vazquez, 555 F.3d 923, 930 (10th Cir. 2009)(quoting Florida v. Meyers, 466 U.S. 380, 381 (1984)). "Moreover, '[o]nce the officer[s'] suspicions rise to the level of probable cause, they are empowered to search the entire vehicle, including the trunk and all containers therein that might contain contraband.'" United States v. Vazquez, 555 F.3d at 930 (quoting United States v. Chavez, 534 F.3d at 1345). "Probable cause to search an automobile exists 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" United States v. Montes-Ramos, 347 F. App'x 383, 395-96 (10th Cir. 2009)(unpublished)(quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). Courts must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Ledesma, 447 F.3d at 1316 (10th Cir. 2006)(citations omitted). "The ultimate question is whether the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." United States v. Ledesma, 447 F.3d at 1316 (internal quotation marks omitted)(citations omitted).

The extent to which a search's scope is permissible can expand if probable cause develops during the performance of an otherwise lawful automobile search. See United States v. Carbajal-Iriarte, 586 F .3d 795, 802 (10th Cir. 2009)(holding that, even if a defendant's consent did not authorize an officer to "cut open his spare tire, the search [is] nonetheless permissible [if] the officers obtained probable cause to search the tire during the portion of the search to which the defendant did consent"). In United States v. Carbajal-Iriarte, for example, the Tenth Circuit held that the district court did not err in refusing to suppress drugs recovered from the seat of a vehicle after officers cut open the upholstery. See 596 F.3d at 802. The defendant argued that the officers exceeded the scope of his consent when they cut open the upholstery of the seat. See 596 F.3d at 802. The Tenth Circuit stated:

> Here, the officers had an independent legal basis upon which to proceed because the dog's positive alert to the presence of drugs in the van provided probable cause. See United States v. Ludwig, 10 F.3d 1523, 1527-28 (10th Cir. 1993). As a result, it is immaterial whether Carbajal-Iriarte consented to cutting open the seat. Once the officers had probable cause to search the seat, his consent was no longer necessary.

586 F.3d at 802. See United States v. Morales-Zamora, 914 F.2d 200, 205-06 (10th Cir. 1990) (finding that it need not "reach the issue of consent because probable cause to search was supplied when the dog alerted to the vehicles" and stating that, under the "vehicle exception to the general rule that searches are reasonable only if conducted pursuant to a valid search warrant," no warrant was necessary for the search of the vehicles to be reasonable under the Fourth Amendment).[39]

---

[39]Although the Supreme Court has not narrowed the scope of the automobile exception to the warrant requirement, it has recently held that officers may not use the search incident to a lawful arrest exception to justify the search of a defendant's cell phone. See Riley v. California, 134 S. Ct. 2473, 2493 (2014)("[A] warrant is generally required before such a search, even when a cell phone is seized incident to arrest.").

## RELEVANT LAW ON THE EXCLUSIONARY RULE

"When evidence is obtained in violation of a person's constitutional rights, the government is prohibited from using that evidence in a criminal prosecution of that person." United States v. Villaba, No. CR 13-0664 JB, 2013 WL 4782206, at *27 (D.N.M. Aug. 21, 2013)(Browning, J.)(citing United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.")).  In addition, a court must also suppress any other evidence deemed to be the "fruit of the poisonous tree," because it is evidence which was discovered as a direct result of the unlawful law enforcement activity.  United States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006).  "To suppress evidence that was derived following unlawful activity, the defendant must show that there is a factual nexus between the illegality and the challenged evidence."  United States v. Villaba, 2013 WL 4782206, at *27 (citing United States v. Olivares-Rangel, 458 F.3d at 1109; United States v. Nava-Ramirez, 210 F.3d at 1131).

"For the exclusionary rule to apply, the defendant must show, by a preponderance of the evidence: (i) a constitutional violation, and (ii) a causal nexus between the violation and the evidence sought to be excluded."  United States v. Villaba, 2013 WL 4782206, at *27 (citing United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006)).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the prosecution to establish that an exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999.

1.    **The Good-Faith Exception.**

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence through an unlawful search or seizure acted in good faith. United States v. Davis, 131 S. Ct. 2419, 2426 (2011).  To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the substantial social costs generated by the rule."  131 S. Ct. at 2427.  The Supreme Court has explained that "[t]he basic insight of the Leon line of cases is that the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue."  131 S. Ct. at 2427. Consequently, "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."  United States v. Davis, 131 S. Ct. at 2438 (citation omitted).  By contrast, "[w]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way."  United States v. Davis, 131 S. Ct. at 2427-28 (citations omitted)(internal quotation marks omitted).

a.    **Warrants based on illegally obtained information.**

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception."  United States v. Alabi, 943 F. Supp. 2d at 1260.  "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed."  United States v. Alabi, 943 F. Supp. 2d at 1260.  If the remaining

content of the warrant affidavit establishes probable cause, the search pursuant to that warrant

was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information.  An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause.  If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).  See United States v. Cusumano, 83

F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in

the affidavit and ask whether sufficient facts remain to establish probable cause."); United States

v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990)("An affidavit containing erroneous or

unconstitutionally obtained information invalidates a warrant if that information was critical to

establishing probable cause.  If, however, the affidavit contained sufficient accurate or untainted

evidence, the warrant is nevertheless valid.").  "The apparent rationale for this rule is that one

officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow

officer obtained illegally."  United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United

States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

### b.  United States v. Leon.

In United States v. Leon, the Supreme Court faced the question whether to apply the

good-faith exception when a police officer mistakenly thought a warrant, from which he obtained

evidence, was supported by probable cause.  See 468 U.S. at 905.  The Supreme Court noted that

excluding this evidence would not deter police misconduct.  See 468 U.S. at 918-19.  The officer

had taken all of the necessary steps to comply with the Fourth Amendment and reasonably

thought the warrant, and, thus, his search, was valid.  See 468 U.S. at 918-19.  The Supreme

Court explained that, when a warrant is issued on less than probable cause, the person whose

conduct the law wishes to deter is the issuing judge and that excluding the evidence would not

have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme

Court, thus, concluded that a court need not suppress evidence seized pursuant to a facially valid

warrant which later turns out to lack probable cause, as long as police were acting in good-faith

reliance on that warrant.  See 468 U.S. at 922-23.

"The Tenth Circuit, therefore, now applies the rule that, in cases where the police

obtained a warrant but the affidavit supporting the warrant does not establish probable cause,

suppression of the evidence found is inappropriate so long as the officers relied on the warrant in

good faith."  United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning,

J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v.

Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)), aff'd, 643 F.3d 1292 (10th Cir. 2011).

> [T]he suppression of evidence obtained pursuant to a warrant should be ordered
> only in those unusual cases in which exclusion will further the purposes of the
> exclusionary rule[.]  Where an officer acting with objective good faith obtains a
> search warrant from a detached and neutral magistrate and the executing officers
> act within its scope, there is nothing to deter.

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, the Tenth Circuit has explained that,

"[u]nder Leon, we presume good-faith when an officer acts pursuant to a warrant unless one of

'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an
> affidavit containing false information or information that the affiant would have
> known was false if not for his "reckless disregard for the truth."  Second, the
> exception does not apply when the "issuing magistrate wholly abandon[s his]
> judicial role."  Third, the good-faith exception does not apply when the affidavit
> in support of the warrant is "so lacking in indicia of probable cause as to render
> official belief in its existence entirely unreasonable."  Fourth, the exception does
> not apply when a warrant is so facially deficient that the executing officer could
> not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23)(citations omitted). See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If any of these situations is present, the good-faith exception should not be applied, and the evidence should be excluded." United States v. Romero, 743 F. Supp. 2d at 1316.

### c. Herring v. United States.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in the Dale County, Alabama, warrant database. See 555 U.S. at 137. In the search incident to that arrest, officers found drugs and a gun on Herring's person. See 555 U.S. at 137. Herring was then indicted on federal gun and drug-possession charges. See 555 U.S. at 138. It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall. See 555 U.S. at 138. Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it. See 555 U.S. at 138. The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed. See 555 U.S. at 138.

The Supreme Court upheld the Eleventh Circuit's decision, based primarily on the good-faith exception to the exclusionary rule. See 555 U.S. at 140-46. The Supreme Court agreed with the Eleventh Circuit that, although the failure of the police to update the warrant database to reflect the fact that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate. See 555 U.S. at 140. The Supreme Court reiterated its holding from United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." 555 U.S. at 142 (citing United States v. Leon, 468 U.S. at 922). Tracing the history of cases applying and declining to apply the exclusionary rule,

the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  555 U.S. at 144.  The Supreme Court further explained that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional."  555 U.S. at 143.  As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. 555 U.S. at 146.

            c.      Davis v. United States.

       In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent.  See 131 S. Ct. at 2428.  At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety that the arrestee poses or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  See 556 U.S. at 341-48.  The United States Court of Appeals for the Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).  Although the officers' search incident to the defendant's arrest

"was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 131 S. Ct. at 2428.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim." United States v. Davis, 131 S. Ct. at 2428.  The Supreme Court explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system."  131 S. Ct. at 2428 (citations omitted)(internal quotation marks omitted). The Supreme Court stated: "[T]he conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any recurring or systemic negligence on the part of law enforcement."   131 S. Ct. at 2428 (citations omitted)(internal quotation marks omitted).  The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  United States v. Davis, 131 S. Ct. at 2429.

### 2.     The Inevitable Discovery Exception.

Under the inevitable discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"  United States v. Christy, 739 F.3d at 540 (quoting Nix v. Williams, 467 U.S. at 444).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005)(citation omitted).  In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the

evidence in question.  782 F.2d at 152.  Relying on this statement from United States v. Owens, the Court stated in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it."  810 F. Supp. 2d at 1274 (citations omitted)(internal quotation marks omitted).  On appeal, however, the Tenth Circuit clarified that the inevitable discovery exception does not require an independent investigation that would have discovered the evidence in question.  See United States v. Christy, 739 F.3d at 540.  The Tenth Circuit explained:

> In Cunningham and [United States v. ]Souza[, 223 F.3d 1197 (10th Cir. 2000),] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal." Cunningham, 413 F.3d at 1204 n.1.  In Cunningham, police searched the defendant's home after getting his consent.  Id. at 1202.  The defendant later contested the search, claiming his consent was coerced.  Id.  We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred.  Id. at 1205.  In Souza, police illegally opened a UPS package that contained drugs.  223 F.3d at 1200, 1202.  We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred.  Id. at 1206.  Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.
>
> . . . .
>
> Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," Larsen, 127 F.3d [984,] 987[ (10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v.

Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that

could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at

1203.  The Tenth Circuit stated that, "a court may apply the inevitable discovery exception only

when it has a high level of confidence that the warrant in fact would have been issued and that

the specific evidence in question would have been obtained by lawful means."  United States v.

Souza, 223 F.3d at 1205.  The Tenth Circuit adopted four factors to determine "how likely it is

that a warrant would have been issued and that the evidence would have been found pursuant to

a warrant":

> 1) the extent to which the warrant process has been completed at the time those
> seeking the warrant learn of the search; 2) the strength of the showing of probable
> cause at the time the search occurred; 3) whether a warrant ultimately was
> obtained, albeit after the illegal entry; and 4) evidence that law enforcement
> agents "jumped the gun" because they lacked confidence in their showing of
> probable cause and wanted to force the issue by creating a fait accompli.

United States v. Souza, 223 F.3d at 1204 (citing United States v. Cabassa, 62 F.3d 470, 473-74,

473 n.2 (2d Cir. 1995))(citations omitted)(internal quotation marks omitted).  Applying the first

factor, the Tenth Circuit stated:

> [T]he prerequisite to a consideration of the inevitable discovery exception in these
> cases, steps taken to obtain a warrant prior to the unlawful search, is present in
> this case.  Special Agent Rowden took steps to alert his office that he would be
> coming back to prepare a warrant for the package and made sure that the affidavit
> form would be ready when he got back to his office. Also, the package was
> specifically placed on the floor behind Detective Sloan for the purpose of
> obtaining a warrant.

223 F.3d at 1205.  Regarding the second factor, the Tenth Circuit stated:

> [A]t the time the illegal search occurred, probable cause to believe the package
> contained contraband was extremely strong.  The package itself contained several
> suspicious characteristics, including all of the openings on the box being heavily
> taped, the box having been sent through third party shipping, the sender having
> only used a first name, and the box being solid so that no side of it could be
> compressed.  Moreover, the box was alerted to by a certified narcotics dog, which
> is itself sufficient to create probable cause.

223 F.3d at 1205-06.  The Tenth Circuit noted that a sergeant eventually obtained a search warrant.  See 223 F.3d at 1206.  Regarding the third factor, the Tenth Circuit stated that, unlike "Cabassa, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued."  223 F.3d at 1206.  The Tenth Circuit did not reach the fourth factor, but concluded that, although it was

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway."  782 F.2d at 152-53.  The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable discovery doctrine.  See 782 F.2d at 152-53.  Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit found:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine.  First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers.  In fact, such an intrusion would have been a significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable.  The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it.  Finally, absent the unlawful search, [the defendant] might have

- 98 -

posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband.  Alternatively, a friend could have returned to claim the closed bag.

United States v. Owens, 782 F.2d at 153.  "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." United States v. Martinez, 696 F. Supp. 2d at 1244.

In United States v. Cunningham, the Tenth Circuit "appl[ied] the inevitable discovery doctrine, . . . because [it was] convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered."  413 F.3d at 1205.  The Tenth Circuit, in addressing the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- stated:

> Here, the officers took substantial steps to obtain a warrant before the contested search occurred.  The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes. As a result of their conversation with the AUSA, the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately.  The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204.  Regarding the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Tenth Circuit stated:

> The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home.  Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway.  The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the

> investigation was stopped containing Mr. Cunningham, who said that he lived at
> 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that
> the home next door had been receiving all of the traffic that evening, and the
> officers ruled out 1175 East 76th Terrace as the location visited by the alleged
> check supplier; and a gray Blazer previously observed in the investigation was
> seen parked by 1179 East 76th Terrace. The government thus had sufficient
> probable cause for a search of 1179 East 76th Terrace at the time of Mr.
> Cunningham's disputed consent to search his home.

413 F.3d at 1204-05. Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home." 413 F.3d at 1205. Regarding the fourth factor -- evidence that the officers "jumped the gun," because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

> There is also no evidence the officers "jumped the gun" due to a lack of
> confidence about probable cause and out of a desire to force the issue. Instead,
> the record indicates that the search occurred at the time it did because of the
> coincidental arrival of Mrs. Cunningham. Her presence on the scene led to a
> series of events that culminated in her son's release from jail, his return home, and
> his consent to search. As a result, we are satisfied the government has
> demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East
> 76th Terrace on the evening of the search, the officers would have obtained a
> search warrant and the evidence in question would have been found.

413 F.3d at 1205 (citations omitted). The Tenth Circuit, therefore, applied the inevitable discovery doctrine. See 413 F.3d at 1205.

In United States v. Christy, the Court applied the four United States v. Souza factors and determined that the inevitable discovery exception applied. Regarding the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- the Court stated: "The deputies did not take any steps to obtain a warrant before entering Christy's residence. The United States concedes that they did not attempt to obtain a warrant before entering Christy's residence. . . . This factor thus weighs against

applying the inevitable discovery exception." 810 F. Supp. 2d at 1275 (citations omitted). As to

the second factor -- the strength of the showing of probable cause at the time the search occurred

-- the Court concluded:

> The Court finds that [Investigator Carvo] had strong probable cause that Christy
> committed crimes. At the time of the search, Carvo believed he had probable
> cause for the California crime of unlawful sexual intercourse, because Christy and
> K.Y. exchanged naked pictures through electronic mail transmissions over the
> internet and then arranged a meeting in the middle of the night for K.Y. to run
> away with Christy.
>
> . . . .
>
> Because [the officer] knew that K.Y. and Christy were exchanging naked pictures,
> "the belief that there was a sexual relationship or sexual interest between the two
> was reasonable." Amended Memorandum Opinion and Order at 57. These
> circumstances are sufficient to form "a reasonable ground for belief of [Christy's]
> guilt," . . . for the California crime of unlawful sexual intercourse.
>
> [The officer] also had strong probable cause for the federal crime of coercion or
> enticement. Carvo believed that he had probable cause for the federal crime of
> enticement or coercion, because of Christy's and K.Y.'s communications through
> the internet and electronic mail transmissions, because Christy sent K.Y. naked
> pictures of himself and solicited pictures of K.Y., which showed her breasts, and
> because cellular telephone evidence shows that Christy traveled across state lines
> to bring K.Y. to New Mexico.
>
> . . . .
>
> Because [the officer] knew that Christy and K.Y. communicated through
> electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and
> solicited pictures of K.Y., because evidence showed that Christy traveled across
> state lines with K.Y., and because Carvo had strong probable cause that Christy
> committed the California crime of unlawful sexual intercourse, Carvo had "a
> reasonable ground for belief of [Christy's] guilt," . . . for the federal crime of
> coercion or enticement. Because Carvo had strong probable cause for the
> California crime of unlawful sexual intercourse and for the federal crime of
> enticement or coercion, this factor weighs in favor of application of the inevitable
> discovery doctrine.

810 F. Supp. 2d at 1276-78 (brackets in original)(citations omitted). Regarding the third factor --

whether a warrant ultimately was obtained, albeit after the illegal entry -- the Court held:

The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy.  United States v. Cunningham, 413 F.3d at 1205. Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation.   Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so.  Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO or from the Albuquerque FBI. . . .  Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information.  Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [the Bernalillo County Sheriff's Office ("BCSO") and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature." . . .  If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant. . . .  Carvo is cross designated to acquire both state and federal search warrants. . . .  This factor thus weighs in favor of application of the inevitable-discovery doctrine.

United States v. Christy, 810 F. Supp. at 1278-79.  As to the fourth factor -- the existence of evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Court determined:

There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue."  United States v. Cunningham, 413 F.3d at 1205.  The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence.  This factor thus weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279.  Consequently, the Court applied the inevitable discovery doctrine.  See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirmed the Court's decision.  See 739 F.3d at 539-544. Addressing the United States v. Souza factors, the Tenth Circuit pointed out that the defendant challenged only the Court's ruling on factors two and four -- the strength of the probable cause showing when the unlawful search occurred and whether the officers "jumped the gun" to sidestep the warrant requirement.  739 F.3d at 541.  Regarding the second factor -- the strength of the showing of probable cause at the time the unlawful search occurred -- the Tenth Circuit stated:

> The district court found that Officer Carvo knew that K.Y. was a minor, there was a large age difference between her and Mr. Christy, the two exchanged sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y. . . . Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y. Officer Carvo also knew that K.Y. was potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy. . . .  Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable.  Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines to engage in criminal sexual activity in violation of federal law. . . .  The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542.  Analyzing the fourth factor -- evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit explained:

> Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause. . . .  Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason. . . .  Instead, the deputies forced entry because they believed K.Y. was in danger. . . .  Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not. . . .  But that is beside the point.  The record fully supports the reasonableness of the deputies' assessment of danger.  The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543.  The Tenth Circuit concluded, therefore, that the Court properly applied the United States v. Souza factors.  See 739 F.3d at 542.

## LAW REGARDING THE COLLECTIVE KNOWLEDGE DOCTRINE

"Under the collective-knowledge doctrine -- also called the 'fellow officer rule' -- the knowledge of one officer supporting a search or seizure may be imputed to other law enforcement officers acting in conjunction with the knowledgeable officer."  James v. Chavez, 830 F. Supp. 2d 1208, 1260 (D.N.M. 2011)(Browning, J.)(citing United States v. Hensley, 469 U.S. 221, 232-33 (1985); United States v. Wilkinson, 633 F.3d 938, 941 (10th Cir. 2008)).  The collective knowledge doctrine originates from United States v. Hensley, in which the Supreme Court held that evidence uncovered in the police officers' stop of a defendant based on a notice that another state issued about the defendant's outstanding warrant was admissible.  See 469 U.S. at 223.  The collective knowledge doctrine has two categories -- horizontal and vertical.  See United States v. Chavez, 534 F.3d at 1345.

Vertical collective knowledge exists "if one officer actually has probable cause and instructs another officer to act without communicating the information he knows that would justify the action."  Felders ex rel. Smedly v. Malcom, 755 F.3d 870, 881 (10th Cir. 2014)(emphasis in original).  By contrast, horizontal collective knowledge exists "when many officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause."  Felders ex rel. Smedly v. Malcom, 755 F.3d at 881 (citations omitted)(internal quotation marks omitted).  In the latter situation, courts may consider whether officers who are acting together collectively have enough information to support probable cause, provided that the officers actually communicated the information to each other.  See United States v. Shareef, 100 F.3d 1491, 1503-05 (10th Cir. 1996)(noting that horizontal collective

- 104 -

knowledge only applies if information is shared); United States v. Christy, 810 F. Supp. 2d 1219, 1261 (D.N.M. 2011)(Browning, J.).   Horizontal and vertical collective knowledge are not mutually exclusive doctrines; for example, "the officer who has probable cause may possess that information as a result of communication from other officers."   United States v. Chavez, 534 F.3d at 1345 n.12.

### RELEVANT LAW REGARDING MIRANDA RIGHTS

Law enforcement officials must give the Miranda warnings to a person subject to "custodial interrogation."   United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(citing Miranda, 384 U.S. at 444)(internal quotations omitted).   A person is in custody if "his freedom of action is curtailed to a degree associated with formal arrest."   United States v. Hudson, 210 F.3d at 1190 (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984))(internal quotations omitted). The Court must examine "whether a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest."   United States v. Hudson, 210 F.3d at 1190 (brackets in original)(internal quotation marks omitted)(citations omitted).   The Tenth Circuit has articulated the "[t]wo discrete inquiries . . . essential to the determination" of custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."   United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).

1.    **Waiver of Rights Under Miranda.**

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently."   United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(citations omitted).   An express statement of waiver is not required; the waiver can be

inferred from the defendant's actions and words.  See <u>United States v. Nelson</u>, 450 F.3d 1201, 1211 (10th Cir. 2006)(citation omitted).  "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"  <u>United States v. Burson</u>, 531 F.3d at 1256 (citations omitted). The government generally bears the burden of proving that a valid waiver by a preponderance of the evidence.  See <u>United States v. Burson</u>, 531 F.3d at 1256; <u>United States v. Nelson</u>, 450 F.3d at 1210-11.  The Tenth Circuit has noted that this standard incorporates two distinct requirements:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.   Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>United States v. Morris</u>, 287 F.3d 985, 988 (10th Cir. 2002)(citations omitted).  In determining whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs a totality of the circumstances approach.   See <u>United States v. Burson</u>, 531 F.3d at 1256-57 (citation omitted).  A waiver is knowingly and intelligently made when it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>United States v. Burson</u>, 531 F.3d at 1257 (citations omitted).  "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect."  <u>United States v. Smith</u>, 606 F.3d 1270, 1276 (10th Cir. 2010)(citations omitted).

2.      **Invocation of the Right to Remain Silent.**

Under Miranda, an interrogation must cease immediately when an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." United States v. McCarthy, 382 F. App'x 789, 792 (10th Cir. 2010)(citation omitted). Statements elicited after a defendant invokes this right are inadmissible. See United States v. McCarthy, 382 F. App'x at 792 (citation omitted). To fall within the ambit of this rule, however, a defendant's invocation of his right to remain silent must be clear and unambiguous. See United States v. McCarthy, 382 F. App'x at 792 (citing United States v. Rambo, 365 F.3d 906, 910 (10th Cir. 2004)).

3.      **Requests for an Attorney.**

The Fifth and Fourteenth Amendments provide the accused a "right to have counsel present during custodial interrogation." Edwards v. Arizona, 451 U.S. 477, 481 (1981). Once an individual subject to custodial interrogation expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85. In Miranda, the Supreme Court stated:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.

The request for counsel must be clear and unequivocal. See Davis v. United States, 512 U.S. 452, 459 (1994). "Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance

of an attorney.'" <u>Davis v. United States</u>, 512 U.S. at 459 (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991)). "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her <u>Miranda</u> rights." <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 381 (2010)(quoting <u>Miranda</u>, 512 U.S. at 461-62). The Supreme Court has said that an individual's "ambiguous" or "equivocal" references to an attorney that "a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning. <u>Davis v. United States</u>, 512 U.S. at 459 (emphasis in original).

In <u>United States v. Lux</u>, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked "how long it would take if she wanted a lawyer and if she would have to stay in jail while she waited for a lawyer." 905 F.2d at 1382. The Tenth Circuit, without elaborating on its reasoning, found that, based upon its "independent review" of the record, with deference to the trial court's findings of fact, the defendant did not make a request for an attorney. 905 F.2d at 1382.

## ANALYSIS

The Court will deny the Motion. Under the collective knowledge doctrine, the DEA's investigation of the Varela DTO gave Almonte and Marquez probable cause to stop Gonzalez, Sr.'s truck and to search his trailer. The Court thus will not suppress the cocaine and marijuana that the deputies discovered in Gonzalez, Sr.'s trailer, and will not suppress Gonzalez, Sr.'s post-arrest statements as the fruit of an unconstitutional search or seizure. If the Court could not

impute Maestas' probable cause to the deputies, however, their search of Gonzalez, Sr.'s trailer was unlawful, and the Court would suppress the drugs that they discovered during their search, and Gonzalez, Sr.'s post-arrest statements as the fruit of an unlawful search and seizure.

I.   **UNDER THE COLLECTIVE KNOWLEDGE DOCTRINE, THE DEA'S INVESTIGATION OF THE VARELA DTO GAVE ALMONTE AND MARQUEZ PROBABLE CAUSE TO STOP GONZALEZ, SR.'S TRUCK AND TO SEARCH HIS TRAILER.**

The Court's analysis proceeds in three steps.  First, the Court concludes that Maestas had probable cause to believe that Gonzalez, Sr.'s trailer contained narcotics based on the DEA's investigation of the Varela DTO.  Second, the Court holds that -- under the collective knowledge doctrine -- it may impute Maestas' probable cause to Almonte and Marquez to justify their stop of Gonzalez, Sr.'s truck, and their search of his trailer.  Third, because Almonte and Marquez had probable cause to stop Gonzalez, Sr.'s truck and to search his trailer, they lawfully discovered the marijuana and cocaine in his trailer, and Gonzalez, Sr.'s post-arrest statements were not the fruit of an unlawful search or an unlawful seizure.  Accordingly, the Court will not suppress the drugs or Gonzalez, Sr.'s statements.

A.   **MAESTAS DEVELOPED PROBABLE CAUSE TO STOP GONZALEZ, SR.'S TRUCK AND TO SEARCH HIS TRAILER BASED ON THE DEA'S INVESTIGATION OF THE VARELA DTO.**

Gonzalez, Sr. argues that Maestas did not develop sufficient probable cause through the DEA's investigation of the Varela DTO to stop Gonzalez, Sr.'s vehicle or to search his trailer.  See Jan. 30, 2015, Tr. at 348:17-351:2 (Walz).  Gonzalez, Sr. has not disputed that Varela and J. Ibarra-Solis were actively involved in drug trafficking.  Instead, he asks the Court to conclude that it was a mere coincidence that he was mentioned during those calls, and that, because he has trained horses for Varela, he had "a legitimate reason to contact him and discuss various matters with him."  Jan. 30, 2015, Tr. at 348:20-21 (Walz).

Through the DEA's investigation into the Varela DTO, Maestas developed probable cause to believe that Gonzalez, Sr. was trafficking drugs. "Probable cause is a matter of probability, not certainty. Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." United States v. Gutierrez, No. CR 07-1014 JB, 2008 WL 2397668, at *32 (D.N.M. Jan. 4, 2008)(Browning, J.)(citation omitted)(internal quotation marks omitted). Maestas' probable cause was based on: (i) his interpretation of intercepted telephone calls between various members of the Varela DTO from November 3, 2011, to November 10, 2011; and (ii) the DEA surveillance operation's corroboration of those calls by observing Gonzalez, Sr.'s activities in El Paso.

First, the intercepted telephone calls indicate that Gonzalez, Sr. planned to transport a large quantity of illegal drugs from El Paso to Albuquerque on or about November 10, 2011. See United States v. Beltran, 11 F. App'x 786, 787 (9th Cir. 2001)(unpublished)("We see no reason why the district court could not rely on [the agent's] interpretations [of intercepted conversations] to find probable cause."); United States v. Carr, No. CR 07-40034 JAR, 2007 WL 2253200, at *4 (D. Kan. July 31, 2007)(finding that "cryptic or coded conversations can support a finding of probable cause"); United States v. Feola, 651 F. Supp. 1068, 1096 (S.D.N.Y. 1987)(holding that the agents' interpretations of intercepted telephone calls "properly contributed to a finding of probable cause"). The DEA intercepted over twenty telephone calls between November 3, 2011, and November 10, 2011. Many of those calls mention specific amounts -- like twenty, thirty, or forty -- but never connect those amounts to a particular item. See Call 11 at 4 ("Varela said that sometimes he would have a pile, and he would ask them for 30 or 40, and they would tell him not to worry because there was more coming, and for Varela to receive it, then send whatever (money)."); Call 491 at 22 (noting that J. Ibarra-Solis told Varela "that he

had promised him that he would have a 2,0 [NFI] there [NFI] on Tuesday."); Call 795 at 31 ("Varela advised that at least those 4 [NFI] are there and that he (Jaime) should tell his brother [NFI] to give Varela some 15 [NFI] at least to do something **. . . .**").  Varela used this code in his conversations with: (i) J. Ibarra-Solis, see Call 293 at 3 ("Varela asked UM471 how many total there are.  UM471 said that all together there are about 35 or 40. . . .  Varela asked if there are at least 30.  UM471 said that like 35 or 40 for sure."); (ii) Gonzalez, Jr., see Call 418 at 12 (explaining that Varela told Gonzalez, Jr. that the Ibarra-Solises "have 45 right now, and they want for Varela to bring them [NFI]"); Call 895 at 5 ("Gonzalez Jr. asked about this dude [UNK] and asked if they [UNK] had arrived late.  Varela negated and said that at the end they [UNK] did send some and 20 [NFI] would arrive."); (iii) Chavez, see Call 688 at 13 ("Steve asked if it would be no less than 20 [NFI].  Varela affirmed."); and (iv) Gonzalez, Sr., see Call 329 at 11 ("Varela informed Ramon that they (Jaime et al) had 45 there [NFI]."); id. ("Varela replied **. . .** it was 32 and told Ramon the dude would have to make three trips**. . . .**  Varela said that was what they didn't want to have to do and added they wanted it all at once.").

Maestas interpreted these figures as kilograms of cocaine.  See Jan. 22, 2015, Tr. at 96:15-97:3 (Maestas).  Gonzalez, Sr. has not offered a lawful interpretation of these calls, and the Court has not been able to come up with one -- for example, that the individuals were all discussing transporting thirty or forty horses or thirty- to forty-kilogram horses.  See Jan. 22, 2015, Tr. at 97:13-18 (Maestas).  There is no indication that Varela and J. Ibarra-Solis regularly transported horses or other lawful items across the Mexico-United States border together.  Gonzalez, Sr. has not explained why Varela and J. Ibarra-Solis would have so many conversations in such a short period of time about transporting horses, how many horses they could transport at a single time, when those horses could be transported, who could transport

them, and who would receive the horses on Varela's behalf.  That Varela and J. Ibarra-Solis had

so many conversations about these issues and were so concerned about them is more consistent

with them planning a shipment of illegal drugs across the border than with them planning a

shipment of lawful items.  It would also be strange for Varela to joke about being sent to jail for

transporting forty-five horses, as he did in a November 6, 2011, telephone call with Gonzalez, Jr.

See Call 457 at 17 ("Varela agreed and added those 45 [NFI] were there [NFI] and added he

didn't know what he was going to do.  Varela added he might have to go alone.  **[Gonzalez, Jr.]**

laughed.   Varela told **[Gonzalez, Jr.]** to wait for the call in case he (Varela) called him

**[Gonzalez, Jr.]** from jail.").  Moreover, if Varela was discussing lawful items, there is no sound

reason for him and the people with whom he communicated to use vague numbers without

identifying the items to which they were referring.  Although one or two conversations like this

may be unremarkable, that Varela used the same code in multiple conversations with multiple

individuals suggests that he was purposefully trying to conceal illegal activity.

      Contrary to Gonzalez, Sr.'s contentions, the intercepted telephone conversations do not

indicate that he was planning only to transport or to train Varela's horses.  A November 6, 2011,

telephone call between Varela and Gonzalez, Sr. is instructive.  During that call, Varela

> informed Ramon that they (Jaime et al) had 45 there [NFI].  Ramon advised that
> they (Jaime et al) didn't have anyone to train their horses [NFI] right now.  Varela
> replied that they do have, but only 16 [NFI] fit and they wanted it all at once.
> Varela added the dude was going to take off right now after all but with 16 [NFI]
> and added the dude was going to have to do two trips.  Varela asked Ramon what
> 16 and 16 were.  Varela replied to himself that it was 32 and told Ramon the dude
> would have to make three trips.  Ramon agreed.  Varela said that was what they
> didn't want to have to do and added they wanted it all at once.  Ramon replied
> they would burn themselves there crossing and crossing and added the
> maestros/teachers [NFI] were not stupid.  Ramon chuckled and asked if Varela
> understood.  Varela affirmed.  Ramon told Varela that one of those falls [NFI] for
> those guys would be fucked up and added they would lose a shit load of money.

Call 329 at 11.

- 112 -

It is possible that this conversation is about whether Gonzalez, Sr. could transport or train Varela's or some other individual's horses, but there are a few problems with that interpretation. Throughout this conversation, Varela and Gonzalez, Sr. refer to forty-five, thirty-two, or sixteen with the singular pronoun "it" rather than "them," which suggests that they were describing a quantity of a single item -- i.e., cocaine or marijuana -- rather than multiple horses. It would also be strange for Gonzalez, Sr. to be able to transport thirty-two -- or even sixteen -- horses in a single trip. There was no testimony about how many horses the average horse trailer holds, but the Court would find it hard to believe that the average horse trailer pulled by a pick-up truck can hold such a large number of horses at one time. Most problematic for Gonzalez, Sr.'s position, however, is that he mentions "burn[ing] themselves" from "crossing and crossing," and that, if "one of those falls . . . they would lose a shit load of money." Call 329 at 11. If Gonzalez, Sr. was transporting horses -- or other lawful items -- for Varela or others, he would have no reason to be concerned about anyone getting "burn[ed]" from "crossing" -- presumably, the Mexico-United States border -- having a load "fall[]" or "los[ing] a shit load of money." Call 329 at 11. On the other hand, if Gonzalez, Sr. was involved in a shipment of illegal drugs, he would likely be concerned that more shipments would make it more likely that law enforcement would intercept a load, seize it, and cause them to lose "a shit load of money." Call 329 at 11.

A November 9, 2011, telephone call between Varela and Gonzalez, Sr. also undercuts Gonzalez, Sr.'s argument. That day -- a day before Gonzalez, Sr. and A. Gonzalez picked up the drug shipment -- Varela informed Gonzalez, Sr. that "the machine was in place." Call 994 at 22. Gonzalez, Sr. "affirmed and added it was red alert there," and later said that "he saw it since he got there." Call 994 at 22. Gonzalez, Sr. then told Varela that "he would take off at four in the morning" and then added: "[W]hy take a risk?" Call 994 at 22. Maestas interpreted this

conversation as Varela and Gonzalez, Sr. talking about an active Border Patrol checkpoint between Albuquerque and El Paso, and that Gonzalez, Sr. planned to leave El Paso at 4:00 a.m. in the hopes that the checkpoint would not be active at that time.  Gonzalez, Sr. has offered no lawful explanation for this conversation, and the Court cannot come up with one.  If Gonzalez, Sr. were only transporting horses, it is unclear about which "machine" he is talking that is on "red alert."  It is also unclear what "risk" about which he would be worried that he could avoid if he left at four in the morning.  If Gonzalez, Sr. was only transporting horses, there was no reason for him to have these concerns.  For these reasons, the Court concludes that Maestas' interpretation of the intercepted telephone calls supported a finding a probable cause.

Second, the DEA's surveillance operation confirmed Maestas' interpretation of the intercepted telephone calls as setting up a plan for Gonzalez, Sr. to transport a large quantity of illegal drugs from El Paso to Albuquerque.  Based on the intercepted telephone calls, Maestas determined that Gonzalez, Sr. would pick up a drug load in El Paso on approximately November 10, 2011, and transport it to Albuquerque.  See Jan. 28, 2015, Tr. at 158:16-20 (Swainston, Gooch).  On November 9, 2011, the DEA surveillance team encountered Gonzalez, Sr. and A. Gonzalez heading south on I-25 towards El Paso.  See Jan. 28, 2105, Tr. at 158:16-159:8 (Gooch).  DEA agents observed a meeting in El Paso among A. Gonzalez, Gonzalez, Sr. and two unidentified female subjects in a mall parking lot at approximately 8:30 p.m., and later followed Gonzalez, Sr. from his hotel to a nearby storage facility -- where the agents believed that Gonzalez, Sr. picked up illegal drugs -- and observed Gonzalez, Sr. and A. Gonzalez settle down at their hotel for the night.  See Jan. 28, 2015, Tr. at 159:1-167:7 (Swainston, Gooch). Throughout the surveillance operation, Gooch and Maestas were in constant communication, and Maestas was giving Gooch instructions based on the communications that he was intercepting.

See Jan. 28, 2015, Tr. at 167:8-15 (Swainston, Gooch).  Maestas told Gooch that, based on the intercepted telephone conversations, he expected A. Gonzalez and Gonzalez, Sr. to leave El Paso at approximately 4:00 a.m. on November 10, 2011.  See Jan. 28, 2015, Tr. at 167:1-7 (Swainston, Gooch).  Sure enough, at almost 4:00 a.m., Gonzalez, Sr. and A. Gonzalez left their hotel, driving towards Albuquerque.  See Jan. 28, 2015, Tr. at 169:9-14 (Gooch).

Gonzalez, Sr. correctly points out that the surveillance team did not see him "loading the trailer, touching any boxes" or openly carrying illegal drugs.  Jan. 30, 2015, Tr. at 350:24-351:2 (Walz).  That Gonzalez, Sr. went to a storage facility in El Paso at 9:00 p.m. to pick up some unidentified items and then headed back to Albuquerque at 4:00 a.m. the following day, however, undercuts Gonzalez, Sr.'s story that he was transporting or training horses for Varela. It is unlikely that Varela kept his horses in storage facilities, especially in the amounts that he was discussing with Gonzalez, Sr. over the telephone.  If he did keep his horses in the storage facility, there is no reason for Gonzalez, Sr. and A. Gonzalez to transport those horses in the middle of the night.  Gonzalez, Sr.'s actions are more consistent with the plan set forth in the intercepted communications: Gonzalez, Sr. would travel to El Paso, pick up illegal drugs, and transport them back to Albuquerque at 4:00 a.m. to avoid the Border Patrol checkpoint.

"Probable cause is a flexible common-sense standard."  United States v. McKenzie, No. CR 08-1669 JB, 2010 WL 1795173, at *15 (D.N.M. April 13, 2010)(Browning, J.)(citations omitted)(internal quotation marks omitted).  A finding of probable cause rests not on whether particular conduct is "innocent" or "guilty," but on the "degree of suspicion that attaches" to the United States' evidence.  Illinois v. Wardlow, 528 U.S. at 128.  Probable cause "does not demand any showing that such a belief be correct or more likely true than false," but instead requires only that "the facts available to the officer would warrant a man of reasonable caution in

the belief that certain items may be contraband or stolen property or useful as evidence of a crime." United States v. McKenzie, 2010 WL 1795173, at *15 (citation omitted)(internal quotation marks omitted). Although it is possible that the intercepted telephone communications set forth a plan for Gonzalez, Sr. to transport horses or to train horses for Varela, and it is possible that Gonzalez, Sr. and A. Gonzalez travelled to a storage facility in El Paso at 9:00 p.m. and left for Albuquerque at 4:00 a.m. the following day all for lawful reasons, Maestas -- an experienced DEA agent -- interpreted the telephone calls and Gonzalez, Sr.'s and A. Gonzalez' actions in El Paso as setting forth and executing a plan to transport illegal drugs. After reviewing all of the intercepted telephone calls -- both the calls' original content and Maestas' interpretations of those calls -- and Gonzalez, Sr.'s actions in El Paso, the Court concludes that the DEA investigation developed probable cause for Maestas to stop Gonzalez, Sr.'s vehicle and to search his trailer.

Other courts have found that officers established probable cause in similar circumstances. See, e.g., United States v. Ramirez, 60 F. App'x 130, 132 (9th Cir. 2003)(unpublished)(finding that officers had probable cause where they believed the defendant was involved in the delivery of cocaine because they had intercepted a series of drug-sale-related telephone calls, witnessed the defendant's arrival and departure, noted that these events coincided with the placement of relevant telephone calls, and observed the defendant depart in the direction indicated that his boss indicated); United States v. Ridge, 329 F.3d 535, 540-51 (6th Cir. 2003)(holding that officers were justified in stopping defendant's vehicle where they had intercepted a telephone call that "Danny's on the way with the money," they had been informed that Danny cooked methamphetamine, and they observed a van arriving approximately twenty minutes later); United States v. Lee, No. CR 06-125(9), 2007 WL 1567098, at *11-12 (E.D. Tex. May 29,

2007)(holding that federal agents' knowledge, provided by intercepted calls, that truck drivers in tractor-trailers were utilized as couriers to distribute narcotics, coupled with agents' observation of duffle bags being placed in truck with call afterwards confirming "everything was cool," provided sufficient probable cause to believe defendant was transporting cocaine); United States v. Wright, 171 F. Supp. 2d 1195, 1202 (D. Kan. 2001)(concluding that traffic stop was justified where officers had reason to believe defendants were transporting drugs based on intercepted telephone calls and surveillance leading up to the traffic stop).  Given the relatively low showing required to establish probable cause -- "only a probability or substantial chance of criminal activity, rather than an actual showing of such activity," United States v. Rey, 663 F. Supp. 2d 1086, 1113 (D.N.M. 2009)(Browning, J.)(citation omitted)(internal quotation marks omitted) -- the Court concludes that the intercepted telephone calls between the Varela DTO's members and the DEA surveillance operation's corroboration of Maestas' interpretation of those calls is sufficient to establish probable cause that Gonzalez, Sr. was transporting illegal drugs on November 10, 2011.

**B.     THE COURT MAY IMPUTE MAESTAS' PROBABLE CAUSE TO ALMONTE AND MARQUEZ.**

That Maestas had probable cause to stop Gonzalez, Sr.'s truck and to search his trailer does not end the Court's inquiry, however.  The Court must also conclude that there was a sufficient connection between Maestas and the deputies to impute Maestas' probable cause to them under the collective knowledge doctrine.  This case implicates only the vertical permutation of the collective knowledge doctrine: it is a situation "where one officer has probable cause and instructs another officer to act, but does not communicate the corpus of information known to the

first officer that would justify the action."[40]   United States v. Chavez, 534 F.3d at 1345 (emphasis omitted).  The Court holds that Maestas' probable cause may be imputed to Almonte and Marquez.

Gonzalez, Sr. asserts that the United States "provides no evidence whatsoever that the officers involved in the stop had any knowledge of the DEA investigation or of Defendant's alleged complicity in a drug trafficking operation."  Reply at 7.  During his opening statement at the suppression hearing, Gonzalez, Sr. mentioned in passing that he had concerns whether Maestas' imputation of probable cause to Almonte and Marquez "was really a true imputation of knowledge" and was "something that could be relied upon by officers in that situation," Jan. 22, 2015, Tr. at 14:14-18 (Walz), but he did not expand on this argument.  In his closing argument, Gonzalez, Sr. focused primarily on Maestas' probable cause determination, see Jan. 30, 2015, Tr. at 349:17-350:6 (Walz), and did not explain why there was an insufficient connection between Maestas and the deputies for the collective knowledge doctrine to apply.

The Tenth Circuit has held that officers may use traffic stops as a pretext to intercept drug shipments identified in wiretap investigations.  In United States v. Chavez, for example, a confidential informant acting under the DEA's direction sold one kilogram of cocaine to Servando Moreno.  See 534 F.3d at 1340.  The following day, the DEA agents observed Moreno get into a truck that the defendant, Victor Chavez, drove.  See 534 F.3d at 1340.  As the DEA surveillance team followed the truck on Interstate 40, a DEA task force officer described the truck to a New Mexico State Police officer, and instructed him to "develop his own probable cause" and to conduct a traffic stop of the vehicle.  534 F.3d at 1341.  Regarding the DEA's

---

[40]By contrast, the horizontal permutation of the collective knowledge doctrine applies where "a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause."  United States v. Chavez, 534 F.3d at 1345.

investigation, the task force officer said only that "the white pick-up was carrying 'coke.'"   534 F.3d at 1341.   The officer then "pretended that he had stopped Mr. Chavez for failing to turn on his headlights in a safety corridor" -- a failure which the officer incorrectly believed violated New Mexico's motor vehicle regulations -- searched Chavez' truck and discovered cocaine.   <u>See</u> 534 F.3d at 1342.   The Tenth Circuit upheld the stop and the search, concluding that the DEA's investigation cultivated probable cause, and that the officer "acted on the strength of the DEA's probable cause" when he stopped and searched the truck.   534 F.3d at 1347.   The Tenth Circuit noted that "[d]isguising the stop as a traffic stop was a valid law enforcement tactic calculated to ensure an officer's safety" and "safeguard . . . the integrity of the DEA investigation."   534 F.3d at 1348 (citation omitted)(internal quotation marks omitted).

Other Courts of Appeals have upheld the use of walled-off stops in similar circumstances. In <u>United States v. Rodriguez</u>, 831 F.2d 162 (7th Cir. 1987), for example, DEA agents gathered enough reasonable suspicion to stop the defendant's car based on a wiretap investigation and physical surveillance.   <u>See</u> 831 F.2d at 165.   Without conveying any details about the ongoing investigation, the agents asked local law enforcement to conduct a "routine traffic stop" of the defendant.   831 F.2d at 165.   Although the United States conceded that the stop was pretextual and designed to protect the DEA's investigation, the United States Court of Appeals for the Seventh Circuit held that the officers properly relied on the DEA's reasonable suspicion that the defendant was transporting drugs.   <u>See</u> 831 F.2d at 165.   The Seventh Circuit said: "The requesting DEA agent had good grounds for articulable suspicion and the detaining officer had a reasonable basis for believing the request to be well-founded -- even though she did not personally know the facts giving rise to the suspicion."   831 F.2d at 166.

The collective knowledge doctrine does has limits, however.  See United States v. Williams, No. CR 08-777-11 DHC, 2009 WL 4172989, at *3 (N.D. Ill. Nov. 24, 2009)("There must be some connection between the officer(s) on the beat and the ultimate source(s) of the agency's probable cause, or the collective-knowledge doctrine will degenerate into an end run around the Fourth Amendment.").   The Tenth Circuit has explained that, for the collective knowledge doctrine to apply, "there must be some communication between the officer or officers with probable cause and the officer who executes the stop or search."  United States v. Chavez, 534 F.3d at 1347 n.13.  See Wood v. Crouse, 436 F.2d 1077 (10th Cir. 1971)(holding that the arresting officer properly relied on sheriff's arrest order where sheriff has probable cause).  This communication "confirms that the officers are functioning as a team."  United States v. Chavez, 534 F.3d at 1347 n.13.   Accordingly, the Tenth Circuit has refused to use the collective knowledge doctrine to pool information known to two officers independently where there is no evidence of communication between them.  See United States v. Shareef, 100 F.3d at 1503-05.

This case is not one where two officers independently had information that could provide probable cause, but failed to communicate with each other.  If anything, the communication between Lopez, Almonte, and Marquez was even greater than the bare-bones description of a vehicle and its license plate that triggered the application of the collective knowledge doctrine in United States v. Chavez.  Emrich -- an agent in the Albuquerque DEA office who was in communication with Gooch and Maestas -- asked Lopez to obtain the assistance of deputies with the El Paso Sheriff's office to conduct a walled-off stop of Gonzalez, Sr.'s vehicle.  See Jan. 28, 2015, Tr. at 185:1-186:10 (Swainston, Lopez); id. at 206:22-207:14 (Walz, Lopez).  The El Paso Sheriff's Office assigned Almonte and Marquez to conduct the stop.  See Jan. 28, 2015, Tr. at 187:15-24 (Swainston, Lopez).  On November 9, 2011, Lopez explained to Marquez that he and

Almonte were assisting the Albuquerque DEA office in a wiretap investigation, and that the DEA needed him and Marquez to conduct a traffic stop on a vehicle that was possibly loaded with an unknown amount of cocaine.  See Jan. 28, 2015, Tr. at 189:5-15 (Swainston, Lopez). Lopez gave Marquez a DEA radio, see Jan. 28, 2015, Tr. at 188:19-189:4 (Swainston, Lopez), and, later that day, pointed out Gonzalez, Sr.'s vehicle to Marquez at Gonzalez, Sr.'s hotel, see Jan. 28, 2015, Tr. at 192:14-193:4 (Swainston, Lopez).

Throughout the operation, Lopez communicated with Marquez on the DEA radio; Marquez then relayed Lopez' instructions to Almonte through the Sheriff's Office's radio.  See Jan. 28, 2015, Tr. at 194:11-14 (Swainston, Lopez).  When Gonzalez, Sr. left his hotel, Lopez followed him and relayed his location to Marquez, who then relayed his location to Almonte, who conducted the stop shortly thereafter.  See Jan. 28, 2015, Tr. at 194:7-196:22 (Swainston, Lopez); id. at 202:18-22 (Walz, Lopez); id. at 226:1-16 (Swainston, Almonte).  The close cooperation between Lopez, Almonte, and Marquez satisfies the Tenth Circuit's relatively low threshold that there be "some communication between the officer or officers with probable cause and the officer who executes the stop or search."  United States v. Chavez, 534 F.3d at 1347 n.13.  Beyond that basic level of communication, "the underlying facts constituting probable cause . . . need not be communicated" to the officers in the field to satisfy the Fourth Amendment.  United States v. Shareef, 100 F.3d at 1503 n.4.  See United States v. Whitley, 680 F.3d at 1233 ("An arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action.").  Because Almonte and Marquez stopped Gonzalez, Sr. and searched his trailer at the DEA's direction, the Court may use the collective knowledge doctrine to impute Marquez' probable cause to Almonte and Marquez.

That Maestas did not communicate directly with Almonte and Marquez does not affect the collective knowledge analysis.  In United States v. Nafzger, 974 F.2d 906 (7th Cir. 1992), FBI Agent Thomas Marquardt had reasonable suspicion to stop the defendant, and relayed that information to a "command post" at the local sheriff's office that sheriff's deputies and FBI agents manned.  974 F.2d at 908.  Based on the information from Marquardt, FBI agents told the sheriff's deputies that the defendant was "suspected of being involved in a stolen car ring."  974 F.2d at 908.  One of those deputies executed a traffic stop of the defendant's vehicle.  See 974 F.2d at 908.  Upholding the stop, the Seventh Circuit emphasized that Marquardt "was an active member of the joint FBI state-investigative team," and that "[b]oth Marquardt and the briefing agents were part of a coordinated investigation, and were all in close communication with the command post."  974 F.2d at 914.  The Seventh Circuit explained that, because Marquardt developed reasonable suspicion to stop the defendant, "and this suspicion was presumably relayed, via the command post, to the briefing officials, who then relayed it to [the deputy], his stop of the defendant did not violate the Fourth Amendment."  974 F.2d at 914.  The Seventh Circuit added that, "[w]here officers are capable of instant communication at any time," Marquardt's presence "should not make any difference, so long as his justified suspicion travelled through reliable channels . . . and eventually reached the briefing officials and then [the deputy]."  974 F.2d at 915.

Likewise, it is immaterial that Maestas did not brief Almonte and Marquez directly about Gonzalez, Sr.'s pending drug shipment.  Maestas' instructions travelled through reliable channels -- Emrich and Lopez -- and ultimately reached Almonte and Marquez.  When the ultimate aim of the Fourth Amendment is reasonableness, it seems overly formalistic to require the agent or agents with firsthand knowledge of the information providing probable cause to brief the

arresting officers directly.  So long as the instructions of the agent with firsthand knowledge are communicated through reliable channels -- dispatchers, formal briefings, radio broadcasts, or other law enforcement officers -- requiring a direct line of communication would be unduly burdensome without providing any commensurate benefits.  See United States v. Williams, 429 F.3d 767, 771-72 (8th Cir. 2005)("[W]e also hold that the collective knowledge of the DEA team was sufficient to provide reasonable suspicion to stop [the co-defendant's] vehicle, and such knowledge was imputed to the officer at the scene when he received [another officer's] radioed request."); United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir. 1990)("[W]hen a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause.").

The Supreme Court cases that established the collective knowledge doctrine reinforce this flexible approach.  In Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560 (1971), a county sheriff issued a statewide dispatch relaying the arrest warrant for an individual suspected of a burglary.  See 401 U.S. at 563.  The message went first through a state transmission network, a different county's sheriff department received it, and then the message was relayed to another police department whose officers subsequently arrested the defendant.  See 401 U.S. at 563.  The Supreme Court first noted that, despite receiving the information third- or forth-hand, the officers "were entitled to act on the strength of the radio bulletin."  401 U.S. at 568.  The Supreme Court ultimately found the stop unreasonable, however, because the initial officers who issued the bulletin lacked probable cause to arrest the defendant.  See 401 U.S. at 568.

In United States v. Hensley, a law enforcement department issued a "wanted flyer" to other police departments in the area that provided the defendant's description, stated that he was involved in a bank robbery, and asked the other departments to look for him and to, if possible,

apprehend him.  469 U.S. at 232.  The flyer did not communicate any of the underlying facts that

led the department to issue the flyer, however.  See 469 U.S. at 226.  Although a different police

department found the defendant and detained him, the Supreme Court found that the flyer

provided a sufficient connection between the departments for the collective knowledge doctrine

to apply.  See 469 U.S. at 232-33.  The Supreme Court reasoned that,

> [i]n an era when criminal suspects are increasingly mobile and increasingly likely
> to flee across jurisdictional boundaries, this rule is a matter of common sense: it
> minimizes the volume of information concerning suspects that must be
> transmitted to other jurisdictions and enables police in one jurisdiction to act
> promptly in reliance on information from another jurisdiction.

United States v. Hensley, 469 U.S. at 231.  The pragmatic concerns that animated the Supreme

Court's holding in United States v. Henley apply with equal force here.  In an era when national

law enforcement agencies conduct nationwide investigations involving a large number of

defendants, confidential informants, undercover officers, and intercepted communications, it

makes little sense to require the agents who have firsthand knowledge of probable cause to brief

each officer who executes a search or arrest directly.  Such an approach would hamstring law

enforcement officers when time is often of the essence in apprehending suspects, or in

intercepting shipments of weapons or drugs to keep them from reaching the streets.  See United

States v. Robinson, 536 F.2d 1298, 1300 (9th Cir. 1976)("[E]ffective law enforcement cannot be

conducted unless police officers can act on directions and information transmitted by one officer

to another and that officers, who must often act swiftly, cannot be expected to cross-examine

their fellow officers about the foundation for the transmitted information.").  So long as agents

and officers use reliable channels to communicate their instructions to other officers, and those

instructions accurately reach those officers, the collective knowledge doctrine allows courts to

impute the directing officers' probable cause to the officers in the field.

## II.    THE COURT WILL NOT SUPPRESS THE COCAINE AND MARIJUANA DISCOVERED IN GONZALEZ, SR.'S TRAILER OR GONZALEZ, SR.'S STATEMENTS AS FRUIT OF AN UNLAWFUL SEARCH AND SEIZURE.[41]

Once Almonte and Marquez had probable cause to believe that Gonzalez, Sr.'s trailer contained illegal drugs, the automobile exception to the Fourth Amendment's warrant requirement permitted them to search "the entire [trailer], all containers therein that might contain contraband," without obtaining a search warrant.  United States v. Bradford, 423 F.3d 1149, 1160 (10th Cir. 2005).  See United States v. Sauzamedz-Mendoza, 595 F. App'x 769, 776 (10th Cir. 2014)(unpublished)(noting that the automobile exception "has been applied to trailers as well").  Because Gonzalez, Sr.'s trailer could reasonably contain contraband, Marquez and Almonte were entitled to search it.  See United States v. Olvera, 178 F. App'x 373, 374-75 (5th Cir. 2006)(per curiam)(unpublished)(finding wiretap surveillance and observations of suspect provided agents with probable cause to search vehicle, including any area where contraband could be found).  Accordingly, the Court will not suppress the marijuana and cocaine that Almonte and Marquez discovered in Gonzalez, Sr.'s trailer.

In addition to asking the Court to suppress the illegal drugs discovered in his trailer as the fruit of an unconstitutional search and seizure, Gonzalez, Sr. asks the Court to suppress the statements that he made to Marquez and Montoya after he was arrested.  See Motion at 7-8. After Gonzalez, Sr. was arrested, Marquez asked him about horse trainers, and Gonzalez, Sr. told Marquez that "[they] had stopped him too soon.  If [they] would have waited, [they] would have gotten the owner at the Pilot in Acton."  Jan. 28, 2015, Tr. at 304:22-305:25 (Marquez)(internal quotation marks omitted).  Gonzalez, Sr. told Marquez that he "was a small fish and the other

---

[41]Gonzalez, Sr. has not challenged the scope of the deputies' search of his trailer.  For the sake of thoroughness, however, the Court concludes that the automobile exception allowed them to search "the entire vehicle, including the trunk and all containers that might contain contraband."  United States v. Bradford, 423 F.3d at 1160.

ones would have been a bigger catch."   Jan. 28, 2015, Tr. at 305:2-4 (Marquez)(internal quotation marks omitted).   Marquez asked Gonzalez, Sr. if he was being followed or being monitored, and Gonzalez, Sr. told Marquez that he "was in communication with somebody else on a push-to-talk phone that was in the truck."   Jan. 28, 2015, Tr. at 306:4-8 (Marquez)(internal quotation marks omitted).   Marquez asked Gonzalez, Sr. why he had not told Marquez during the traffic stop that he was possibly being followed; Gonzalez, Sr. said that "it was because he was in the unit and there was nobody there."   Jan. 28, 2015, Tr. at 306:11-20 (Marquez)(internal quotation marks omitted).   Subsequently, as Gonzalez, Sr. was waiting for the judge to arraign him, he blurted out in Spanish to Montoya: "Once you're in this business, if you don't do what they tell you to do, even your family is in danger."   Jan. 28, 2015, Tr. at 346:3-5 (Montoya)(internal quotation marks omitted).   Montoya then asked Gonzalez, Sr. if he or his family was in any danger, to which Gonzalez, Sr. responded: "No.  I'm just saying."  Jan. 28, 2015, Tr. at 340:7-10 (Swainston, Montoya)(internal quotation marks omitted).

In the Motion, Gonzalez, Sr. does not raise any Fifth Amendment challenges to those statements, but argues only that they are "fruit of the poisonous tree[,] because the arrest and comments made were a direct result of the drugs found during the illegal search."  Motion at 8. Because the Court has concluded that Almonte and Marquez had probable cause to stop Gonzalez, Sr.'s truck and to search his trailer based on the DEA's investigation of the Varela DTO, any subsequent statements that Gonzalez, Sr. made were not the fruit of an unlawful search or seizure.  Consequently, the Court will not suppress Gonzalez, Sr.'s statements on those grounds.

III.   **IF THE COURT COULD NOT IMPUTE MAESTAS' PROBABLE CAUSE TO ALMONTE AND MARQUEZ, THEIR SEARCH OF GONZALEZ, SR.'S TRAILER WOULD HAVE VIOLATED THE FOURTH AMENDMENT.**

If the Court could not impute Maestas' probable cause to the deputies, their search of Gonzalez, Sr.'s trailer would have violated the Fourth Amendment.  Almonte's initial traffic stop of Gonzalez, Sr. was justified based on witnessing Gonzalez, Sr. commit two traffic infractions. Once Gonzalez, Sr.'s record check came back negative, however, Almonte could not continue holding onto his license and insurance card without reasonable suspicion that he was involved in criminal activity.  Because Almonte and Marquez did not have such reasonable suspicion, if the Court could not impute Maestas' probable cause to Marquez and Almonte, it would have to suppress any contraband that the deputies discovered in a subsequent search of Gonzalez, Sr.'s trailer, and any post-arrest statements that he made as the fruit of an unlawful search and seizure.

   A.   **ALMONTE'S INITIAL TRAFFIC STOP OF GONZALEZ, SR. WAS JUSTIFIED.**

A routine traffic stop is "a relatively brief encounter" and "is more analogous to a so-called <u>Terry</u> stop . . . than to a formal arrest."  <u>Knowles v. Iowa</u>, 525 U.S. 113, 116 (1998)(internal quotation marks omitted).  The first step in analyzing the reasonableness of a routine traffic stop is determining "whether the officer's action was justified at its inception." <u>United States v. Wilson</u>, 96 F. App'x 640, 643 (10th Cir. 2004)(unpublished).  "A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  <u>United States v. Reyes-Vencomo</u>, 866 F. Supp. 2d 1304, 1334 (D.N.M. 2012)(Browning, J.)(citations omitted)(internal quotation marks omitted).  Almonte was justified in temporarily detaining Gonzalez, Sr., because he saw Gonzalez, Sr. commit two traffic offenses: (i) displaying an expired temporary registration tag; and (ii) failing to have a license

plate on his truck's rear bumper.[42]  See Whren v. United States, 517 U.S. at 808, 819 ("Here the District Court found that the officers had probable cause to believe that the petitioners had violated the traffic code.  That rendered the stop reasonable under the Fourth Amendment . . . .").

Gonzalez, Sr. concedes that the traffic stop was lawful, because he committed two traffic violations.  See Jan. 30, 2015, Tr. at 369:5-23 (Court, Walz).  Although the Incident Report mentions only that Gonzalez, Sr. "display[ed] an expired temporary registration," Incident at 2, and says nothing about his failure to have a license plate on his rear bumper, Almonte testified at the suppression hearing that he saw Gonzalez, Sr. commit both violations, see Jan. 28, 2015, Tr. at Jan. 28, 2015, Tr. at 226:22-230:11 (Swainston, Almonte).  Accordingly, Almonte was justified in stopping Gonzalez, Sr., because he saw Gonzalez, Sr. commit two traffic infractions.

B.    **MARQUEZ AND ALMONTE IMPERMISSIBLY EXTENDED THE TRAFFIC STOP WHEN THEY FAILED TO RETURN GONZALEZ, SR.'S LICENSE AND INSURANCE.**

Like a Terry stop, a traffic stop that is lawful at its inception can violate the Fourth Amendment if it "lasts longer than is necessary to effectuate [its] purpose."  Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015)(citation omitted).  Ordinarily, "this limits the officer to a request for the driver's license and registration, a computer check on the car and driver, an inquiry about the driver's travel plans, and the issuance of a citation."  United States v. Cervine, 347 F.3d 865, 871 (10th Cir. 2003).  Once the officer completes these tasks, the driver "must be allowed to proceed on his way unless reasonable suspicion exists that the driver is engaged in

---

[42]Neither the Incident Report nor the United States identifies which sections of the Texas Transportation Code Gonzalez, Sr. violated.  Displaying an expired registration tag violates § 502.407(a)(1) of the Texas Transportation Code, which prohibits "operat[ing] on a public highway . . . a motor vehicle, trailer, or semitrailer" with an expired registration tag.  Tex. Transp. Code § 502.407(a)(1).  Failing to display a license plate on a vehicle's rear bumper violates § 504.493(a) of the Texas Transportation Code, which prohibits "operat[ing] on a public highway . . . a motor vehicle that does not display two license plates."  Tex. Transp. Code § 504.493(a).

criminal activity or the driver consents to additional questioning." United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005). "[I]f the officer returns the [driver's] license and registration" after completing those tasks, however, "and asks questions without further constraining the driver," the traffic stop "may become a consensual encounter, requiring no reasonable suspicion." United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). The Tenth Circuit has held that "an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to [him or her]."[43] United States v. Guerrero-Espinoza, 462 F.3d 1302, 1308-09 (10th Cir. 2006)(emphasis in original)(citation omitted)(internal quotation marks omitted).

Almonte testified that, after obtaining Gonzalez, Sr.'s license and insurance, and asking him a few questions, he left Marquez with Gonzalez, Sr., so that he could run a record check on Gonzalez, Sr. in his patrol car. See Jan. 28, 2015, Tr. at 232:4-8 (Swainston, Almonte); id. at 284:7-10 (Swainston, Marquez). Almonte said that Gonzalez, Sr.'s record check came back negative, indicating that he had no outstanding arrest warrants. See Jan. 28, 2015, Tr. at 238:8-10 (Swainston, Almonte). Rather than returning Gonzalez, Sr.'s license and insurance to him, however, Almonte left them in his patrol car, see Jan. 28, 2015, Tr. at 248:11-24 (Swainston, Almonte); id. at 260:10-20 (Walz, Almonte), and proceeded to ask Gonzalez, Sr. a series of questions -- if he had anything illegal, any cocaine, marijuana, methamphetamine, or heroin in

---

[43]The Tenth Circuit has said that, during a "routine traffic stop, an officer's retention of a defendant's documents is significant because it indicates that the defendant, as a general rule, did not reasonably feel free to terminate the encounter and, therefore, the government cannot rely on the defendant's consent to justify further detention, questioning, or a search." United States v. Burch, 153 F.3d 1140, 1143 (10th Cir. 1998). Accordingly, although examining whether an officer and driver are engaged in a consensual encounter "typically requires the court to focus on the totality of the circumstances in a particular case, this circuit has consistently applied at least one bright-line rule: an officer must return a driver's documentation before the detention can end." United States v. Mendez, 118 F.3d 1426, 1430 (10th Cir. 1997).

his truck, see Jan. 28, 2015, Tr. at 239:7-17 (Almonte).  Gonzalez, Sr. answered no to each of these questions.  See Jan. 28, 2015, Tr. at 239:7-17 (Almonte).  Only after asking this series of questions did Almonte ask for Gonzalez, Sr.'s consent to search his trailer.  See Jan. 28, 2015, Tr. at 239:18-20 (Almonte).

Although Almonte and Marquez could lawfully ask Gonzalez, Sr. questions "during a lawful traffic stop that are unrelated to the stop," their questioning could not extend the length of stop.  United States v. Guerrero-Espinoza, 462 F.3d at 1308 n.6 (emphasis in original).  Once Almonte completed the records check, and chose not to issue Gonzalez, Sr. a citation or a warning, the purpose of the traffic stop was complete.  Because Almonte did not return Gonzalez, Sr.'s license and insurance at that point, he needed reasonable suspicion that Gonzalez, Sr. was involved in criminal activity to prolong the stop.  See United States v. Lopez, 443 F.3d 1280, 1285-86 (10th Cir. 2006)(holding unconstitutional an officer's five-minute continued detention of the defendant by failing to return his driver's license after the justification for the initial stop was dispelled); United States v. Gregorie, 426 F.3d at 879 ("In a routine traffic stop, a trooper may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation. . . .  Once those tasks are completed, a driver must be allowed to proceed on his way unless reasonable suspicion exists . . . .").  As Almonte conceded at the suppression hearing, Gonzalez, Sr. was not free to leave when Almonte continued asking him questions, but failed to return his license and insurance.  See Jan. 28, 2015, Tr. at 260:10-20 (Almonte).

The United States argues that Almonte and Marquez had reasonable suspicion to extend the traffic stop, because: (i) Gonzalez, Sr. appeared "a little more nervous than somebody who has just committed a traffic violation," Jan. 28, 2015, Tr. at 285:16-18 (Marquez); (ii) the interior

- 130 -

of Gonzalez, Sr.'s truck was dirty: there were clothes and luggage in the back seat, several empty water bottles, uneaten food on the floorboards, and several empty food wrappers, <u>see</u> Jan. 28, 2015, Tr. at 235:19-236:5 (Swainston, Almonte); <u>id.</u> at 298:1-25 (Swainston, Marquez); and (iii) there were a number of inconsistencies between Gonzalez, Sr.'s answers to the deputies' questions, <u>see</u> Jan. 28, 2015, Tr. at 233:23-234:14 (Swainston, Almonte); <u>id.</u> at 284:15-285:13 (Swainston, Marquez).  These factors -- even when taken together -- did not provide Almonte and Marquez reasonable suspicion to extend the stop.

1.      <u>Gonzalez, Sr.'s Alleged Nervousness.</u>

Gonzalez, Sr.'s alleged nervousness does not weigh heavily in favor of finding reasonable suspicion.  "The Tenth Circuit has 'held consistently that nervousness is of limited significance in determining whether reasonable suspicion exists.'"  <u>United States v. Hernandez-Lopez</u>, 761 F. Supp. 2d 1172, 1201 (D.N.M. 2010)(Browning, J.)(quoting <u>United States v. Simpson</u>, 609 F.3d 1140, 1147 (10th Cir. 2010)).  "Nervousness is of limited value in assessing reasonable suspicion for two reasons."  <u>United States v. Simpson</u>, 609 F.3d at 1147.  First, "it is common for most citizens -- whether innocent or guilty -- to exhibit signs of nervousness when confronted by a law enforcement officer."  <u>United States v. Simpson</u>, 609 F.3d at 1147 (citation omitted)(internal quotation marks omitted).  See <u>United States v. Santos</u>, 403 F.3d 1120, 1127 (10th Cir. 2005)("[N]ervousness is a sufficiently common -- indeed natural -- reaction to confrontation with the police that unless it is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is of limited significance in determining whether reasonable suspicion exists."  (citation omitted)(internal quotation marks omitted)).  Second, "unless the police officer has had significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for

them or nervously." United States v. Simpson, 609 F.3d at 1147.  The Tenth Circuit has thus rejected a Border Patrol agent's bare assertion that the defendant was nervous as insufficient to provide the agent reasonable suspicion, because he had no baseline to which he could compare the defendant's behavior:

> Nothing in the record indicates whether [a Border Patrol agent] had any prior knowledge of Defendant, so we do not understand how [the agent] would know whether Defendant was acting nervous and excited or whether he was merely acting in his normal manner.  Rather, Defendant's appearance to [the agent] is nothing more than an inchoate suspicion or hunch.

United States v. Bloom, 975 F.2d 1447, 1458 (10th Cir. 1992), overruled on other grounds by United States v. Little, 18 F.3d 1499, 1504 n.5 (10th Cir. 1994)(en banc).

Accordingly, "to take into account a suspect's nervousness in any encounter with a law enforcement officer, the officer must have some opportunity from which to determine a baseline behavior, with which the officer can compare the suspect's later nervousness."  United States v. Villaba, 2013 WL 4782206, at *36.  In United States v. Valles, 292 F.3d 678 (10th Cir. 2002), for example, a DEA agent detained the defendant's luggage after his behavior changed from "very easygoing" to "extreme nervousness" when the agent asked him about his luggage.  292 F.3d at 679.  Holding that the defendant's nervousness contributed to a finding of reasonable suspicion, the Tenth Circuit noted that the agent had the opportunity to observe the defendant's behavior before he directed the conversation to the defendant's bags, "thereby giving [the agent] a baseline behavior to which he could compare [the defendant]'s later extreme nervousness."  292 F.3d at 681.  The Tenth Circuit found it particularly significant that the defendant's nervousness "greatly impacted his ability to communicate" and that the agent testified that the defendant "wasn't the same guy [he] was talking to thirty seconds prior."  292 F.3d at 681.

- 132 -

Gonzalez, Sr.'s alleged nervousness does not weigh in favor of finding reasonable suspicion, because Marquez never had an opportunity to determine Gonzalez, Sr.'s baseline behavior.   Unlike the defendant in United States v. Valles, whose behavior completely transformed when the DEA agent asked him about his bags, there is no evidence that Gonzalez, Sr.'s behavior changed considerably while he interacted with Marquez when Almonte was conducting the records check.[44]   That Marquez observed Gonzalez, Sr. for a only a few minutes on the side of the road during a traffic stop at 4:00 in the morning makes it even less likely that he had an opportunity to determine Gonzalez, Sr.'s baseline behavior.   See Jan. 28, 2015, Tr. at 285:14-286:2 (Marquez).

Although "[e]xtreme and persistent nervousness . . . is entitled to somewhat more weight," United States v. Simpson, 609 F.3d at 1147 (citation omitted)(internal quotation marks omitted), Gonzalez, Sr.'s nervousness was neither extreme nor persistent.   Marquez testified that Gonzalez, Sr. "had a certain level of nervousness" that was "a little more nervous than somebody who has just committed a traffic violation."   Jan. 28, 2015, Tr. at 285:16-18 (Marquez). Marquez did not find Gonzalez, Sr.'s nervousness significant enough to note it in the Incident Report, however, and Almonte apparently did not notice it at all -- Almonte did not mention that Gonzalez, Sr. appeared nervous at any point during his testimony at the suppression hearing.   For

---

[44]Marquez noted that Gonzalez, Sr.'s demeanor changed "[w]hen he asked about the drug dog" -- he started laughing, despite the fact that they were not having a "humorous conversation[]."   Jan. 28, 2015, Tr. at 328:10-13 (Marquez).   Marquez testified, however, that Gonzalez, Sr. asked about the drug dog after Almonte asked for his consent to conduct a search, and after Gonzalez, Sr. signed the Consent Form.   See Jan. 28, 2015, Tr. at 327:9-15 (Marquez). Neither Marquez nor Almonte testified that Gonzalez, Sr.'s demeanor changed in the key timeframe before Almonte finished the records check and began asking Gonzalez, Sr. more questions.   Because the deputies impermissibly prolonged the traffic stop by not returning Gonzalez, Sr.'s license and registration after his records check came back clean, it is irrelevant to the reasonable suspicion analysis that his demeanor changed after he signed the Consent Form.

these reasons, the Court is reluctant to give much weight to this factor in the reasonable-suspicion analysis.

### 2.    The Messy Interior of Gonzalez, Sr.'s Truck.

The presence of trash, clothing, and uneaten food in Gonzalez, Sr.'s truck also does not weigh heavily in favor of finding reasonable suspicion.  Almonte testified that Gonzalez, Sr.'s truck was "very dirty" -- there was "some clothing and luggage on the rear bench seat," several empty water bottles, "uneaten food on the floor boards, and several food wrappers and containers empty in the vehicle."  Jan. 28, 2015, Tr. at 235:24-236:4 (Almonte).  Almonte testified that the items inside Gonzalez, Sr.'s truck were "indicative of narcotics trafficking, because traffickers like to go from point A to point B [in] . . . as short a time as possible without stopping."  Jan. 28, 2015, Tr. at 236:22-25 (Almonte).  Marquez gave an almost identical explanation why the empty food containers in Gonzalez, Sr.'s truck were suspicious.  See Jan. 28, 2015, Tr. at 289:9-15 (Marquez)("[W]hen we find a lot of food wrappers, beverage[s] . . . , clothing thrown around, it tells us that this person wants to get from point A to point B as quickly as possible, either because they've already got contraband [or] they're on the way to pick up contraband.").

The Tenth Circuit has held that the presence of trash, fast-food wrappers, and empty food containers in a vehicle does not add much to the reasonable-suspicion calculus, because "a very large category of presumably innocent travelers" possess such items.  United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997)("Remnants from fast-food restaurants can probably be found on the floor of many cars traveling the interstate highways . . . .").  See United States v. Olivares-Campos, 276 F. App'x 816, 823 (10th Cir. 2008)(unpublished)("[A]s anyone who travels cross-country on I-70 well knows, fast food exists in overabundance and fuels many long haul drives.").  Other circuits agree.  See Karnes v. Skrutski, 62 F.3d 485, 496 (3d Cir. 1995)(noting

- 134 -

that fast-food wrappers "have become ubiquitous in modern interstate travel and do not serve to separate the suspicious from the innocent traveler").  Drug traffickers may "like to go from point A to point B [in] . . . as short of time as possible without stopping," Jan. 28, 2015, Tr. at 236:22-25 (Almonte), but so do many travelers who are not involved in illegal activities.  The Court often travels to Texas and southeastern New Mexico, and regularly eats along the way to save time.  Some of the trash from those meals inevitably ends up in the passenger seat or on the floorboard of the Court's vehicle.  That Gonzalez, Sr. may have eaten his dinner on the road and not have kept his truck's interior clean does not distinguish him from the average lawful driver.  Accordingly, "any suspicion associated with these items is virtually nonexistent."  United States v. Wood, 106 F.3d at 947.

That there was clothing strewn about the interior of Gonzalez, Sr.'s truck also does not weigh heavily in favor of reasonable suspicion.  The United States has not provided -- and the Court has been unable to find -- a case in which a court found the presence of clothing in a vehicle significant in a reasonable-suspicion analysis.  Although an officer's observation that the defendant's amount of luggage is inconsistent with the stated purpose of his or her trip sometimes bolsters a finding of reasonable suspicion, see United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995)(finding lack of luggage suspicious for an alleged two week trip); United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)(noting that no luggage in either trunk or back seat on a long-distance trip could be suspicious), the United States has not advanced that argument here.  The Court sees no reason why the presence of clothing in Gonzalez, Sr.'s truck -- in and of itself -- suggests that he was involved in criminal activity.  This factor thus provides little support to a finding of reasonable suspicion.

3.      **Gonzalez, Sr.'s Inconsistent Answers to the Deputies' Questions**.

Gonzalez, Sr.'s inconsistent answers to Almonte's and Marquez' questions weigh in favor of finding reasonable suspicion.   A defendant's "[i]nconsistent answers to routine questions" from law enforcement officers "may give rise to a reasonable suspicion." United States v. Gutierrez, 2008 WL 2397668, at *26 (citation omitted).  See United States v. Turner, 928 F.2d 956, 959 (10th Cir. 1991)(finding reasonable suspicion established where defendant claimed to be mechanic but had clean, well-manicured hands, expensive clothes, and a large CD collection; car was not registered to defendant or passenger; and defendant was increasingly nervous throughout the encounter); United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990)(finding reasonable suspicion where defendant had an Illinois driver's license but drove a car with California plates, could not provide registration for the vehicle, and gave inconsistent answers to officers regarding his destination).

Gonzalez, Sr. gave two inconsistent answers to the deputies' questions on two occasions. First, while Gonzalez, Sr. told Almonte that he was on his way to pick up a horse, see Jan. 28, 2015, Tr. at 233:23-234:14 (Swainston, Almonte), he told Marquez that he was on his way to pick up two mares and a colt, see Jan. 28, 2015, Tr. at 284:15-23 (Swainston, Marquez).  Second, while Gonzalez, Sr. initially told Marquez that he was going to pick up two mares and a colt that "were his," Incident Report at 9, he later told Marquez that he was going to pick up horses "that belonged to the owner of the farm," Incident Report at 9.  Because "[c]onfusion about details is often an indication that a story is being fabricated on the spot," United States v. Santos, 403 F.3d at 1131, this factor weights in favor of finding reasonable suspicion.

**4.     If the Court Could Not Impute Maestas' Probable Cause to the Deputies, the Totality of the Circumstances Did Not Provide the Deputies Reasonable Suspicion to Continue to Detain Gonzalez, Sr.**

None of the factors on which the United States relies would, standing alone, justify the prolonged detention of Gonzalez, Sr.  Indeed, the United States acknowledges that, when viewed independently, each of the factors is "completely innocuous."  Jan. 30, 2015, Tr. at 397:21 (Swainston).  The Tenth Circuit has instructed, however, that the Court "may not . . . engage in a divide-and-conquer analysis, evaluating and disposing of each factor individually."  United States v. Karam, 496 F.3d 1157, 1165 (10th Cir. 2007)(citation omitted)(internal quotation marks omitted).  The Court must instead consider "the totality of the circumstances -- the whole picture" in determining whether Almonte and Marquez had a "particularized and objective basis for suspecting [Gonzalez, Sr.] of criminal activity."  United States v. Cortez, 449 U.S. at 417-18.

The Court concludes that, without imputing Maestas' probable cause to Almonte and Marquez, the deputies did not have reasonable suspicion that Gonzalez, Sr. was involved with criminal activity to prolong the traffic stop.  Two of the three factors upon which the deputies relied -- that the interior of Gonzalez, Sr.'s truck was dirty and that Gonzalez, Sr. appeared "a little more nervous than somebody who has just committed a traffic violation," Jan. 28, 2015, Tr. at 285:16-18 (Marquez) -- merit little to no weight in the reasonable-suspicion calculus.  While the final factor -- the inconsistencies between Gonzalez, Sr.'s statements -- weighs in favor of finding reasonable suspicion, the totality of the circumstances is insufficient to meet the reasonable-suspicion standard.

Once the information from the DEA's investigation into the Varela DTO is taken out of the equation, this case presents similar circumstances to those in United States v. Wood.  There, the district court upheld an officer's prolonged stop of the defendant based on five factors: (i) the

defendant's "unusual" travel plans: he planned a two-week vacation in California, flew there one-way in a commercial airplane, rented a car in California, and then planned to drive the rental car back to Kansas; (ii) the defendant was "extremely nervous" during the traffic stop; (iii) the defendant had prior convictions involving illegal drugs; (iv) the defendant said that he rented the car in San Francisco, California, when he had actually rented the car in Sacramento, California; and (v) the officer saw fast-food wrappers and open maps in the passenger compartment of the defendant's rental car.  See 106 F.3d at 946-48.  The Tenth Circuit reversed, explaining that, "[a]lthough the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."  106 F.3d at 948 (citation omitted)(internal quotation marks omitted). The Tenth Circuit cautioned that, "[t]o sanction a finding that the Fourth Amendment permits a seizure based on such a weak foundation would be tantamount to subjecting the traveling public to virtually random seizures, inquisitions to obtain information which could then be used to suggest reasonable suspicion, and arbitrary exercises of police power."  106 F.3d at 948.

The United States asks the Court to find reasonable suspicion for the deputies to prolong their traffic stop of Gonzalez, Sr. based on a weaker foundation than the Tenth Circuit found insufficient in United States v. Wood.  Like the defendant in United States v. Wood, Gonzalez, Sr. made inconsistent statements, appeared nervous during the traffic stop, and had a dirty truck. Unlike the defendant in United States v. Wood, however, Gonzalez, Sr. had no criminal record. Moreover, Gonzalez, Sr.'s inconsistent statements were not any more egregious than the defendant's in United States v. Wood.  While the defendant in United States v. Wood misstated where he picked up his rental car, Gonzalez, Sr. misstated how many horses he planned to pick

up and to whom they belonged.  Especially in light of the fact that Gonzalez, Sr. made his statements while answering questions from two uniformed deputies on the side of the highway at 4:00 in the morning, the Court is reluctant to find that his conduct established reasonable suspicion when the facts of this case track so closely to that of United States v. Wood.  The Court thus concludes that Marquez and Almonte impermissibly extended the traffic stop.

If the Court could not impute Maestas' probable cause to Marquez and Almonte, and the deputies did not have reasonable suspicion to prolong the traffic stop, any subsequent consent that they obtained from Gonzalez, Sr. to search his trailer was invalid.[45]  See United States v. Gregory, 79 F.3d 973, 979-80 (10th Cir. 1996)(holding a search unlawful, because the preceding illegal detention tainted it); United States v. Thompson, 712 F.2d 1356, 1361 (11th Cir. 1983)("Because Thompson was illegally detained when he gave his consent, however, the district court's conclusion that Thompson's consent was voluntary is insufficient to validate the seizure and search.").  Accordingly, if the deputies could not rely on Maestas' probable cause, the Court would suppress the marijuana and cocaine, and Gonzalez, Sr.'s statements to Marquez and Montoya as the fruit of an unlawful search.  See United States v. Elliott, 107 F.3d 810, 813

---

[45]The United States does not argue that, even if the deputies impermissibly prolonged the traffic stop of Gonzalez, Sr., their unlawful seizure did not taint Gonzalez, Sr.'s subsequent consent.  In any event, the Court concludes that the taint of the deputies' unlawful seizure of Gonzalez, Sr. was not purged by the time the deputies obtained his consent.  If a defendant's consent is given after an illegal stop, the United States "carries a heavy burden of showing that the primary taint of the illegal stop was purged."  United States v. Gregory, 79 F.3d at 978.  The United States must prove, from the totality of the circumstances, a sufficient attenuation or "break in the causal connection between the illegal detention and the consent."  United States v. McSwain, 29 F.3d 558, 562 n.2 (10th Cir. 1994).  Given the absence of any intervening circumstances and that Gonzalez, Sr. consented to the search while the illegal detention was still ongoing, the Court finds that the taint of the illegal seizure -- if the deputies did not have probable cause from the DEA's investigation -- was not purged when Gonzalez, Sr. consented to the search.  See United States v. Fernandez, 18 F.3d 874, 883 (10th Cir. 1994)(finding taint not purged where "only moments" passed between the illegal detention and the defendant giving consent); United States v. Maez, 872 F.2d 1444, 1447, 1455 (10th Cir. 1989)(concluding taint not purged where defendant signed a consent form signed thirty minutes after illegal arrest).

(10th Cir. 1997)(holding that, after a traffic stop ends, and absent reasonable suspicion or voluntary consent to additional questioning, "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms").

### C.   IF THE DEPUTIES HAD REASONABLE SUSPICION TO FURTHER DETAIN GONZALEZ, SR., THEIR SEARCH OF HIS TRAILER WAS VALID PURSUANT TO GONZALEZ, SR.'S CONSENT.

In addition to arguing that the deputies "lacked reasonable suspicion to further detain" him after the traffic's stop purpose was complete, Gonzalez, Sr. also argues that he did not voluntarily consent to the deputies' search of his trailer.  Motion at 8.  "Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search warrant and probable-cause requirements."  United States v. Alabi, 2013 WL 2284956, at *42.  "A person who is being detained may still give a voluntary consent," so long as the detention was lawful. United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996)("A person who is being detained may still give a voluntary consent.").  The United States has the burden of proving valid consent to a warrantless search.  See United States v. Cody, 7 F.3d 1523, 1526 (10th Cir. 1993).  The Tenth Circuit's two-part test for determining whether consent is given voluntarily requires that the United States: "(1) proffer clear and positive testimony that consent was unequivocal and specific and intelligently given, and (2) the officers must have used no implied or express duress or coercion."  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998).  The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when determining whether a defendant's consent was voluntarily given:

(i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010)(Browning, J.)(citations omitted)(internal quotation marks omitted).

If the deputies had reasonable suspicion to prolong the traffic stop, Gonzalez, Sr. voluntarily consented to a search of his trailer under the totality of the circumstances.  First, the Court notes that Gonzalez, Sr. signed a consent-to-search form.  Superimposing Gonzalez, Sr.'s statements onto the English portion of the form, the Consent Form reads as follows:

> I, Ramon D. Gonzalez Dob 7-15-66, have been informed of my constitutional right guaranteed under the Fourth Amendment of the U.S. Constitution, not to have a search made hereinafter mentioned without a search warrant, and of my right to refuse consent to a search.  I hereby authorize Luis Almonte M. Marquez, K9 Remo and K9 Remo (Police Dog), Deputy Sheriff(s) of the El Paso County Sheriff's Department, to conduct a complete search of my 2012 Dodge Truck NM72640 Sundowner Horse Trailer (premises, vehicles), located at Interstate 10 West Redd Rd., El Paso County, Texas.  These officers are authorized by me to take any letter, papers, materials, or other property, which they may deem necessary.  This written permission is given by me to the above named officers voluntarily and without threats, promises, or coercion of any kind.

Consent Form at 1.  See Jan. 28, 2015, Tr. at 241:17-243:22 (Swainston, Almonte).  The Consent Form contains Gonzalez, Sr.'s signature, dated November 10, 2011.  See Consent Form at 1. The form does not completely resolve the question whether the consent was voluntary, but it is a factor weighing strongly in favor of finding that it was voluntary.  See United States v. Romero, 247 F. App'x 955, 961-62 (10th Cir. 2007)(unpublished)("Consent is a factual issue to be determined by the totality of the circumstances, not by per se rules.  In other words, no one factor

-- including the execution of a consent-to-search form -- is dispositive."). Gonzalez, Sr. took approximately two minutes to read and fill out the Consent Form, see Jan. 28, 2015, Tr. at 244:11-13 (Swainston, Almonte), suggesting that he had a sufficient amount of time to read and understand it.

That two deputies were present when Gonzalez, Sr. consented to the search and that the deputies did not return Gonzalez, Sr.'s driver's license and insurance both weigh in favor of finding that Gonzalez, Sr.'s consent was involuntary. Those factors are not dispositive, however. See United States v. Fuller, 374 F.3d 617, 622 (8th Cir. 2004)(concluding that the district court did not clearly err in finding voluntary consent to search where the officer requesting consent was holding the individual's driver's license at the time and three armed police officers were present). Most of the other circumstances also weigh in favor of finding that Gonzalez, Sr.'s consent was voluntary. Gonzalez, Sr. was also not in a private, isolated place when he gave his consent; he was in the full view of the public on the side of the interstate. See United States v. Romero, 743 F. Supp. 2d 1281, 1337 (D.N.M. 2010)(Browning, J.)(finding that the defendant's consent to search was voluntary, and relying, in part, on the fact that the defendant was not in a private, isolated place when the officers asked for permission to search; rather, the defendant was in full view of the public through the windows of the officer's vehicle). When Gonzalez, Sr. read and signed the Consent Form, Almonte's drug-detection dog, Remo, was in Almonte's patrol car. See Jan. 28, 2015, Tr. at 245:12-19 (Swainston, Almonte). Before Gonzalez, Sr. signed the Consent Form, his discussion with Almonte was "conversational, . . . low voice tone, and cooperative." Jan. 28, 2015, Tr. at 245:7-11 (Swasinton, Almonte). Almonte did not tell Gonzalez, Sr. that he had to sign the consent or "force him to sign the consent in any way." Jan. 28, 2015, Tr. at 245:12-15 (Swainston, Almonte). When Almonte gave the Consent Form to

Gonzalez, Sr., Marquez took a couple steps away from Gonzalez, Sr. so that he did not feel intimidated by two deputies being right next to him.   See Jan. 28, 2015, Tr. at 288:3-18 (Swainston, Marquez).   When Gonzalez, Sr. reviewed and signed the Consent Form, he appeared calm and was mainly silent, except when Almonte asked if he would consent to the search, and Gonzalez, Sr. said "yes."   Jan. 28, 2015, Tr. at 245:20-246:2 (Swainston, Almonte).   There was also no evidence of "physical mistreatment, violence, threats, threats of violence, promises or inducements or deception or trickery."   United States v. Romero, 743 F. Supp. 2d at 1338.

The Court finds that, under the totality of circumstances, Gonzalez, Sr. voluntarily consented to his trailer's search.   See United States v. Herrell, 41 F. App'x 224, 232-33 (10th Cir. 2002)(unpublished)(finding that, given the totality of the circumstances, the defendant's consent to search the van and its contents was voluntary where: (i) the defendant signed a written consent form consenting to the search, which informed the defendant that he did not have to sign the form; (ii) although the defendant may not have read the form before signing it, he was within hearing distance when another officer read the form to another person; (iii) there was no testimony that the officer threatened the defendant, used a hostile tone of voice, touched the defendant, or displayed his weapon; and (iv) although the defendant was detained, this factor was not determinative); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the district court properly found that the defendant's consent was voluntary where the defendant read the form before he signed it, and the district court found that the officer did not threaten the defendant).   Accordingly, if the deputies had reasonable suspicion to prolong the traffic stop of Gonzalez, Sr., their subsequent search would have been valid pursuant to Gonzalez, Sr.'s knowing and voluntary consent.[46]

_____

[46]Gonzalez, Sr. has not argued that the deputies' search exceeded his consent's

In sum, the Court concludes that Maestas developed probable cause to stop Gonzalez, Sr.'s truck and to search his trailer based on the DEA's investigation into the Varela DTO, and that Almonte and Marquez lawfully stopped Gonzalez, Sr.'s truck and searched his trailer based on that probable cause.[47]  Because the stop and search was lawful, the Court will not suppress the

_____

permissible scope.  In any event, the Court concludes that the deputies did not exceed his consent's permissible scope.  Gonzalez, Sr. consented to a search of his truck and his trailer.  See Consent Form at 1.  Pursuant to that consent, Almonte conducted a search with his drug detection dog, Remo, who alerted to the presence of drugs in Gonzalez, Sr.'s trailer.

It is well-settled law in the Tenth Circuit that a trained drug detecting dog's alert, without more, provides law enforcement officers with probable cause to search the vehicle.  See United States v. Ludwig, 10 F.3d 1523, 1527 (10th Cir. 1993); United States v. Carbajal-Iriate, 586 F.3d at 803 (explaining that the drug detection dog's "positive alert to the drugs in the van provided probable cause").  Once probable cause is found, the entire vehicle may be searched, including containers and its contents.  See United States v. Ross, 456 U.S. 798, 799 (1982).

Almonte and Marquez had probable cause to search Gonzalez, Sr.'s trailer based on Remo's alert.  When Almonte and Remo approached Gonzalez, Sr.'s trailer, Remo immediately alerted to the presence of drugs at the trailer's rear.  See Jan. 28, 2015, Tr. at 246:12-15 (Almonte).  Remo then alerted several times along the side of the trailer and once at the trailer's nose.  See Jan. 28, 2015, Tr. at 246:16-21 (Almonte).  Almonte and Marquez thus had probable cause to believe that there were narcotics in the trailer after Remo alerted.  See United States v. Carbajal-Iriarte, 586 F.3d at 802-03 ("Here, the officers had an independent legal basis upon which to proceed because the dog's positive alert to the presence of drugs in the van provided probable cause.").

[47]The deputies did not disclose to Gonzalez, Sr. during the traffic stop that they obtained probable cause to stop him and to search his trailer from the DEA's investigation into the Varela DTO.  In fact, the Consent Form suggested that they did not have such probable cause when it said that Gonzalez, Sr. had a "right to refuse consent to a search."  Consent Form at 1.  The deputies' failure to inform Gonzalez, Sr. of the DEA's investigation of the Varela DTO and the Consent Form's statement did not make their search of Gonzalez, Sr.'s trailer unlawful, however.  Cf. United States v. Williams, 627 F.3d at 253 ("[T]he collective knowledge doctrine is unaffected by an officer's use of a cover story to disguise a stop as a mere traffic stop.").  Relying on the Supreme Court's holding in Whren v. United States that an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," 517 U.S. at 813, courts have held that officers may validly conduct a stop and a search of a vehicle based on probable cause from an ongoing investigation, even where the officers do not reveal the ongoing investigation, and instead rely on the pretext of a traffic stop and the defendant's consent to conduct the search.  See United States v. Chavez, 660 F.3d 1215, 1225 (10th Cir. 2011)(finding a defendant validly consented to officer's search of his vehicle, even though the officer never disclosed that he had probable cause from an ongoing drug investigation); United States v. Bivens, 204 F. App'x 835, 836 (11th Cir. 2006)(holding that the

marijuana and cocaine that the deputies discovered in Gonzalez, Sr.'s trailer, or Gonzalez, Sr.'s statements as the fruit of an unlawful search or seizure. If the Court could not impute Maestas' probable cause to the deputies, their search of Gonzalez, Sr.'s trailer would have violated the Fourth Amendment, and the Court would have to suppress the drugs that the deputies discovered in Gonzalez, Sr.'s trailer, and Gonzalez, Sr.'s statements as the fruit of an unlawful search and seizure.

**IT IS ORDERED** that the Motion to Suppress, filed August 7, 2014 (Doc. 675), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Reeve L. Swainston
Cynthia L. Weisman
Stephen R. Kotz
  Assistant United States Attorneys
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Jerry A. Walz
Walz & Associates
Albuquerque, New Mexico

        *Attorneys for the Defendant*

---

defendant validly consented to the officer's search, even though the officer's Terry stop of the defendant was a pretext to disguise a money-laundering investigation that the officer did not disclose to the defendant.). Although the deputies' failure to disclose the information that they gleaned from the DEA investigation can be viewed as deceiving, pretextual stops in general are a deceiving practice: they use the pretext of a traffic stop to conceal an officer's true motivations for conducting the stop. Given that the Supreme Court has made clear that an officer's subjective motivations for conducting a stop are irrelevant, the Court sees no sound reason why an officer's subjective motivations for conducting a search have any bearing on whether the search was reasonable under the Fourth Amendment.